[No. S017869. Jan. 28, 2002.]

THE PEOPLE, Plaintiff and Respondent, v.
KRISTIN WILLIAM HUGHES, Defendant and Appellant.

## COUNSEL

Fern M. Laethem, State Public Defender, Jeffrey J. Gale, Acting State Public Defender, under appointment by the Supreme Court, Erik Larson, Therene Powell, Douglas G. Ward and Donald J. Ayoob, Deputy State Public Defenders, for Defendant and Appellant.

Bill Lockyer, Attorney General, David P. Druliner, Chief Assistant Attorney General, Ronald A. Bass, Assistant Attorney General, Joan Killeen, Donna B. Chew and Morris Lenk, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**GEORGE, C. J.**—Defendant Kristin William Hughes appeals from a judgment of the Monterey County Superior Court imposing a sentence of death following his conviction of first degree murder (Pen. Code, § 187),[1] first degree robbery (§ 211), first degree burglary (§ 459), and sodomy (§ 286, subd. (c)). The jury found true the special circumstance allegations that the killing was committed in the perpetration of burglary (§ 190.2, subd. (a)(17)(G)), robbery (*id.*, subd. (a)(17)(A)), and forcible sodomy (*id.*, subd. (a)(17)(D)), and it also found true the allegations that, as to all four counts, defendant personally used a deadly or dangerous weapon, a knife (§ 12022, subd. (b)).[2]

In addition to sentencing defendant to death on the murder conviction, the trial court imposed a total determinate term of 14 years and eight months on the remaining convictions, but stayed that term pending this appeal of the death judgment. Defendant's appeal is automatic. (§ 1239, subd. (b).) We affirm the judgment in its entirety.

### I. FACTS AND PROCEDURE

On September 7, 1989, after ingesting cocaine and alcohol for much of the prior day and night, defendant reported for work as a construction laborer, but soon passed out at the jobsite. Richard James, defendant's boss, found him lying on the ground with his eyes partially open. Defendant jumped up and attempted to speak, slurred badly, and had trouble standing. James told defendant to go home and "straighten himself up."

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

[2] Prior to trial, defendant pleaded guilty to related charges of receiving stolen property (§ 496; two counts) and admitted an alleged prior serious felony conviction (§ 667, subd. (a)).

Defendant's home was in Pacific Grove, less than one-half of a mile from the jobsite. Defendant recently had moved into Jan Bishop's studio apartment. Upstairs from Bishop resided Kim Hickman, a masseuse employed at a shop in Monterey.

Hickman returned from the shop to her apartment at approximately 12:00 noon to clean it in preparation for vacating the premises. (During the prior two weeks she had been sleeping at her boyfriend's home, during which time she had begun moving her possessions to his house.) Defendant had met Hickman briefly the prior day, when she had dropped off a birthday present for Bishop at Bishop's apartment.

Shortly after 8:00 p.m., an apartment complex neighbor, Olav Kvaslerud, noticed water seeping through his living room ceiling. Kvaslerud went to Hickman's unit to investigate the leak, but received no response. He then inquired at Bishop's unit, to determine whether there was leakage there as well. Defendant answered the door and did not appear to be intoxicated. Defendant accompanied Kvaslerud to his apartment, where they viewed the leak, which had turned a "little reddish." Kvaslerud asked defendant whether he thought the liquid contained blood. Defendant did not answer, and left.

Kvaslerud looked inside Hickman's apartment from a window and saw a woman's body. He called the police, who found Hickman's door unlocked. Pacific Grove Officers Heredia and Cox arrived, and observed Hickman on her back in the kitchen, dead, her clothes pulled or torn away, and her ankles and legs propped up against the wall. There was an object (later determined to be defendant's suspenders) wrapped around her neck. Hickman had suffered numerous deep stab and puncture wounds to her chest. Her shirt was soaked in blood, which had flowed and commingled with water dripping from the open, defrosting refrigerator.

Detective Kennedy and Detective Uretsky of the Pacific Grove Police Department were summoned to the scene. They noticed that Hickman was wearing rubber cleaning gloves, and that there was a small scouring sponge saturated with blood and water next to her. Blood was spattered and apparently had been smeared and streaked with a sponge on the walls, stove, and refrigerator. A bloodied hunting knife was on the kitchen floor. Blood was found on various other objects throughout the unit. There were no signs of forced entry into the apartment.

After the police arrived, Bishop walked to the nearby beach at Lover's Point to look for defendant. She saw him there and yelled to him that she thought Hickman had committed suicide. Bishop returned to the area of her

apartment, where she sat down outside. Approximately 15 minutes later, defendant also returned and sat next to Bishop, but told her he could not stay because the presence of the police cars made him nervous.

After transferring control of the crime scene to Kennedy and Uretsky, Officers Heredia and Cox went outside to maintain security and prevent persons from entering the premises. They cordoned off the area with tape and spoke with several individuals to determine whether they had information or might be witnesses.

At approximately 11:45 p.m., Heredia and Cox saw defendant walking near the crime scene. Heredia, in uniform, walked toward defendant and had a brief conversation with him. Heredia inquired whether he could help defendant, and defendant replied that he lived in apartment No. 2. Heredia thought that to be odd, because the officers had spoken with Bishop, who had not mentioned having a boyfriend, husband, or roommate. Heredia asked defendant whether anyone else had spoken with him before Heredia had done so. Defendant replied that he had been there when the police first arrived, and an officer had spoken with him then and had told him that the situation was not "that big a deal" and that defendant could return in a few hours. Heredia told defendant that the situation was "more involved" and that the officers likely would be at the scene until at least late the next day. Defendant replied that this was fine with him and that he would return the next day.

Officer Heredia thought that these responses seemed strange under the circumstances. Although he and Officer Cox had been first on the scene, he had not seen defendant speaking with any other officer earlier in the evening. At that point, Heredia decided that Detective Kennedy should speak with defendant, and he summoned Kennedy, who joined the officers and defendant about a minute later. Upon Kennedy's arrival, Heredia noticed, and pointed out, what appeared to be bloodstains on defendant's jacket, which was draped on his arm.

Throughout these exchanges, the officers smelled alcohol on defendant's breath and noticed that he had glassy eyes, seemed slightly intoxicated but not "drunk," and although somewhat unsteady, did not have trouble standing. Detective Kennedy found defendant's speech to be slightly slurred.

Detective Kennedy observed that defendant wore a white shirt bearing a small stain that appeared to be blood, that the front of defendant's jeans was wet, and that defendant was smoking a Kool brand cigarette. When Kennedy asked defendant whether the jacket on his arm belonged to him, defendant

replied that it did. Kennedy asked about the stains on the jacket, and defendant replied that they were from rust. Kennedy informed defendant that he was investigating an assault, and asked whether he could take his jacket and have a criminalist check it for blood. Defendant replied, "Go ahead," and gave the jacket to Kennedy. The detective took the jacket to a criminalist who was in the crime scene apartment, where he learned that a blood-saturated Kool brand cigarette had been found on the floor directly above Hickman's right shoulder. The tests on the jacket were inconclusive for fresh blood.

During the few minutes in which Detective Kennedy was having the jacket tested, Officers Heredia and Cox remained with defendant. Kennedy returned, stated that the tests were inconclusive, and asked defendant whether he would travel to the police station to speak with him there. Defendant replied, "Sure." Subsequently, Heredia retrieved a cigarette butt—later determined to be Kool brand—that defendant had discarded on the ground.

Detective Kennedy testified that because defendant lived near the victim, he wanted to interview defendant in order to determine whether he had information relating to the homicide investigation, and that it was more appropriate to speak at the station, rather than on the dark street. Defendant was cooperative and expressed no hesitation about traveling to the police station.

Detective Kennedy asked Officer Cox to transport defendant to the police station. Before doing so, Cox handcuffed defendant and placed him in the back of a patrol car, explaining that defendant was not under arrest but was being handcuffed for safety reasons. (Officer Cox and Detective Kennedy both testified that this was an "acceptable" procedure used by the police department for transportation of unfamiliar persons, even if not suspects, and that such decisions are left to the transporting officer's discretion.) Defendant said that he understood, and expressed no reluctance about being handcuffed or traveling to the station. Upon their arrival at the station, Officer Cox removed the handcuffs as soon as defendant exited from the car. Detective Kennedy estimated that, from the time defendant first was seen by the officer until the time he left for the police station, only about seven to 10 minutes elapsed.

Within a few minutes of defendant's arrival at the police station, Detective Kennedy told defendant several times that he was not under arrest, and defendant repeatedly acknowledged that he understood. After defendant was advised of and waived his constitutional rights, Detective Kennedy video-taped a two-hour interview with defendant beginning at 12:30 a.m. on

September 8. Defendant denied knowing Hickman, or having ever been inside her apartment. During the interview, defendant lit and smoked cigarettes with no coordination problems, and he appeared coherent and responsive.

In the course of the interview, Detective Kennedy noticed "track marks" on defendant's arm, and defendant admitted using cocaine. After the interview, Kennedy arrested defendant for the homicide of Kim Hickman. Kennedy took defendant's fingerprints and palm prints, and also took photographs of defendant's hands and right foot.

Later that morning, defendant's fingerprints and a bloody thumbprint were found at the crime scene, and defendant's fingerprint was found on a pack of Kool brand cigarettes located in a Dumpster adjacent to the apartment. Identifiable prints could not be lifted from the knife or the gloves found at the scene. Subsequently, two latent impressions of defendant's fingerprints also were found on a check that had been given to Hickman by a customer on the morning of her death. That check had been altered and cashed by defendant at a nearby Alpha Beta grocery store, within hours of Hickman's death.

With Bishop's consent, the police searched her apartment and found the following items in a closet and dresser drawer: tennis shoes with a pattern matching prints found at the crime scene, and a maroon-colored Crown Royal bag containing identification and credit cards belonging to other persons—Shirley Barrett-Sheridan and E.E. McFadden.

On September 23, 1989, Wendy May participated in a beach cleanup at Lover's Point in Pacific Grove. At that time she found, behind a shrub, a Crown Royal cloth drawstring bag (similar to the one found in Bishop's apartment) containing Hickman's cashless wallet, checkbook, and credit cards.

Bishop testified that on September 6—the day before Hickman was killed—when Bishop arrived home from work, defendant gave her the bottle of wine and the birthday card that had been dropped off by Hickman. Shortly thereafter, defendant left the apartment with his friend Richard Stanley, and returned about four hours later, appearing somewhat intoxicated and nervous. Bishop and defendant began drinking from a new bottle of rum. Bishop had two drinks from the bottle, before going to bed at 2:00 a.m., while defendant was watching television. When Bishop awoke at 7:00 a.m., defendant still was watching television and drinking rum and appeared drunk, but he managed to get up and told Bishop that he was going to his

jobsite. As she left for work, Bishop noticed that the bottle of rum was empty.

Defendant was not home when Bishop returned from work at 5:15 p.m. on September 7. He returned about 45 minutes later, wearing clothing different from that which he had worn that morning, and no suspenders. He also appeared different—it seemed to Bishop that defendant had "aged 15 to 20 years," and that he had been drinking. Defendant gave Bishop a new, unopened bottle of rum to replace the one he had drunk the night before. Bishop asked defendant what was wrong, but he did not respond to that question. He mentioned, however, that he had been to the Alpha Beta grocery store.

Defendant again left Bishop's apartment about 7:20 p.m. and returned approximately 20 minutes later with cigarettes, thereafter encountering Kvaslerud, who was investigating the leak of water into his own apartment. Defendant returned to Bishop's apartment, where he mixed a rum drink for himself and prepared to depart. When Bishop asked defendant where he was going, he told her it was none of her business, and left with the bottle of rum.

A forensic pathologist testified that he examined Hickman's body at the crime scene at 11:30 p.m. on September 7 and estimated that she had died before 5:30 p.m. that day. Autopsy evidence revealed that her numerous stab wounds were not themselves "rapidly fatal," that death would not have occurred from the stab wounds until at least an hour after they were inflicted, and that she still was alive when she was strangled with both the suspenders (which had been wrapped tightly around her neck, *over* some of the stab wounds) and by the pressure of thumbs to the throat.

The position of Hickman's body was consistent with some form of sexual attack. The pathologist testified that it appeared, from the state of rigor mortis, that Hickman's legs had been propped up against the wall "sometime after death within the first few hours," at which time she had been partially wiped or washed down. Also indicating that the body had been moved some time after death was the circumstance that the bottom of her feet, although covered with dried blood, had left no transfer of blood onto the wall. The pathologist testified that there was bruising two to three inches inside the victim's rectum, that this bruising had occurred shortly before death, and that the bruising was consistent with penetration by a blunt object such as a penis or a finger. Tests for evidence of defendant's seminal fluids or pubic hair at the crime scene were negative.

A criminalist testified that he found type A blood—a match with Hickman's, and different from defendant's type O—on one of the tennis shoes found in Bishop's closet.

James Zoellin testified that between 5:00 p.m. and 7:00 p.m. on September 7, he was in charge of the Pacific Grove Alpha Beta store, where defendant previously had worked for a few months. Defendant entered the store and presented Zoellin with a check, which he asked to cash. Zoellin noticed nothing unusual about defendant's behavior. With Zoellin's approval, store employees cashed the check, which later was determined to have been made out originally to Hickman. Testimony by a documents expert linked defendant's handwriting to the "pay to order" and endorsement lines of the check. An Alpha Beta store clerk testified that she believed she recalled defendant purchasing "alcohol of some type" with the check proceeds.

Another store employee testified that the black suspenders found wrapped around Hickman's neck were "exactly" like the distinctive suspenders that defendant had worn when he worked at the store.

Defendant presented evidence demonstrating his level of intoxication on the night before and on the day of the killing. Bishop testified that defendant mixed drinks on September 6 from a 750-milliliter bottle of 80-proof rum, but conceded that she previously had stated that the bottle was larger and that it was 151 proof. Richard Stanley, defendant's friend, testified that he and defendant drank alcoholic beverages and ingested cocaine on two occasions on September 6, that defendant had searched unsuccessfully on that date for means to inject the cocaine, and that when he left defendant at Bishop's apartment between 9:00 p.m. and 10:00 p.m. that same night, defendant was intoxicated and still had about half of the one-sixteenth of an ounce of cocaine powder that defendant had purchased earlier that evening. Urine and blood samples taken from defendant at 2:40 a.m. and 3:40 a.m. on September 8 tested positive for cocaine and alcohol, and these tests showed that at 3:40 a.m., defendant had a blood-alcohol concentration of .09 percent.

A forensic toxicologist testified that cocaine stimulates the central nervous system, whereas alcohol depresses mental and physical functions. In response to hypothetical questions from defense counsel, another expert, Department of Justice laboratory criminalist Juan Bergado, testified that given a .09 percent blood-alcohol level at 3:40 a.m., a 135-pound person (defendant's approximate weight at the time of booking) would have had a .17 percent blood-alcohol level at 11:45 the prior evening. Bergado further testified that if such a person had consumed all but two ounces of a 750-milliliter bottle of a beverage containing 80-proof alcohol over a 14-hour period starting at 6:00 p.m. on September 6, that person would have a blood-alcohol level of approximately .26 percent by 8:00 a.m. on September 7 and about .16 percent at noon on that date. In response to further

hypotheticals from defense counsel, Bergado also testified that if a beverage containing 151-proof (instead of 80-proof) alcohol were consumed, the blood-alcohol level would have been approximately .49 percent by 8:00 a.m. on September 7, and about .33 percent at 3:00 p.m. to 4:00 p.m. on that date. Finally, Bergado explained that most persons whose blood-alcohol level is between .25 and .35 percent would be "stuporous"—that is, the person would have great difficulty getting up and moving about, and be very unsteady, incoherent, and disoriented—and that most persons with a blood-alcohol level above .35 percent would be "unconscious," that is, unable to stand erect or move without support, and would be unaware of their surroundings. Bergado added that the effects of impairment at these highest levels would be obvious to an untrained observer, but that an untrained observer might have some difficulty discerning impairment of a person whose blood-alcohol level was .15 percent or lower.

In response to questions from the prosecution, Bergado testified that if a 135-pound man had no alcohol in his system at 10:00 p.m., and then proceeded to consume 23 ounces of 80-proof alcohol until 7:00 a.m., the man would have a .30 percent blood-alcohol level by approximately 7:30 a.m., would be able to force himself to get up, walk, converse, and walk to work, and would have a blood-alcohol level of approximately .22 percent by noon. By contrast, Bergado testified that if the same person consumed the same amount of 151-proof alcohol under the same conditions, he would have a .56 percent blood-alcohol level by approximately 7:30 a.m., and for the next few hours would be unable to get up, walk, converse, or walk to work.

Dr. Steven Pittel, a psychologist specializing in the effects of drugs and alcohol, testified for the defense concerning the extent to which defendant was impaired by drugs or alcohol during the commission of the crime. Dr. Pittel reviewed defendant's family background and noted that defendant's parents and siblings had long histories of alcohol and drug abuse, and that defendant himself had a history of drug abuse. Pittel opined that on the night of Bishop's birthday (September 6), defendant became very drunk after Bishop expressed anger with him for spending insufficient time with her, and that when defendant subsequently was sent home from work the following morning for being drunk, he was depressed and viewed his situation as the culmination of a series of disappointments.

Dr. Pittel, like the expert who preceded him, testified concerning hypothetical blood-alcohol levels on the morning before the killing. Pittel stated that if defendant's blood-alcohol level was .26 percent at 8:00 a.m., defendant still would have been significantly impaired at noon (when he would have had an approximately .18 percent blood-alcohol level) and would have

been on the borderline of impairment at 2:00 p.m. (when he would have had approximately .14 percent blood alcohol). Dr. Pittel also testified that if defendant's blood-alcohol level were .49 percent at 8:00 a.m., defendant still would have been, at noon, "extraordinarily" impaired (at which time he would have had approximately .30 percent blood alcohol)—that is, defendant would have had difficulty reasoning, and possibly would have been unconscious. Dr. Pittel stated that although a person who has ingested both alcohol and cocaine may appear to be less impaired than one who has ingested one substance alone, this appearance is misleading, because cocaine balances out the coordination and slurred speech problems caused by alcohol, while the alcohol "takes off some of the edge" from the stimulant effect of the cocaine. Finally, Pittel testified that a person experiencing alcoholic "blackout" engages in "automatism"—a complex sequence of behavior with no recall of the behavior. Pittel asserted that the combination of drugs and alcohol ingested by defendant likely caused "significant impairment" of defendant's mental abilities at the time of the charged crimes. Still, Pittel stated the circumstance that a person's memory of an event is impaired does not signify that the person lacked control of his actions at the time of the event.

The prosecution, on rebuttal, presented evidence establishing that defendant's place of employment on September 7 was approximately four-tenths of a mile from Bishop's apartment, and that in order to walk that distance, one needed to cross several intersections, including one of Pacific Grove's main thoroughfares. John Purdom, a police officer who lived near Bishop's apartment, testified that between 3:00 p.m. and 5:00 p.m. on September 7, he and his fiancée were at home and noticed defendant walking up a hill with his bicycle on 16th Street above Lover's Point, heading toward the Alpha Beta store. Purdom testified that his fiancée, who had been employed at that store with defendant, spoke with defendant for five to 10 minutes. Officer Purdom found that defendant seemed to act and speak in a "completely normal" fashion. Purdom's fiancée confirmed these observations, adding that this encounter occurred between 3:00 p.m. and 3:30 p.m., or possibly 4:00 p.m. at the latest.

A Seaside police detective testified that he interviewed defendant at 1:00 p.m. on September 8, at which time defendant recounted meeting Purdom on the previous afternoon, admitted ingesting cocaine on the day prior to the killing, denied using crack or rock cocaine, stated that on the last occasion on which he had used cocaine he had "done about a gram," and explained that although doing so did not make him feel "bad," it did make him "a little bit antsy," and "that's where the liquor help[ed]." Finally, defendant told the detective that he remembered clearly everything that had happened the previous day and had no memory gaps.

Pacific Grove Detective Uretsky testified that during the morning of September 11, he spoke with defendant about undertaking a "rape kit examination," explaining that defendant would be transported to a local hospital for the taking of (among other things) fingernail and toenail scrapings. At that point, defendant requested that he be provided an attorney, and was returned to his cell for a few minutes while Uretsky telephoned the public defender's office. Upon returning to defendant's cell, Uretsky found him hunched over his sink, cleaning his hands. Uretsky testified that defendant's fingernails, which previously had been of moderate length and dirty under the cuticles, were "notably different"—they had been bitten or cut, and the dirt had been removed.

The jury deliberated for just under two hours before returning its verdict of guilty as charged on all counts and finding true the special circumstances alleged.

At the penalty phase of the trial, the prosecution introduced evidence that defendant had suffered one prior felony conviction for escape, and three prior felony convictions for residential burglary. A deputy sheriff at the Monterey County jail testified that a "shank"-like object that could be used for stabbing was found in defendant's jail cell where he kept his possessions.

The defense presented the following evidence in mitigation: Defendant was the seventh of eight children. His father was an electronics executive who owned his own firm. The family enjoyed skiing and sailboating, but defendant was unable to participate in those activities because he had club feet, for which he had undergone various surgeries. When he was 10 years of age, defendant's parents separated and his mother left home, never to return. There was no discipline in defendant's home, and his siblings began skipping school and using drugs and alcohol. Defendant's father moved the family to Florida and remarried, but the foregoing problems continued and worsened. As defendant's older siblings became more involved in drugs and alcohol and became truants, defendant was "lost in the shuffle."

When defendant was 13 years of age, the family moved to New Hampshire, where defendant was placed in a local boarding school. A few years later, after one of defendant's sisters died in a fire, defendant's parents began to drink heavily and, according to defendant's father, "did not care whether [defendant] lived or died." Although the family's children were well provided for materially, one of defendant's sisters testified that the family's children were "warehoused" without direction, discipline, love, or affection from their parents. Eventually, defendant began to consume drugs with his siblings. A sister testified that when high on drugs, defendant became "very scary."

Defendant's former girlfriend, Susan Pothier, testified that he had lived with her family for a time, but was asked to leave when her parents discovered that he was injecting cocaine. Her relationship with defendant then ended. She described him as gentle and easygoing but suffering from low self-esteem, and she admitted she had been out of contact with him for the past six years and no longer knew him. Similar testimony was given by Rita Dolbeare, Pothier's mother.

A defense psychologist who had prepared a report on defendant's psychological history and background testified that defendant's chaotic and unstable family situation affected his ability to cope with life, giving him a "low frustration tolerance"—problem exacerbated by his drug use, which apparently began at the age of 13 years.

Jerry Enomoto, the past Director of the California Department of Corrections, testified that based upon defendant's prison records, it appeared to him that in the event defendant were to be incarcerated in a maximum security prison, he would make a satisfactory adjustment to a term of life imprisonment without the possibility of parole. On rebuttal, the prosecution introduced the testimony of a jail guard who recounted that when defendant was notified that a report would be written concerning his misconduct (involving an incident in which defendant placed cardboard over the locking mechanism of his door), defendant responded by saying "something like 'go ahead, I don't care, there is nothing you can do to me because I'm going away to prison for life anyway.' "

After slightly more than five hours of deliberations, the jury returned a verdict of death.

## II. CLAIMS AND ANALYSIS

### A. *Pretrial Issues*

#### 1. *Delayed arraignment*

■ Immediately after his police interview in the early morning of Friday, September 8, 1989, Detective Kennedy, at the request of defendant's parole officer, placed defendant in custody on a parole hold for the use of cocaine. Also at that time, Detective Kennedy arrested defendant for the homicide of Hickman. Defendant was not arraigned until September 13, and asserts now that this delay violated his statutory and constitutional rights. In support, defendant relies upon section 825, codifying the right to arraignment "without unnecessary delay" and, in any event, within two days (now

"48 hours") after arrest *by warrant.* (See also Cal. Const., art. I, § 14 [establishing the right to felony arraignment "without unnecessary delay"]; *County of Riverside v. McLaughlin* (1991) 500 U.S. 44 [111 S.Ct. 1661, 114 L.Ed.2d 49].)

Defendant asserts in conclusory fashion that the postarrest statements that he made to a Seaside detective at 1:00 p.m. on September 8 (to the effect that he remembered the prior day and had no memory gaps) and Detective Uretsky's testimony concerning defendant's actions prior to the "rape kit examination" on September 11 (at which time defendant cleaned his fingernails after being told they would be examined) were produced by the delay and should have been excluded.

This claim is forfeited for failure to raise it at arraignment or at trial. (*People v. Turner* (1994) 8 Cal.4th 137, 176-177 [32 Cal.Rptr.2d 762, 878 P.2d 521].)[3] In any event, the statutory claim is without merit. The two-day limitation of section 825 does not apply to this case, in which arrest was made without a warrant. (§ 849 [governing arraignment in cases of arrest without a warrant]; *People v. Bonillas* (1989) 48 Cal.3d 757, 787, fn. 11 [257 Cal.Rptr. 895, 771 P.2d 844].) Moreover, as we have observed, "the arraignment requirement of Penal Code section 825 has been interpreted as not applying when [as here] a parole hold on other matters has been placed upon the defendant." (*Ng v. Superior Court* (1992) 4 Cal.4th 29, 38 [13 Cal.Rptr.2d 856, 840 P.2d 961].) Finally, defendant fails to demonstrate that the delay resulted in his making the September 8 and 11 statements. (*People v. Turner, supra,* 8 Cal.4th at p. 176.)

Nor does defendant demonstrate that his constitutional claim has merit. "To justify exclusion of a statement, defendant must show that the delay produced admissions or that there was an essential connection between the illegal detention and admissions of guilt." (*People v. Turner, supra,* 8 Cal.4th at p. 176.) Such a showing necessarily rests upon the facts of the particular case, but because defendant never raised this issue below, these facts were not developed, and the record that was made does not support defendant's contention.

### 2. *Suppression motion*

In the trial court, defendant moved pursuant to section 1538.5 to suppress various items of evidence (e.g., Kool brand cigarette butts that he discarded after speaking with officers, and personal items found in his

---

[3]Defendant asserts in his reply brief that we should abandon or modify our procedural rules of waiver and forfeiture of claims. No reason has been shown for us to do so.

apartment linking him to burglaries), statements (including his interview with Detective Kennedy), and observations (including those relating to defendant's sobriety and the wetness of his clothing, etc.) collected on the night of September 7 and on the following days. Defendant asserted that his initial meetings with police officers at approximately 11:45 p.m. on September 7, on the street adjacent to the crime scene, constituted an illegal detention from the time Officer Heredia summoned Detective Kennedy to speak with defendant, and that all fruits of that detention should be suppressed. The trial court disagreed, finding that the encounter between defendant and the officers was consensual and not a detention, and that even if defendant had been detained at the point at which Detective Kennedy was summoned, Officer Heredia had reasonable cause to detain him. The court found it "abundantly clear . . . not only from the testimony of the officer but [also from the] videotape [of Detective Kennedy's interview with defendant], that [defendant] at no point felt he was either being detained or [was] under arrest. [¶] I would have to say in summary, that the police acted as I hope they would act under these kind of circumstances. They were curious and inquisitive, but not in violation of anyone's Constitutional rights. . . . [¶] . . . [W]hen [defendant] went to the station, he explained to [Officer] Cox that he completely understood that it's just a safety precaution that people have to be [hand]cuffed to be transported. [¶] Under the circumstances, I don't know how the police could have been more protective of his legal rights and yet still do the job that we all expect them to do . . . ."

■ In reviewing the trial court's ruling on the suppression motion, we uphold any factual finding, express or implied, that is supported by substantial evidence, but we independently assess, as a matter of law, whether the challenged search or seizure conforms to constitutional standards of reasonableness. (*People v. Williams* (1988) 45 Cal.3d 1268, 1301 [248 Cal.Rptr. 834, 756 P.2d 221].)

■ " 'For purposes of Fourth Amendment analysis, there are basically three different categories or levels of police "contacts" or "interactions" with individuals, ranging from the least to the most intrusive. First, there are . . . "consensual encounters" . . . , which are those police-individual interactions which result in no restraint of an individual's liberty whatsoever—i.e., no "seizure," however minimal—and which may properly be initiated by police officers even if they lack any "objective justification." . . . Second, there are what are commonly termed "detentions," seizures of an individual which are strictly limited in duration, scope and purpose, and which may be undertaken by the police "if there is an articulable suspicion that a person has committed or is about to commit a crime." . . . Third, and finally, there are those seizures of an individual which exceed the permissible limits of a

detention, seizures which include formal arrests and restraints on an individual's liberty which are comparable to an arrest, and which are constitutionally permissible only if the police have probable cause to arrest the individual for a crime.' " (*In re James D.* (1987) 43 Cal.3d 903, 911-912 [239 Cal.Rptr. 663, 741 P.2d 161] (*James D.*).)

■ As the United States Supreme Court explained in *Florida v. Royer* (1983) 460 U.S. 491 [103 S.Ct. 1319, 75 L.Ed.2d 229]: "[L]aw enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, by putting questions to him if the person is willing to listen, or by offering in evidence in a criminal prosecution his voluntary answers to such questions. [Citations.] Nor would the fact that the officer identifies himself as a police officer, without more, convert the encounter into a seizure requiring some level of objective justification. [Citation.] The person approached, however, need not answer any question put to him; indeed, he may decline to listen to the questions at all and may go on his way. [Citations.] He may not be detained even momentarily without reasonable, objective grounds for doing so; and his refusal to listen or answer does not, without more, furnish those grounds. [Citation.] If there is no detention—no seizure within the meaning of the Fourth Amendment—then no constitutional rights have been infringed." (*Id.*, at pp. 497-498 [103 S.Ct. at p. 1324] (lead opn.).) Under case law established by the high court, " ' "[A] person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." ' " (*James D., supra*, 43 Cal.3d 903, 913, and cases cited, italics omitted.)

■ Here, the initial interaction between defendant and Officer Heredia plainly was a consensual encounter. The apartment building had been cordoned off; police cars were parked outside and the area was being guarded by officers as defendant walked by. Heredia approached defendant, inquired whether he could assist him, and posed basic and preliminary questions to establish whether defendant might possess information concerning the crime. The conversation was nonaccusatory, routine, and brief, and would not have caused a reasonable person to believe that his or her liberty was being restrained.

We question defendant's assertion that Heredia's act of summoning Detective Kennedy, Kennedy's subsequent exchange with defendant (including the request that defendant permit the police to test his jacket for blood), and the subsequent trip to the police station, substantially changed the volitional nature of the encounter. The record does not reflect that the officers engaged

in conduct that would have made a reasonable person feel compelled to remain or to allow the testing of the jacket. Indeed, the record amply supports the trial court's factual finding that defendant freely consented to remain for the purpose of speaking with Detective Kennedy, having the jacket tested, and being transported in handcuffs to the police station for further questioning.

In any event, even assuming that at some point in this sequence of events defendant was, as he asserts, constructively "arrested" prior to being formally arrested following the interview with Detective Kennedy, there would have been ample basis for such an arrest. Indeed, prior to defendant's being transported to the police station, there was adequate probable cause to arrest him. The police knew that he (i) lived in the apartment house, (ii) smoked Kool brand cigarettes (like the ones found at the crime scene), (iii) wore wet pants (it appeared that the assailant had washed down the crime scene), (iv) appeared to have blood on his jacket, and (v) made initial statements to Officer Heredia that conflicted with the officer's own observations. These facts and circumstances reasonably could engender in a reasonable person of ordinary care a strong suspicion that defendant had committed the crime. (*People v. Davis* (1981) 29 Cal.3d 814, 822-823 [176 Cal.Rptr. 521, 633 P.2d 186].)

No Fourth Amendment violation having been established, the trial court properly denied the suppression motion.

### 3. *Trial court's refusal to disclose police personnel files*

Defendant filed a motion for discovery, seeking information regarding all "complaints" filed with the Pacific Grove Police Department concerning Detective Kennedy and Officers Heredia and Cox "relating to the fabrication of charges, distortions and exaggerations of alleged facts and/or evidence, or dishonesty, or use of improper tactics." (See § 832.7 [making such records confidential]; Evid. Code §§ 1043, 1045.) Trial counsel clarified in a declaration that he sought evidence concerning the credibility of the officers, in order to support his theory that defendant was in fact detained by the officers. The prosecution produced the files, and the trial court inspected them in camera but did not disclose any information in them to defendant. Defendant asserts that the trial court erred.

The record reflects that the trial court found the vast majority of Officer Cox's file, which consisted largely of letters of commendation, to be irrelevant to the issue of his credibility. The court noted that there was one charge of use of excessive force that had been filed by a person more than

three months after that person had been arrested for driving under the influence, but the court found that complaint to be remote and of questionable relevance to the specific issue of Officer Cox's credibility, as framed by the defense motion. The trial court found no discoverable material concerning Officer Heredia.

A trial court's ruling on a motion for access to law enforcement personnel records is subject to review for abuse of discretion. (*Pitchess v. Superior Court* (1974) 11 Cal.3d 531, 535 [113 Cal.Rptr. 897, 522 P.2d 305].) Consistent with customary procedure, the records have been made part of the record on appeal but have been sealed, and appellate counsel for defendant have not been permitted to view them. (See Cal. Rules of Court, rule 33.5(b)(2).) As we have done in similar situations (*People v. Samayoa* (1997) 15 Cal.4th 795, 827 [64 Cal.Rptr.2d 400, 938 P.2d 2] (*Samayoa*)), we independently have examined the materials in camera, and conclude that the trial court did not abuse its discretion in refusing to disclose the contents of either officer's personnel files.

### B. *Guilt Phase Issues*

#### 1. *Evidence admitted over defendant's objection*

##### a. *Admission of portions of postarrest videotaped interview*

■ Defendant asserted that at the time of the killing, he was intoxicated to an extent that made it impossible for him to intend to commit the crimes. To rebut that claim, the prosecution was permitted to introduce excerpts of the beginning and closing portions of defendant's videotaped postarrest interview. During those parts of the interview, defendant's blood-alcohol level was .16 percent and .12 percent, respectively—measurements that coincided with some of the defense expert testimony concerning defendant's estimated blood-alcohol level at the time of the killing, some 10 to 13 hours earlier. Accordingly, by presenting this evidence, the prosecution sought to demonstrate that, at a .12 to .16 percent blood-alcohol level, defendant conducted himself in a manner that did not reflect substantial impairment of his mental functions. (The jury was instructed to consider this evidence for the limited purpose of determining defendant's mental and physical state at the time of the interview.)

Defendant asserts the court erred in admitting these portions of the videotape, because that evidence did not reflect a " 'reasonable representation of that which it is alleged to portray.' " (*People v. Carpenter* (1997) 15 Cal.4th 312, 386 [63 Cal.Rptr.2d 1, 935 P.2d 708] (*Carpenter*).) Defendant

claims that the videotape misleadingly failed to show that during part of the interview, defendant was leaning against a wall instead of supporting himself. Defendant also asserts that the videotape was irrelevant and did not assist the jury in its determination of the facts, but instead misled the jury.

Assuming for purposes of argument that these claims properly are preserved and have not been waived, the trial court did not err. The evidence was relevant and was "a reasonable representation of that which it is alleged to portray"—defendant's mental state at certain blood-alcohol levels. As we observed in *Carpenter, supra,* 15 Cal.4th 312, in order for such a videotape to be admissible, " ' " 'the physical conditions which existed at the time the event in question occurred need not be duplicated with precision nor is it required that no change has occurred between the happening of the event and the time the [videotape] is taken.' " ' " (*Id.,* at p. 386.) In this regard, we note that defense counsel was free to (and indeed, did) question Detective Kennedy concerning whether or not defendant leaned against a wall, and defense counsel argued to the jury that defendant was in fact leaning against a wall during part of the interview. We agree with the People that "any 'incompleteness' would go to the weight of the videotape on the issue of [defendant's] sobriety and not to its admissibility."

### b. *Testimony concerning defendant's request for counsel*

 As noted above, Detective Uretsky testified that on September 11, he advised defendant of the need to undergo a "rape kit examination," and described what such an examination would entail. At some point, Detective Uretsky testified, defendant asked for counsel, and while he (Uretsky) was out of the room arranging for counsel, defendant washed his hands and trimmed his fingernails, removing matter that had been under his nails. On cross-examination, defense counsel explored with Detective Uretsky the sequence of events preceding the hand-cleaning incident, and stressed that defendant had "been in a cell . . . or an interview room in the police department since around midnight on the 7th at that point," and "for somewhere around three and a half days; is that right?" Detective Uretsky replied "yes," and defense counsel then asked: "And it was sometime around this conversation with him that he was permitted to talk with a lawyer; is that right?" Detective Uretsky replied "yes," after which the following occurred:

Defense counsel: "And insofar as you know, at that time on the 11th was the first time that he had spoken to a lawyer since he had been in custody . . . since around midnight on the 7th going on the 8th; is that right?"

Detective Uretsky: "Whether he had actually spoken to a lawyer or requested one?"

Defense counsel: "As far as you know was that the first time that he had spoken to a lawyer?"

Detective Uretsky: "As far as I know that was the first time."

Outside the presence of the jury, the prosecutor argued that this testimony left the jury with the impression that defendant had not previously been given the opportunity to speak with an attorney, and hence, in order to prevent the jury from speculating that defendant improperly had been denied counsel before that time, the prosecutor sought to introduce evidence that defendant first made his request for counsel immediately after being informed of the rape-kit examination. Defense counsel conceded that he "may have in fact opened the door" on this point, stating that he "had no objection that he could think of" to the prosecutor's proposal. The prosecutor thereafter was allowed to elicit testimony to the effect that defendant requested counsel "right after" he had been informed of the rape-kit examination.

Defendant now asserts that the prosecutor's questioning was indeed objectionable, and error. He relies upon *Doyle v. Ohio* (1976) 426 U.S. 610, 618 [96 S.Ct. 2240, 2244-2245, 49 L.Ed.2d 91] (it is fundamentally unfair, and a deprivation of due process, to promise an arrested person that his silence will not be used against him, and then to breach that promise by using silence to impeach his trial testimony), *Wainwright v. Greenfield* (1986) 474 U.S. 284, 295 [106 S.Ct. 634, 640, 88 L.Ed.2d 623] (*Greenfield*) ("evidentiary use of an individual's exercise of his constitutional rights after the State's assurance that the invocation of those rights will not be penalized" is impermissible), and our statement in *People v. Crandell* (1988) 46 Cal.3d 833, 878 [251 Cal.Rptr. 227, 760 P.2d 423] (*Crandell*) that "comment which penalizes exercise of the right to counsel is also prohibited." This claim is waived by defense counsel's failure to object. Moreover, we do not perceive error on these facts.[4] In any event, even *assuming* error, in light of the overwhelming evidence of defendant's guilt we conclude, beyond a reasonable doubt, that the verdicts could not have been affected by the prosecutor's brief reference—made in response to defense counsel's cross-examination—to defendant's assertion of his right to counsel. (*Crandell* at p. 879.)

---

[4]Even assuming that *Doyle* and *Greenfield* are not distinguishable, we agree with the People's observation that the fact and timing of defendant's request may have been relevant to establish that the request was part of a ruse on his part to remove Detective Uretsky from defendant's presence in order to allow defendant to destroy any evidence that was under his fingernails. Were that the situation, the evidence of defendant's assertion of his right would not have been offered to penalize defendant by illustrating consciousness of guilt, but instead would have been relevant to demonstrate a plan to destroy evidence. As observed in *Crandell, supra*, 46 Cal.3d at page 879, " 'a prosecutor may legitimately inquire into and comment upon "purely 'demeanor' or 'behavior' evidence." ' " (Quoting *Greenfield, supra*, 474 U.S. 284, 295, fn. 13 [106 S.Ct. 634, 640].)

### c. *Evidence of defendant's prior criminal conduct*

■ Defendant asserts that the trial court erroneously allowed introduction of evidence that credit cards belonging to Shirley Barrett-Sheridan and E.E. McFadden, and stolen from their respective automobiles six months prior to the killing, were found inside a maroon-colored Crown Royal bag in the apartment defendant shared with Bishop. On the first day of trial in this matter, and outside the jury's presence, defendant pleaded guilty to receiving those items as stolen property. As noted above, a similar Crown Royal bag, containing Hickman's stolen wallet, credit cards, and checkbook, was found at the beach near defendant's apartment approximately two weeks after the killing.

Thereafter, the prosecutor sought to present evidence of the underlying circumstances of the receiving-stolen-property charges to which defendant had pleaded guilty, on the ground that those facts were relevant to establish that defendant intended in this case to commit, among other things, robbery.[5] (See Evid. Code, § 1101, subd. (b).) Defendant asserted that there was other evidence linking him with the murder, burglary, and robbery of Hickman, and that the proffered evidence should be excluded under Evidence Code section 352. The trial court disagreed with defendant's assertions that allowing such evidence would unduly prejudice him. The court permitted the evidence to be introduced, commenting "for the record" that "[g]iven the severity of the offenses that this jury is going to be hearing evidence on—a stabbing murder, wherein it is alleged that the victim was also strangled, sodomized, robbed and burglarized—I really have to question how shocked the jury would be to hear that he might also have some credit cards that belonged to some other people. I think in the relative hierarchy of things in this case, that new bit of information will be inconsequential."

We find that the trial court did not abuse its discretion in making its ruling under Evidence Code section 352 and in concluding implicitly that stolen credit cards in Crown Royal bags are sufficiently distinctive "signature" characteristics to support an inference that the same person committed both the charged and the uncharged acts. (See *People v. Ewoldt* (1994) 7 Cal.4th 380, 403 [27 Cal.Rptr.2d 646, 867 P.2d 757].) The evidence also was relevant to establish, among other things, that defendant intended to rob Hickman—an element of the charges that the prosecution was required to prove. Moreover, for the reasons stated by the trial court and quoted above, any federal constitutional error or error of state law clearly was harmless beyond a reasonable doubt.

---

[5]As noted above, robbery murder and burglary murder were two of the three special circumstances alleged and found to be true.

In a related argument, defendant asserts that the trial court erred in allowing the prosecutor to question Dr. Pittel on cross-examination concerning his knowledge of defendant's prison record. Defendant claims that the trial court allowed such evidence under the authority of *People v. Powell* (1974) 40 Cal.App.3d 107, 155 [115 Cal.Rptr. 109] (*Powell*) (defendant's parole status can be used to establish his motive and state of mind in killing a police officer to avoid revocation of his parole), but that *Powell* should not be extended beyond the context of one who kills a police officer in order to avoid apprehension and return to prison.

The trial court initially declined to allow the prosecutor to elicit such evidence, ruling that it was inadmissible under Evidence Code section 352. Thereafter, when the propriety of such information arose again in a different context—impeachment of testimony by Dr. Pittel that defendant had a good work ethic and a "commitment to work"—the trial court allowed such evidence to be admitted.

The prosecutor sought to cross-examine Dr. Pittel concerning the extent of his knowledge of defendant's background, including the nearly four-and-one-half-year prison term that defendant had completed less than a year before the killing. Outside the presence of the jury, the prosecutor argued that Dr. Pittel had an incomplete picture of defendant and that his testimony left the jury with the false impression that defendant had maintained steady employment. When cross-examination resumed, and Dr. Pittel reasserted that defendant had a "relatively consistent . . . work record," the trial court permitted the prosecutor to ask Dr. Pittel about the time period to which his testimony referred. Dr. Pittel responded that his reference was to the time before defendant moved to California in 1984, and during 1989—approximately eight months prior to the killing, when defendant had worked at the Alpha Beta store. The prosecutor then asked, "[S]o he wasn't working at all between 1985 and 1989?" Dr. Pittel responded that defendant "was incarcerated for a great deal of that period" and that he assumed that defendant worked in prison. On further questioning, Dr. Pittel testified that defendant had been in California for about one month, and had been unemployed, before being arrested on the charges that led to his incarceration in 1984.

We find it unnecessary to consider defendant's argument that the holding of *Powell, supra,* 40 Cal.App.3d 107, should not be extended to establish motive or state of mind beyond the context of one who kills a police officer in order to avoid apprehension and return to prison. Even if the trial court had expressly ruled that the evidence could be admitted under the authority of *Powell*, we agree with the People that the record reflects that the evidence actually was used by the prosecutor for a different and entirely proper

purpose. The evidence was used not to establish motive or state of mind, but to impeach Dr. Pittel's testimony concerning defendant's work history (and hence to impeach Dr. Pittel's expert opinion concerning impairment). (See Evid. Code, § 721, subd. (a) [an expert "may be fully cross-examined as to . . . (2) the subject to which his or her expert testimony relates, and (3) the matter upon which his or her opinion is based and the reasons for his or her opinion"].) The trial court did not abuse its discretion in allowing the prosecutor to question Dr. Pittel in this regard.

In any event, even were we to assume error, no prejudice appears. The jury repeatedly was instructed that information relied upon by Dr. Pittel to form his opinion was "received only for the purpose of establishing what the basis for his opinion is, and not to prove that those specific facts are true."

### d. *Defendant's statement to Officer Cox*

■ Officer Cox testified that while defendant was being transported to the police station for questioning, defendant stated that he did not know the victim, and never had been in her apartment. Defendant asserts the introduction of this testimony was error. It was not; false statements by a defendant[6] are admissible to demonstrate consciousness of guilt. (*People v. Kimble* (1988) 44 Cal.3d 480, 495-496 [244 Cal.Rptr. 148, 749 P.2d 803].) Nor did the trial court abuse its discretion in finding the evidence more probative than prejudicial under Evidence Code section 352. Defendant suggests that because he was on parole at the time of the killing and at the time of his statement to Officer Cox, he may have had a reason independent of any consciousness of guilt for denying that he had been in Hickman's apartment, or that he knew her—he may have lied to Cox in an effort to avoid parole revocation on the basis of his recent drug use. Perhaps this is so, and defendant was free to argue this theory to the jury;[7] however, contrary to his view, a false denial remains relevant evidence of consciousness of guilt even if there also exists a possible alternate basis for the false denial that would not incriminate defendant as to the charged offenses.

### e. *Introduction of two photographs*

■ Defendant objected at trial to the introduction of various crime scene photographs. One photograph, People's exhibit 12, showed blood in Hickman's bathroom and included, in the foreground, a teddy bear in the

---

[6]We note that defendant's fingerprints later were found in Hickman's apartment.

[7]We note that in view of the impeachment testimony elicited from Dr. Pittel on cross-examination, the circumstance that defendant had been imprisoned was known to the jury, and hence defense counsel could have argued, without further prejudicing defendant, or forcing him to testify, the parole-revocation-avoidance theory advanced above.

bathtub. Other photographs to which defendant objected were close-up views of Hickman's body at the crime scene. The trial court excluded one of those photographs as cumulative, but admitted the other, People's exhibit 24(B). Defendant asserts that the trial court erred prejudicially in allowing the introduction of exhibits 12 and 24(B).

The trial court's exercise of discretion in determining relevance and the admissibility of photographs will not be disturbed on appeal unless their probative value clearly is outweighed by their prejudicial effect. (*People v. Crittenden* (1994) 9 Cal.4th 83, 133-135 [36 Cal.Rptr.2d 474, 885 P.2d 887], and cases cited (*Crittenden*).) We have examined the exhibits and, although they are unpleasant to view, we cannot agree that the trial court abused its discretion in admitting them.

Regarding People's exhibit 12, the trial court recognized that some jurors might be "curious" about why a teddy bear was in the victim's bathtub, but it also doubted that the jurors' "anxieties or passions would be inflamed by seeing" the bear next to blood spots. We agree with the People that the prosecution was entitled to "show visually the extent, the location, and the form of the blood found in Hickman's apartment, which was relevant to malice (intent to kill) and premeditation and deliberation . . . and was not obligated to present its case in a sterilized fashion." Even assuming, however, that this photograph should have been excluded as cumulative (as defendant observes, People's exhibit 7(I), admitted without objection, showed the same scene—including the teddy bear—from a different and less dramatic view), we discern no prejudice to defendant, in light of the other properly admitted photographs and the overwhelming evidence of defendant's guilt.

People's exhibit 24(B) showed a close-up view of Hickman's body, propped against a wall with suspenders wrapped around her neck and underwear rolled down to her knees. It also depicted wipe marks on her body, a damp paper towel on her neck, a blood-soaked cigarette, and a sponge. The trial court found that the photograph had "substantial probative value" in a number of respects—for example, the damp paper towel seemed to demonstrate that the killer had "enough presence of mind to . . . use it in a clean up process"; the "blood on the bottom of the victim's feet mean[s] at least to a casual observer that this victim must have stood in her own blood before [she was] placed in the position that she was finally found in"; and finally, "there is the . . . position of the body as it relates to the allegation of the sodomy charge."

Defendant asserts that each of these points was adequately demonstrated by other photos and testimony, and that People's exhibit 24(B) was unnecessarily gruesome and cumulative. We are unconvinced; the other photographs show only a portion of what is shown in full by People's exhibit

24(B). The challenged exhibit was relevant to defendant's criminal intent with regard to the murder and forcible sodomy charges, and it corroborated the testimony concerning the manner and location of the killing and the extent of the victim's wounds. (See *People v. Allen* (1986) 42 Cal.3d 1222, 1256 [232 Cal.Rptr. 849, 729 P.2d 115] (*Allen*).) Because the trial court reasonably could determine that the probative value of People's exhibit 24(B) outweighed its prejudicial effect, the court did not abuse its discretion under Evidence Code section 352 by admitting the photograph into evidence.

## 2. *Evidence excluded over objection (habit evidence)*

■ Defendant attempted to cast doubt upon the prosecution's theory that he entered Hickman's apartment with the felonious intent required for first degree felony murder, and for burglary, robbery and the corresponding special circumstances, by offering testimony that on occasions when Hickman cleaned her apartment, she would leave open the top half of the Dutch door to the apartment. Defendant asserts that the trial court improperly sustained the prosecutor's objection to this proffered testimony of two defense witnesses. Defendant's theory apparently is that, if the apartment door had been left "open," this circumstance would suggest the absence of the requisite felonious intent, because a partially open door may have been a "sign of welcome" that constitutes "a partial relinquishment of privacy." Defendant further speculates that the jury reasonably might have concluded that defendant "viewed [a partially open door] as an invitation to come in" and "to talk or continue a conversation."

It may be questioned whether the proffered evidence was legally relevant. Assuming relevance, Evidence Code section 1105 would permit the admission of evidence of habit or custom "to prove conduct on a specified occasion in conformity with the habit or custom," but as we have observed, the determination of the admissibility of such evidence rests in the sound discretion of the trial court. (*People v. McPeters* (1992) 2 Cal.4th 1148, 1178 [9 Cal.Rptr.2d 834, 832 P.2d 146].) Having reviewed the proffered testimony, we conclude that the trial court did not err in determining that the proffered evidence was insufficient to establish any habit or custom of Hickman in keeping her door partly open while cleaning her apartment. But in any event, because there is no evidence to support defendant's speculation that Hickman invited the person who killed her into her apartment or that defendant entered only to talk to her, it is not reasonably probable that, had the evidence been admitted, the jury would have concluded that defendant entered the apartment without the requisite criminal intent to commit burglary and the other offenses related to the commission of the murder.

### 3. *Claims concerning intoxication and unconsciousness*

#### a. *Exclusion of testimony on effects of intoxication*

 Officer Heredia testified that when he and Officer Cox encountered defendant, he appeared to be slightly intoxicated. On cross-examination by defense counsel, Heredia was asked whether he found, as a police officer, that alcohol intoxication impairs a person's judgment. The officer replied, "Depending on the state of intoxication." The trial court sustained the prosecutor's objection to that answer, on the ground that the officer's experience in that area was related to driving under the influence and not to the "situation" at issue in this case.

In the course of Officer Cox's subsequent testimony concerning defendant's conduct and demeanor in the vicinity of the crime scene on the night of the killing, the witness asserted that he previously had encountered hundreds of persons who were under the influence of alcohol or cocaine. Thereafter the trial court informed defense counsel that "[i]f you intend to adduce from this witness evidence that might go to your client's mental state . . . I think you are going to have to lay substantial[ly] more foundation."

Defense counsel did not lay the requested additional foundation but still was able subsequently to elicit from Officer Cox the statement that "sometimes" the officer had found that persons who were under the influence possessed impaired mental abilities. Defendant now asserts the court improperly excluded these aspects of each officer's testimony.

As noted above, the court did permit some such testimony by Officer Cox, to the effect that "sometimes" he had found the mental abilities of persons who are under the influence of alcohol or cocaine to be impaired. Moreover, defendant fails to establish that any exclusion of portions of the officers' testimony prejudiced him at trial. Indeed, as the People observe, in view of Heredia's testimony that defendant appeared to be only slightly intoxicated, and in light of the officer's stricken answer that in his experience mental ability impairment was *dependent upon the state of intoxication*, it is doubtful that either officer's testimony in this regard would have assisted defendant significantly.

#### b. *Limitation of expert testimony on effects of intoxication*

 Defendant asserts that the trial court improperly limited the testimony of his expert, Dr. Pittel, in various ways: (i) by allegedly prohibiting Pittel from *considering* defendant's statement (made to a defense investigator) that defendant had consumed cocaine on the morning of the killing, (ii)

by prohibiting Pittel from *testifying that he considered* defendant's statement to the investigator as one of the bases for Pittel's opinion concerning defendant's state of impairment, and (iii) by prohibiting Pittel from testifying concerning defendant's asserted intolerance to alcohol.

As defendant observes, the trial court at various points suggested that Dr. Pittel should not be allowed to consider defendant's hearsay statements in forming his expert conclusion concerning defendant's mental competence at the time of the killing. Ultimately, however, the trial court stated that Dr. Pittel could "testify that included in your opinion—among the [bases] for your opinion is an interview with the [d]efendant."

Assuming that the trial court barred Dr. Pittel from considering defendant's hearsay statement to the defense investigator, we agree with the People that no prejudice resulted, because Pittel's opinion that defendant was in fact impaired—concerning which he was permitted to testify—was the same in any event. Pittel testified that, based upon defendant's long history of cocaine use, his use of cocaine on the night preceding the killing, defendant's search with his friend Richard Stanley for more cocaine and the means to inject it, the toxicology of cocaine in defendant's body, Stanley's testimony that defendant had cocaine remaining in his possession when Stanley last saw defendant on the night preceding the killing, and the circumstance that the commission of the crime was consistent with cocaine and alcohol intoxication, he believed that defendant was mentally impaired at the time of the killing.

As defendant asserts, the trial court did bar Pittel from testifying about defendant's alleged hearsay statements to the defense investigator, which were inconsistent with his statements to the police. (In his statement to the police, defendant detailed his use of cocaine prior to the killing, but never mentioned using cocaine on the morning of the killing.) The trial court did not abuse its discretion in preventing Dr. Pittel from testifying as to such hearsay statements. (*Carpenter, supra*, 15 Cal.4th at p. 403, and cases cited [trial court has discretion to bar expert from providing a detailed explanation that brings before the jury incompetent hearsay evidence, under the guise of stating reasons supporting his or her opinion].) We agree with the People that the trial court allowed defendant "reasonably wide latitude to present his expert evidence" and that the "few restrictions it placed on the extensive expert testimony" were proper and did not violate defendant's constitutional right to present a defense.

We employ the same analysis and reach the same conclusion regarding defendant's related assertion that the trial court improperly prohibited Dr.

Pittel from testifying about or basing his opinion upon defendant's alleged intolerance of alcohol. It is not clear from the record that the court forbade Dr. Pittel from considering information regarding defendant's history with alcohol or expressing an opinion on defendant's tolerance level based upon that information. The record suggests, instead, that the trial court was willing to permit Dr. Pittel to testify concerning defendant's tolerance of alcohol based upon the expert's review of information from defendant's family and friends, as well as from defendant, concerning defendant's drinking history, but that the court would not permit Dr. Pittel to testify concerning "specifics regarding alcohol tolerance."[8]

c. *Instruction that "no act is less criminal by reason of voluntary intoxication"*

 Defendant asserts that the murder, robbery, and burglary convictions must be reversed because CALJIC No. 4.20, delivered at defense counsel's request, "eviscerated" defendant's voluntary intoxication defense to those charges. We disagree.

Former CALJIC No. 4.20 (5th ed. 1988) was delivered to the jury in two paragraphs as follows: "*The law provides that no act committed by a person while in a state of voluntary intoxication is less criminal by reason of his having been in such a condition.* [¶] In the crime charged in Count IV, *sodomy*, the fact that the defendant was voluntarily intoxicated is not a defense and *does not* relieve him of responsibility for the crime." (Italics added.)

Immediately thereafter, former CALJIC No. 4.21 (5th ed. 1988) was delivered to the jury as follows: "In the crimes of *murder, robbery,* and *burglary,* of which Defendant is accused in Counts I, II, and III of the Information, a necessary element is the existence in the mind of the Defendant of a certain specific intent and/or mental state. [¶] *If the evidence shows that the Defendant was intoxicated at the time of the alleged crime, you should consider that fact in determining whether the Defendant had such specific intent and/or mental state.* If from all the evidence you have a reasonable doubt whether the Defendant formed such specific intent or mental state, you must find that he did not have such specific intent and/or mental state." (Italics added.)

Defendant asserts that although the second paragraph of CALJIC No. 4.20 correctly provides that voluntary intoxication is no defense to the general

---

[8]Dr. Pittel ultimately was *not* asked by defendant to express an opinion concerning defendant's assertedly low tolerance of alcohol—perhaps, as the People observe, because of the evidence provided by the videotaped interview and the testimonial evidence tending to demonstrate defendant's relative lack of impairment.

intent crime of sodomy, the first paragraph of that instruction erroneously told the jury that as a general matter, *"no act"* is less criminal because of voluntary intoxication, when in fact, as CALJIC No. 4.21 later informed the jury, voluntary intoxication *does* make the specific intent crimes of murder, robbery, and burglary "less criminal" if such intoxication prevents formation of the required specific intent and/or mental state. He asserts that a reasonable juror, reading these instructions as a whole, would have been confused by this assertedly contradictory information concerning whether or not evidence of voluntary intoxication may serve as a "defense" to the formation of the specific intent and/or state of mind required for murder, robbery, and burglary.

We may agree, for the purpose of argument, that in the context of this case, the first paragraph of CALJIC No. 4.20 was potentially misleading in light of the murder, robbery, and burglary charges. Indeed, as defendant has observed, at the time of trial the Use Note to CALJIC No. 4.20 cautioned that trial courts should deliver the full instruction only "in general criminal intent cases" and that it "should NOT be given in cases where specific intent is required." (Use Note to CALJIC No. 4.20 (5th ed. 1988) p. 158.) As defendant also concedes, however, his trial counsel requested the instruction, and hence any error would appear to be waived.

In any event, on the record before us, we cannot agree with defendant that the potentially misleading instruction posed a substantial risk of actually misleading the jury into believing that defendant's voluntary intoxication evidence—essentially, the centerpiece of his defense—was irrelevant to, and could not be considered with regard to, his culpability for the offenses of murder, robbery, and burglary. As the People observe, the closing arguments of the defense and of the prosecution emphasized, implicitly and explicitly, the correct interpretation of both instructions, namely that CALJIC No. 4.20's admonition applied only to count IV, sodomy, whereas under CALJIC No. 4.21, the jury *could* consider the effect of voluntary intoxication on defendant's specific intent to commit the crimes charged in counts I-III—murder, robbery, and burglary. Viewing together the instructions, counsel's legally correct arguments, and the evidence presented to the jury for its consideration, we do not believe that it is reasonably "likely the jury was 'misled to defendant's prejudice' " or that the jury would have understood CALJIC No. 4.20 to operate in the manner asserted by defendant, essentially precluding consideration of his primary defense. (*Allen, supra,* 42 Cal.3d 1222, 1280 [employing similar analysis in concluding that potentially misleading instructions concerning sentencing discretion did not constitute error].)

### d. *Instructions on voluntary intoxication*

 Defendant asserts that the trial court erred in failing to instruct on its own motion that voluntary intoxication may negate (i) premeditation and deliberation, and (ii) the mental states necessary for sodomy murder and the three special circumstance allegations.

The first aspect of this claim is foreclosed by *People v. Saille* (1991) 54 Cal.3d 1103, 1120 [2 Cal.Rptr.2d 364, 820 P.2d 588] (*Saille*), in which we held that the trial court has no sua sponte duty to instruct that voluntary intoxication may be considered in determining the existence of premeditation and deliberation. (See *People v. Clark* (1993) 5 Cal.4th 950, 1022 [22 Cal.Rptr.2d 689, 857 P.2d 1099] (*Clark*) [applying *Saille* retroactively to a trial that occurred before the filing of the opinion in *Saille*].) Contrary to defendant's view, application of the *Saille* rule, requiring defendants to request voluntary intoxication instructions, does not violate ex post facto principles. (U.S. Const., art. I, § 10, cl. 1; Cal. Const., art. I, § 9.) In any event, we do not believe that the instructions were misleading. As noted above, CALJIC No. 4.21 informed the jury that defendant's intoxication should be considered in determining whether defendant possessed the "specific intent and/or mental state" required for count I, murder. In addition, the jury was instructed pursuant to CALJIC No. 3.31.5 that regarding the murder count, "there must exist a certain mental state in the mind of the perpetrator" and that "[t]he mental state required is included *in the definition of the crime charged.*" (Italics added.) *That* definition, provided to the jury through CALJIC No. 8.20, in turn advised that for the jury to find defendant guilty of first degree murder, it must find that he acted with "willful" premeditation and deliberation. The latter instruction further provided that " 'willful,' as used in this instruction, means intentional" and that premeditation and deliberation "must have been formed upon pre-existing reflection and not upon a sudden heat of passion or other condition precluding the idea of deliberation." We agree with the People that "by relating intoxication to 'mental state,' a reasonable jury would have understood deliberation and premeditation to be 'mental states' for which it should consider the evidence of intoxication." (*People v. Castillo* (1997) 16 Cal.4th 1009, 1016 [68 Cal.Rptr.2d 648, 945 P.2d 1197].)

The second aspect of this claim, concerning the trial court's failure to instruct sua sponte that voluntary intoxication could negate the specific intent to commit sodomy (which intent was necessary to convict defendant of sodomy felony murder), and the court's failure to instruct that voluntary intoxication could negate the mental state necessary to support the special circumstance allegations, is similar to the claim we rejected in *Clark, supra,*

5 Cal.4th 950, with regard to a rape-felony-murder charge and a rape special-circumstance allegation. For the reasons set forth in *Clark, supra*, at page 1021, we conclude that when the jury instructions are viewed as a whole, it becomes clear that "the jury was instructed that *one* charge [here, count IV, sodomy] was excluded from the scope of the instructions on voluntary intoxication" and that "all other offenses"—and the special circumstance allegations—"remained within their scope." As in *Clark*, there is no reasonable likelihood that the jury was confused or misled concerning the relevance of defendant's intoxication evidence to both the sodomy-felony-murder count and the special circumstance allegations.

### e. *Refusal of defendant's instruction concerning unconsciousness*

The trial court instructed on unconsciousness pursuant to CALJIC No. 8.47, as follows: "If you find that a defendant, while unconscious as a result of voluntary intoxication, killed another human being without intent to kill and without malice aforethought, the crime is involuntary manslaughter. [¶] When a person voluntarily induces his own intoxication to the point of unconsciousness, he assumes the risk that while unconscious he will commit acts inherently dangerous to human life or safety. Under such circumstances, the law implies criminal negligence."

Defendant asserts that "in the context of [his] defense, the term 'unconscious' has a meaning peculiar to the law which the express terms of the instruction did not convey adequately to the jurors," in that it failed to inform them (as he had requested the trial court also to instruct, in accordance with CALJIC No. 4.30) that "[u]nconsciousness does not require that a person be incapable of movement."

We question whether the trial court had a sua sponte duty to provide a legal definition of "unconsciousness." (Cf. *Saille, supra*, 54 Cal.3d 1103, 1119-1120.) Moreover, as the People observe, defendant has not shown that his proposed language correctly states a legal definition of "unconsciousness" as it relates to voluntary intoxication—indeed, as the People note, defendant's requested instruction "is not a 'definition' of unconsciousness in the strict sense," because it states only what unconsciousness does not necessarily entail, namely that a person be incapable of movement.

In any event, we conclude on the record before us that the jury adequately was informed through the instructions, the evidence, and the closing arguments of counsel that unconsciousness does not require that a person be incapable of movement. We further conclude that the jury was permitted to find that defendant was "unconscious" for purposes of CALJIC No. 8.47,

despite his having moved about and acted as if he were conscious. As noted above, the jury was instructed that if defendant was unconscious when he killed, and acted without intent or malice aforethought, he would be guilty of involuntary manslaughter. Based upon the state of the evidence before the jury when it heard that instruction, it is not reasonably likely that the jury was misled into believing that it was precluded from finding unconsciousness merely because there was evidence that defendant moved about and engaged in various affirmative activity.

The evidence presented by defendant through Dr. Pittel stressed that "unconsciousness" or "blackout" could occur when a person's blood-alcohol level reached .35 to .45 percent, but that this does not mean that such a person would be "flat out prone." As Dr. Pittel explained, a person in this state "engages in what is known as automatism," meaning that "the person goes through a sequence of behaviors, involving many hours of interaction with people, traveling, doing all sorts of things, but they have no recall afterwards." In response to defense counsel's question, "So a blackout doesn't exclude the person being able to do tasks?" Dr. Pittel responded: "No. In fact, one of the characteristics of blackout is that the person is engaged in behaviors that he later then can't recall." Defendant cites nothing in the record to indicate that this testimony was controverted.

Contrary to defendant's insinuations, the prosecutor did not argue or even suggest to the jury that defendant could not have been "unconscious" if the evidence showed that he had been moving about and acting as if he were conscious. The prosecutor did briefly mention that when defendant was awakened at his jobsite on the morning of the crimes, he got "right up" and that this was not the action of "somebody that is in a coma or unconscious." This comment, however, was not directed toward defendant's claim that he was unconscious *during the crimes*, hours later. Thereafter, in his own closing argument, defense counsel, without rejoinder, highlighted his understanding of the involuntary manslaughter and unconsciousness instructions: "If you look at the [involuntary manslaughter] instruction, if you read the instruction when you get back there to the deliberations you will see that the logical inference from that instruction is that a person who is unconscious due to voluntary intoxication can be up, can do acts, can do things that look normal and there may be no perception amongst other people that see that person that tells them that that person is unconscious due to intoxication."

On this record, the jury was adequately informed that unconsciousness does not require that a person be incapable of movement.

f. *Failure to instruct that voluntary intoxication short of unconsciousness may reduce homicide to involuntary manslaughter*

As noted above, the trial court properly instructed the jury pursuant to CALJIC No. 8.47 (quoted *ante*) that if defendant was unconscious due to voluntary intoxication, he would be guilty of involuntary manslaughter. Defendant asserts that the trial court erred by failing *as well* to instruct the jury pursuant to CALJIC No. 8.45[9] that voluntary intoxication falling short of unconsciousness also could negate intent to kill and/or malice afore-thought, and hence support a verdict of involuntary manslaughter.[10]

Any error was invited. Defense counsel, after being apprised that the trial court would instruct the jury pursuant to CALJIC No. 8.47 either as written or in a modified form, expressly withdrew his request for CALJIC No. 8.45. Counsel stated in doing so that "[q]uite frankly, . . . I think 8.47, whether you give the CALJIC form or whether you give the modification that I've requested, *more aptly addresses the issue in this case than 8.45 does.*" (Italics added.) Defendant asserts that defense counsel's withdrawal of the request was based upon defense counsel's misapprehension that CALJIC No. 8.45 would have been legally inapplicable in this case. Based upon our reading of the record, we disagree. It is true that at one point defense counsel agreed with the prosecutor's assertion that "you don't get to even instructing on [in]voluntary manslaughter [based upon] voluntary intoxication unless there is some evidence that the jury can conclude the defendant was unconscious." Reading the record as a whole, however, it appears that this was simply a shorthand way of saying that the defense theory of the case was based upon unconsciousness, and that defense counsel was not seeking instructions on the effect of voluntary intoxication that would produce a result in defendant short of unconsciousness. Indeed, the record supports the conclusion that defense counsel, after extensive discussion and consideration, reasonably came to the conclusion that on the facts of the case, CALJIC No. 8.47, with its emphasis upon unconsciousness, more aptly fit the defense theory of the case.

We find unpersuasive defendant's assertion that the trial court had an obligation to second-guess defense counsel's assessment, and to instruct pursuant to CALJIC No. 8.45 despite defense counsel's considered decision

---

[9]The requested instruction provided in relevant part: "Every person who unlawfully kills a human being without malice aforethought and without intent to kill is guilty of the crime of involuntary manslaughter in violation of Penal Code section 192(b)."

[10]We assume, but do not decide, that the proposed instruction, as well as CALJIC No. 8.47, correctly described the law at the time of trial. Whether at present these instructions correctly describe the law, in light of the subsequent 1995 amendment to section 22, subdivision (b), we need not and do not decide.

to withdraw his request for that instruction, or otherwise to amplify or modify CALJIC No. 8.47 or any other instruction in order to pinpoint an alternative theory that voluntary intoxication short of unconsciousness negated intent to kill and/or malice aforethought. (Cf. *Saille, supra*, 54 Cal.3d 1103, 1118.)

### 4. *Instructions on circumstantial evidence and consciousness of guilt*

#### a. *Instruction pursuant to CALJIC Nos. 2.01 and 8.83*

Defendant asserts that the trial court erred by instructing pursuant to CALJIC No. 2.01, which addressed the sufficiency of circumstantial evidence generally, and CALJIC No. 8.83, which addressed the sufficiency of circumstantial evidence in the context of the special circumstance allegations. These instructions in part each directed that every "fact which is essential to complete a set of circumstances necessary to establish" defendant's guilt or the truth of a special circumstance allegation "must be proved beyond a reasonable doubt. In other words, before an inference essential to establish [guilt or a special circumstance] may be found to have been proved beyond a reasonable doubt, each fact or circumstance upon which such inference necessarily rests must be proved beyond a reasonable doubt." (CALJIC Nos. 2.01 and 8.83.) The instructions continued by specifying that if circumstantial evidence is susceptible of "two reasonable interpretations, one of which points" to guilt and the other to innocence, or one of which points to the truth of a special circumstance allegation and the other to the defendant's innocence relating to the allegation, the jury "must adopt that interpretation which points to" the defendant's innocence concerning the special circumstance, and reject the interpretation that points to guilt or to the truth of the special circumstance. (CALJIC Nos. 2.01 and 8.83) Finally, the instructions provided: "*If, on the other hand, one interpretation of such evidence appears to you to be reasonable and the other interpretation to be unreasonable, you must accept the reasonable interpretation and reject the unreasonable.*" (CALJIC Nos. 201. and 8.83, italics added.)

Defendant asserts that the italicized language allowed a finding of guilt (or of the truth of a special circumstance allegation) based upon a lesser degree of proof than beyond a reasonable doubt, and that the instructions operated as impermissible mandatory rebuttable presumptions. As defendant concedes, we repeatedly have rejected similar and substantially identical claims (e.g., *People v. Millwee* (1998) 18 Cal.4th 96, 160 [74 Cal.Rptr.2d 418, 954 P.2d 990]), and we see no reason to accept defendant's invitation to reconsider those decisions here. As we observed in *Crittenden, supra,* 9 Cal.4th 83, 144, "[w]hen the questioned phrase is read in context, not only

with the remaining language within each instruction but also together with related instructions, including the reasonable doubt instruction, it is clear that the jury was required only to reject unreasonable interpretations of the evidence and to accept a reasonable interpretation that was consistent with the evidence."

### b. *Failure to instruct pursuant to CALJIC Nos. 2.02 and 8.83.1*

 As noted, the trial court gave the jury, at defendant's request, two instructions concerning the sufficiency of circumstantial evidence: CALJIC No. 2.01 (addressing sufficiency of circumstantial evidence, generally), and CALJIC No. 8.83 (addressing sufficiency of circumstantial evidence in the context of special circumstance allegations, generally). The trial court denied defendant's request to give two additional instructions, CALJIC Nos. 2.02, and 8.83.1, which would have explained to the jury how circumstantial evidence related to proof of specific intent or mental state.

As defendant observes, we have held that there is no need to give CALJIC No. 2.02 when the trial court gives a more inclusive instruction based upon CALJIC No. 2.01, unless the only element of the offense that rests substantially or entirely upon circumstantial evidence is that of specific intent or mental state. (*People v. Bloyd* (1987) 43 Cal.3d 333, 351-352 [233 Cal.Rptr. 368, 729 P.2d 802].) Because mental state or specific intent was not the only element of the case resting upon circumstantial evidence, the trial court did not commit error by providing only the more inclusive instructions. (*People v. Marshall* (1996) 13 Cal.4th 799, 849 [55 Cal.Rptr.2d 347, 919 P.2d 1280]; *People v. Rodrigues* (1994) 8 Cal.4th 1060, 1141-1142 [36 Cal.Rptr.2d 235, 885 P.2d 1] (*Rodrigues*); *People v. Mitchell* (1994) 30 Cal.App.4th 783, 811 [36 Cal.Rptr.2d 150].)

Defendant urges us to reconsider these holdings and conclude that the trial court's refusal to instruct the jury as requested was prejudicial error in this case. We decline to do so.[11]

---

[11]Citing the trial court's denial of his requested instructions on the grounds that they were unnecessary and repetitive, defendant asserts that the court granted the prosecution's request for similarly unnecessary or repetitive instructions, and that this demonstrates that overall, the trial court's instructions to the jury were unbalanced, thus "weighting . . . the scales in favor of the People." (*People v. Moore* (1954) 43 Cal.2d 517, 526 [275 P.2d 485].) Defendant also cites, as an example of asserted lack of balance, the trial court's refusal to instruct the jury pursuant to his requested modification of the special circumstances instruction, CALJIC No. 8.81.17.

Defendant's underlying premise—that in many instances, his proposed instructions were "improperly refused"—is suspect. Indeed, the example that he offers in support of that proposition (the court's failure to modify CALJIC No. 8.81.17) demonstrates nothing more

c. *Instruction on consciousness of guilt*

The trial court instructed the jury, at the prosecution's request, in the language of CALJIC Nos. 2.03 and 2.06, telling the jury that false statements or attempts to destroy evidence may indicate consciousness of guilt, but that such conduct is insufficient by itself to prove guilt. Defendant asserts that these instructions were impermissibly argumentative and improperly permitted the jury to draw irrational inferences.

As defendant observes, we repeatedly have rejected these challenges to the instructions in question. (E.g., *People v. Jackson* (1996) 13 Cal.4th 1164, 1222-1224 [56 Cal.Rptr.2d 49, 920 P.2d 1254] (*Jackson*), and cases cited.) We decline his invitation to reconsider these holdings.

5. *Claims concerning the burglary charge*

a. *Adequacy of the burglary instructions—rape as a target offense*

The jury was instructed that it could find defendant guilty of burglary if it found that he entered the victim's apartment with the specific intent to commit (i) theft, or (ii) sodomy, or (iii) rape. The crucial question with regard to burglary was, *at the moment defendant entered the apartment*, did he have the *intent* to commit any of those three crimes?

To help the jury answer that question, the trial court instructed on the elements, including the required mental states, for theft and sodomy. But defendant was not charged with rape, and the court did not instruct, at any time, on the legal definition (including the required mental state) of that offense. The jury returned a general verdict, finding defendant guilty of burglary without specifying the predicate crime or crimes that it found him to have intended upon entering the victim's apartment.

Defendant asserts that the trial court erred in failing to instruct the jury on its own motion regarding the offense of rape. The People assert there was no such duty to instruct. As explained below, we agree with defendant.

In *People v. Failla* (1966) 64 Cal.2d 560 [51 Cal.Rptr. 103, 414 P.2d 39] (*Failla*), we held: "[W]here the evidence permits an inference that the defendant at the time of entry intended to commit one or more felonies and

than the trial court's refusal to deliver a questionable instruction that the People claim was both incorrect and argumentative—points that, even now, defendant does not dispute. (See *post*, pt. II.B.6.c.) Having reviewed as a whole the instructions and rulings on requested instructions, we cannot agree that the trial court gave the jury "unbalanced" instructions.

also an inference that his intent was merely to commit one or more misdemeanors or acts not punishable as crimes, the court must define 'felony' and must instruct the jury which acts, among those which the jury could infer the defendant intended to commit, amount to felonies. Failure to do so is error, for it allows the triers of fact to indulge in unguided speculation as to what kinds of criminal conduct are serious enough to warrant punishment as felonies and incorporation into the burglary statute." (*Id.*, at p. 564.)

The duty to define such so-called target offenses and instruct on their elements has become well established. (E.g., *People v. Williams* (1975) 13 Cal.3d 559, 563 [119 Cal.Rptr. 210, 531 P.2d 778]; *People v. May* (1989) 213 Cal.App.3d 118, 129 [261 Cal.Rptr. 502] (*May*); *People v. Smith* (1978) 78 Cal.App.3d 698, 708-711 [144 Cal.Rptr. 330].) Indeed, at the time of trial, the Use Note to CALJIC No. 14.50—then the standard instruction for burglary—admonished: "If the defendant is charged with entering to commit a felony other than theft," as was the present defendant, "the felony must be named in the instruction and instructions defining such crime must be given." (Use Note to CALJIC No. 14.50 (5th ed. 1988) p. 170.) We recently reaffirmed this understanding of *Failla* in a related context: "In *Failla*, . . . we held that when a defendant is charged with burglary, the trial court, *on its own initiative*, must give instructions to the jury identifying and defining the target offense(s) that the defendant allegedly intended to commit upon entry into the building." (*People v. Prettyman* (1996) 14 Cal.4th 248, 268 [58 Cal.Rptr.2d 827, 926 P.2d 1013], italics in original.)

Here, the question of defendant's intent when he entered the apartment is unclear. There were no pre- or postoffense declarations of intent, and there was no evidence at the scene to suggest that a completed rape ever occurred. And yet the condition of the victim's body and the partial removal of her clothing would have suggested to a reasonable juror that some kind of sexual intent was in defendant's mind when he entered the apartment. As defendant observes, however, "sexual intent"—even if it consisted of an intent to commit some kind of sexual assault or some other "undifferentiated sexual misbehavior" (*Failla, supra*, 64 Cal.2d at pp. 565-566)—is not the same thing as intent to commit rape.

The People assert that there was no error because "although rape has a legal definition, it is commonly understood to mean sexual intercourse against the will of the victim." The People cite no empirical evidence or authority for the proposition that reasonable lay jurors are aware of the correct legal definition of rape and, as defendant observes, that assertion is contrary to *May, supra*, 213 Cal.App.3d 118, 129, and *People v. Rivera* (1984) 157 Cal.App.3d 736, 741 [203 Cal.Rptr. 842], both of which held that

a definition of rape is required in the analogous circumstance of a prosecution for assault with intent to commit rape. The People's assertion also might be made with respect to other offenses, such as oral copulation—one of the target crimes at issue in *Failla*, and for which there is a duty to define and instruct on the elements of the offense. We reject the People's attempted distinction and conclude that the court erred by failing to instruct, on its own motion, on the elements of rape.

Defendant asserts the error permitted the jury to "indulge in unguided speculation" (*Failla, supra,* 64 Cal.2d at p. 564) concerning his intent at the time of the entry into the apartment and thereby violated various of his constitutional rights, including his rights to trial by jury and due process of law. He argues that the burglary conviction cannot be upheld on the theory that it was predicated on intent to commit sodomy or theft, because it cannot be known whether the jury's general burglary verdict was premised upon those findings or instead upon a finding of intent at the time of entry to commit rape. Moreover, defendant observes, merely because the jury specifically convicted defendant on the sodomy and robbery counts, it did not necessarily find that defendant had the intent to commit those crimes *at the time he entered the apartment.*

The People assert that this error did not withdraw an element from the jury's determination, because the jury was instructed that it needed to find that defendant had the intent to rape (or commit sodomy or theft) at the time of entry. At most, the People assert, the error left the jury with incomplete and ambiguous directions.

Both parties appear to assume that in determining whether to affirm or reverse the burglary count, we should be guided by *People v. Guiton* (1993) 4 Cal.4th 1116 [17 Cal.Rptr.2d 365, 847 P.2d 45] (*Guiton*), in which we concluded: "If the inadequacy of proof is purely factual, of a kind the jury is fully equipped to detect, reversal is not required whenever a valid ground for the verdict remains, absent an affirmative indication in the record that the verdict actually did rest on the inadequate ground. But if the inadequacy is legal, not merely factual, that is, when the facts do not state a crime under the applicable statute, as in [*People v. Green* (1980) 27 Cal.3d 1 [164 Cal.Rptr. 1, 609 P.2d 468] (*Green*)], the *Green* rule requiring reversal applies, absent a basis in the record to find that the verdict was actually based on a valid ground." (*Guiton, supra,* 4 Cal.4th at p. 1129.)

The People, relying upon *Guiton,* assert that this case falls within the first category described in that case, and that absent an affirmative indication in the record that the burglary conviction actually rested upon a factually

inadequate ground, reversal is not required, because two valid grounds for the burglary conviction remain. Defendant, also relying upon *Guiton*, asserts that this case falls within the second category described in that case. Defendant stresses that he does not allege that the rape-based theory of burglary lacks evidentiary support, but instead that instructional error in failing to define the uncharged crime of rape rendered that theory of burglary legally erroneous. Under these circumstances, defendant asserts, *Guiton* teaches that the conviction must be reversed unless the People can show that the jury relied upon a legally correct theory in reaching the burglary verdict.

The situation that we face here—legally incomplete and ambiguous instructions relating to an element of the crime of burglary—does not fall squarely within either of the two categories described in *Guiton*. We do not have before us, as in the first category described above and as in the situation presented in *Guiton* itself, legally correct instructions on a theory for which there was an inadequacy of proof. Nor is the present situation identical to the kind of legal error described in the second category above, and as in the *Green* case—a legally *erroneous* instruction. *Guiton,* therefore, is not entirely apposite.

It is important to remember that the question before us is not whether the jury properly found defendant committed, or intended, *rape,* but whether it properly found him guilty of *burglary,* despite the trial court's error in failing to instruct on rape. In assessing the prejudicial impact of this instructional error, two points are critical. First, the intent to commit *any* felony (or theft) suffices for burglary. (§ 459.) Second, the jury need not unanimously decide, or even be certain, which felony defendant intended as long as it finds beyond a reasonable doubt that he intended some felony. (*People v. Russo* (2001) 25 Cal.4th 1124, 1132-1133 [108 Cal.Rptr.2d 436, 25 P.3d 641]; *Failla, supra,* 64 Cal.2d 560, 567-569.)

As explained below, under most of the possible factual scenarios that defendant posits whereby the jury might have erroneously found he intended rape, he still would be guilty of burglary; additionally, the one possible factual scenario under which the jury might have erroneously found that he intended rape is simply untenable.

The jury may have been uncertain as to exactly what sexual act would constitute rape. For example, as defendant suggests, the jury might have believed that defendant intended penetration by an object and might erroneously have believed that such intent would constitute an intent to commit rape. Or, if the jury believed that defendant entered the apartment with the intent to sexually assault the victim by, for example, groping or fondling, a

properly instructed jury would have been informed that entry into the victim's residence with such intent did not constitute entry with intent to rape. But any juror so believing (with a possible exception discussed below) still would properly find defendant guilty of *burglary*. Sexual assault of any type that a jury might erroneously consider to be rape would still be a *felony*. (E.g., §§ 243.4 [sexual battery], 289 [forcible sexual penetration].) *Any* felony suffices for burglary.

Stated differently, although the court should have instructed on the elements of rape, it also could have also instructed that the intent to commit any of these other sexual offenses would suffice for burglary. Sexual penetration under section 289 is the closest other offense in point. Defendant argues that what he did and what he intended, although clearly sexual, was ambiguous. Perhaps, upon entering the apartment, he intended penetration of the anus by an instrument, rather than sexual intercourse. The problem with this argument is that it might mean that defendant did not intend to commit rape, but he still would have intended to commit a felony (§ 289), which is all that is necessary for burglary. Defendant was convicted of burglary, not rape, and for the reasons discussed above, we conclude, beyond a reasonable doubt, that the absence of proper instruction on rape did not prejudice his burglary conviction. (*Chapman v. California* (1967) 386 U.S. 18, 24 [87 S.Ct. 824, 828, 17 L.Ed.2d 705, 24 A.L.R.3d 1065] (*Chapman*).)

As suggested, under only one possible and highly problematic scenario might the absence of an instruction defining rape have prejudiced defendant's burglary conviction. If defendant intended consensual sex when he entered the apartment and *only thereafter* acquired the intent to employ force or fear, he did not commit burglary. Aside from the extreme unlikelihood that the jury so believed from all the circumstances, in this respect we can agree with the People that rape is commonly understood to mean sexual intercourse (however defined) "against the will of the victim." Even if the jury was unaware of exactly what is meant by sexual intercourse, we can be confident that no jury would believe that *consensual* sexual intercourse was rape. Accordingly, if the jury believed defendant entered the apartment merely with the intent to engage in *consensual* sexual activity, no reasonable jury would believe that he entered with the intent to commit rape or any other sexual felony.

In short, defendant posits scenarios in which the jury erroneously may have believed that he entered the apartment with the intent to commit rape. But in each scenario, defendant would have entered with the intent to commit a felony, even if not specifically rape. On these facts, any misconception as to the exact elements of rape could not have resulted in an

erroneous conviction of burglary, which is what is involved here. Because we conclude beyond a reasonable doubt that the instructional error did not produce an improper burglary verdict, we must affirm the burglary conviction and uphold the related special circumstance. (*Chapman, supra,* 386 U.S. 18, 24 [87 S.Ct. 824, 828].)

b. *Asserted "directed verdict" on "structure" element of burglary*

 Defendant asserts the trial court "directed a verdict" on the "structure" element of burglary.

The trial court instructed the jury pursuant to former CALJIC No. 14.50, that in order to find a burglary it must be proved that defendant· *"entered a structure of the type shown by the evidence in this case"* (italics added) with the required intent. Defendant observes that at the time of the crimes charged, section 459 provided that anyone who entered a "house, room, apartment, . . . [or other designated fixed structure or part thereof] or other building" or other designated place, with the required intent, is guilty of burglary. Defendant asserts that the italicized language had the effect of advising the jury that whatever structure was shown by the evidence would suffice for burglary, and that by so instructing, the trial court directed the verdict on the structure element.

We considered and rejected the identical argument in *People v. DeSantis* (1992) 2 Cal.4th 1198 [9 Cal.Rptr.2d 628, 831 P.2d 1210], in which we reasoned: "The instruction required the jury to find that defendant entered a structure. It also required the jury to find that defendant entered a structure of the type shown by the evidence. The only thing that the instruction did not require of the jury was a finding that the 'structure of a type shown by the evidence' was a building. But only one type of structure was shown by the evidence: the Davieses' house. By definition the house was a building. No rational trier of fact could have found that the structure shown by the evidence—the Davieses' house—was not a building. The law does not require the jury to decide the impossible. There was no error." (*Id.,* at p. 1225.) We also observed in *DeSantis* that "had any federal constitutional error occurred, it would have been harmless" beyond a reasonable doubt. (*Id.,* at p. 1225, fn. 9.)

It was uncontested at trial that Hickman's apartment was a structure, and it cannot be doubted that the apartment was in fact a structure. In view of the evidence in the record, any error was harmless beyond a reasonable doubt. (*Neder v. United States* (1999) 527 U.S. 1, 7-20 [119 S.Ct. 1827, 1837-1839, 144 L.Ed.2d 35] [instruction that omits element of offense is subject to harmless error analysis under *Chapman, supra,* 386 U.S. 18].)

c. *"Inhabited dwelling" element of burglary*

i. *Sufficiency of evidence*

Section 460 provides: "Every burglary of an inhabited dwelling house . . . is burglary of the first degree." Section 459 provides, " 'inhabited' means currently being used for dwelling purposes, whether occupied or not." Section 212.5 provides that "every robbery which is perpetrated in an inhabited dwelling house . . . is robbery of the first degree."

Defendant asserts there is insufficient evidence that Hickman's apartment was an "inhabited dwelling" within the meaning of these sections, and accordingly, he claims, the first degree burglary and robbery convictions should be reversed. He argues that because the victim had moved many of her possessions and most of her clothing to her boyfriend's home and had slept there during the prior two weeks, and was cleaning her own apartment in preparation for vacating it, she had "already moved to her boyfriend's house" and her apartment was no longer an inhabited dwelling house.

As the People observe, although most of Hickman's clothing had been moved to her boyfriend's house, none of her furnishings had been moved. Accordingly, the evidence reflects only that she had begun to move to her boyfriend's house, and was still in the process of doing so; it does not reflect that she "already" had moved, as defendant asserts.

Defendant cites decisions construing the term "inhabited dwelling" in the context of premises that were in the process of being vacated. In *People v. Jackson* (1992) 6 Cal.App.4th 1185 [8 Cal.Rptr.2d 239], the court upheld a conviction for first degree robbery because "[i]t [was] clear that [the tenant] was still presently using the house, and in particular his bedroom, at the time of the robbery" (*id.*, at p. 1189) and the tenant had not yet completed the move from the house (*id.*, at p. 1187). Other cases reinforce the proposition that when a tenant moves out of an apartment without intending to return and continue living there, the premises become "uninhabited" for purposes of the relevant statutes, even if the tenant leaves some property behind with the intent of retrieving it later. (E.g., *People v. Cardona* (1983) 142 Cal.App.3d 481, 483-484 [191 Cal.Rptr. 109] [continued use of house by storing family belongings, while having departed with no intent ever to spend another night in the house, insufficient to make the house "inhabited" for purposes of first degree burglary].)

The use of a house as sleeping quarters is not determinative, but instead is merely a circumstance used to determine whether a house is inhabited. As

observed in *People v. Hernandez* (1992) 9 Cal.App.4th 438, 441 [11 Cal.Rptr.2d 739], "statutory amendments have eliminated the requirement that a burglary take place at night for it to be first degree burglary. [Citation.] Thus, the Legislature has rejected the view, expressed in prior case law, that the use of a house as sleeping quarters is critical." The court in *Hernandez* upheld a conviction for first degree burglary even though the victims of the burglary had just moved into the apartment, had not unpacked their belongings, and had not yet slept there. (*Id.*, at pp. 440-442.)

As observed in *People v. DeRouen* (1995) 38 Cal.App.4th 86 [44 Cal.Rptr.2d 842], disapproved on other grounds in *People v. Allen* (1999) 21 Cal.4th 846 [89 Cal.Rptr.2d 279, 984 P.2d 486], " ' "Burglary laws are based primarily upon a recognition of the dangers to personal safety created by the usual burglary situation—the danger that the intruder will harm the occupants in attempting to perpetrate the intended crime or to escape and the danger that the occupants will in anger or panic react violently to the invasion, thereby inviting more violence." ' [Citation.] 'In addition, a burglary of an inhabited dwelling involves an invasion of perhaps the most secret zone of privacy, the place where trinkets, mementos, heirlooms, and the other stuff of personal history are kept. Society therefore has an important interest in seeing to it that burglars stay out of inhabited dwelling houses.' " (*DeRouen, supra*, 38 Cal.App.4th 86, 91.) Furthermore, "[t]he ' " 'inhabited-uninhabited' dichotomy turns not on the immediate presence or absence of some person but rather on the character of the use of the building." ' [Citation.] '[T]he proper question is whether the nature of a structure's composition is such that a reasonable person would expect some protection from unauthorized intrusion.' [Citation.]" (*Id.*, at pp. 91-92, italics omitted.)

In the case presently before us, the evidence does not establish that the victim intended the day of her death—September 7, 1989—to be the last day she would inhabit her apartment, and that she would not sleep there again. Apparently, her furniture (including, we presume, bedroom furniture) remained in the apartment, and the utilities remained on. We agree with the People that the victim's "continual presence during the daytime, in a house where she kept her personal belongings increased the risk of personal injury and the danger of a violent confrontation during a burglary." The evidence was sufficient to support the jury's finding that defendant burglarized (and committed robbery in) an inhabited dwelling.

ii. *Adequacy of CALJIC No. 14.52*

To define "inhabited dwelling house," the trial court instructed the jury pursuant to CALJIC No. 14.52, as follows: "An inhabited dwelling

house is a structure which is occupied and *customarily* used as a dwelling. It is inhabited although the occupants are temporarily absent." (Italics added.) Defendant observes that section 459 defines an inhabited dwelling house as being one that is "currently" (not "customarily") used for dwelling purposes, "whether occupied or not," and asserts that the instruction was "clearly erroneous" because the words "customarily" and "currently" do not have the same meaning.

As the People observe, although the phrase "customarily used as a dwelling" focuses on the general nature of the structure, the instruction also informed the jury that the structure must be "occupied" and hence that the structure currently must be used as a dwelling (even though its occupants are temporarily absent). We also agree with the People that "[a]s long as the instruction given accurately conveyed the law, the apparent inconsistency between statutory language and the instructional language is of no consequence." (See *People v. Benson* (1990) 52 Cal.3d 754, 801 [276 Cal.Rptr. 827, 802 P.2d 330] ["What is crucial . . . is the meaning that the instructions *communicated to the jury*"].) We find that there is no reasonable likelihood that the jury misunderstood anything of significance by virtue of being instructed as it was.[12]

### 6. Claims related to the robbery charge

#### a. Sufficiency of evidence supporting robbery and related charges

 Defendant challenges the sufficiency of the evidence supporting his conviction for robbery (§ 211) and first degree murder based upon a robbery-felony-murder theory. He also challenges the sufficiency of the evidence supporting the true finding concerning the robbery-murder special circumstance.

Defendant asserts that the robbery charge must fail if the evidence does not support a finding that defendant conceived his intent to steal either before committing an act of force against Hickman, or during the commission of that act. Likewise, defendant asserts, a robbery-felony-murder theory of first degree murder was not satisfied if there was no robbery, or if the intent to rob arose after infliction of the fatal wound. (*People v. Morris*

---

[12]We observe that CALJIC No. 14.52 and its predecessor, CALJIC No. 202-A, have employed the challenged term "customarily" since 1946. In 1977, however, the relevant statutory language was amended to provide that "[a]s used in this chapter, 'inhabited' means currently being used for dwelling purposes, whether occupied or not." (§ 459, as amended by Stats. 1977, ch. 690, § 3, p. 2220.) To avoid potential confusion, the drafters of future pattern jury instructions concerning burglary may wish to consider whether to more closely align the instructions with the present statutory language.

(1988) 46 Cal.3d 1, 23, fn. 9 [249 Cal.Rptr. 119, 756 P.2d 843], overruled on another ground in *In re Sassounian* (1995) 9 Cal.4th 535, 543 [37 Cal.Rptr.2d 446, 887 P.2d 527].) And similarly, defendant urges, the robbery-murder special circumstance (§ 190.2, subd. (a)(17)) was not satisfied if the theft of the victim's property was merely incidental to the murder. (*People v. Turner* (1990) 50 Cal.3d 668, 688 [268 Cal.Rptr. 706, 789 P.2d 887] (*Turner*).) In all three respects, defendant argues that there is insufficient evidence that he harbored larcenous intent before or during his use of force or fear against the victim, and that the more reasonable inference from the evidence is that he formed the intent to take the items after killing her.

▇▇▇▇ In addressing defendant's claim of insufficiency, we must "review the entire record, and drawing all reasonable inferences in favor of [the judgment], . . . determine whether a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (*People v. Raley* (1992) 2 Cal.4th 870, 889 [8 Cal.Rptr.2d 678, 830 P.2d 712] (*Raley*).)

▇▇▇▇ We have stated that "when one kills another and takes substantial property from the victim, it is ordinarily reasonable to presume the killing was for purposes of robbery." (*Turner, supra,* 50 Cal.3d 668, 688.) And, significantly, we have observed that "[i]f a person commits a murder, *and after doing so takes the victim's wallet,* the jury may reasonably infer that the murder was committed for the purpose of obtaining the wallet, because murders are commonly committed to obtain money." (*People v. Marshall* (1997) 15 Cal.4th 1, 35 [61 Cal.Rptr.2d 84, 931 P.2d 262], italics added (*Marshall*).) Here, of course, there is evidence that shortly after the killing defendant cashed a check made out to Hickman and placed her wallet inside a Crown Royal bag, which he hid under a bush at the beach near his apartment. It has been stated that " 'when a person is shown to be in possession of recently stolen property slight corroborative evidence of other inculpatory circumstances which tend to show guilt supports the conviction of robbery.' " (*People v. Mulqueen* (1970) 9 Cal.App.3d 532, 542 [88 Cal.Rptr. 235].) This evidence suggested that defendant entered the apartment with the intent to rob, and thereafter stored the loot in a Crown Royal bag (the same type of bag found in defendant's closet containing personal property of other theft victims).

Defendant notes that he took only Hickman's wallet and left behind other items of substantial value, such as her television and videotape recorder, and he argues that this circumstance, coupled with the slim evidence concerning *when* defendant formed an intent to steal, most reasonably supports a conclusion that he formed the intent to steal *after* the killing. From this, defendant reasons that no reasonable juror could have determined beyond a

reasonable doubt that he formed the requisite intent to steal prior to or during the application of force or fear against the victim, or that the force used was employed for the purpose of perpetrating the theft. We conclude, based upon the language quoted above, that the evidence supporting the robbery and related charges is sufficient, and that, as the People assert, on this record a jury reasonably could infer that defendant intended from the outset to steal the victim's possessions by force, or at least possessed that intent as he was engaged in inflicting force upon her.

Defendant also asserts that there is insubstantial evidence that he took Hickman's wallet and check *from her person*. It is sufficient for robbery, however, if the property is taken from the victim's "immediate presence" (§ 211), and hence, contrary to defendant's assertion, his taking would be no less robbery merely because the victim may not have held or carried her wallet while she was cleaning her apartment. (*People v. Hayes* (1990) 52 Cal.3d 577, 626-627, 630-631 [276 Cal.Rptr. 874, 802 P.2d 376] (*Hayes*) ["immediate presence" means at least an area within which the victim reasonably could be expected to exercise physical control over the property taken; this test may be met even if the property was located in another room of the house].)

b. *Instruction concerning the intent element of robbery*

 Defendant asserts that the instructions given to the jury concerning robbery failed to advise the jury of the requirement that the intent to steal must arise before or during the commission of the act of force, and that the trial court had a sua sponte duty to so instruct. We find that the instructions given were adequate.

The jury was instructed in the language of CALJIC Nos. 9.40 (defining robbery)[13] and 8.21 (defining felony murder in the commission of robbery,

---

[13]The jury was instructed:

"Defendant is accused in Count II of the information of having committed the crime of robbery, a violation of section 211 of the Penal Code. Every person who takes personal property in the possession of another, against the will and from the person or immediate presence of that person, accomplished by means of force or fear and with the specific intent permanently to deprive such person of such property, is guilty of the crime of robbery in violation of Penal Code section 211.

"In order to prove such crime, each of the following elements must be proved:

"1. A person had possession of property of some value however slight,

"2. Such property was taken from such person or from his immediate presence,

"3. Such property was taken against the will of such person,

"4. The taking was accomplished either by force, violence, fear or intimidation, and

among other crimes).[14] We have held that previous versions of those two instructions (former CALJIC No. 9.10 (4th ed. 1979), now CALJIC No. 9.40; and former CALJIC No. 8.21 (4th ed. 1979)), "adequately cover the issue of the time of the formation of the intent to steal." (*People v. Hendricks* (1988) 44 Cal.3d 635, 643 [244 Cal.Rptr. 181, 749 P.2d 836] (*Hendricks*); see also *Hayes, supra,* 52 Cal.3d 577, 625-626, 629.) Defendant concedes that CALJIC No. 9.40 is substantively identical to former CALJIC No. 9.10, relied upon in our prior cases, but, he asserts, the version of CALJIC No. 8.21 given in the present case differed "in a crucial respect" from the version given in *Hayes* and *Hendricks*, and to the extent *Hayes* and *Hendricks* imply that CALJIC No. 9.40 is sufficient in itself, their analysis is erroneous.

The version of CALJIC No. 8.21 given in *Hayes* stated that a killing is murder in the first degree if it occurred "*as a result of* the commission of the crime[] of robbery . . . ." (CALJIC No. 8.21, italics added, quoted in *Hayes, supra,* 52 Cal.3d 577, 626, fn. 9.) We stated in *Hayes* that "[a] reasonable juror would necessarily understand from this instruction that defendant was guilty of robbery-murder only if the intent to steal was formed before the fatal blow was struck." (52 Cal.3d at p. 629.) The version of the instruction given here omitted the quoted "as a result of" language, and instead provided that a killing is murder in the first degree if it occurred "during the commission or attempted commission of robbery . . . ." Defendant asserts that by virtue of this different language, we cannot be confident, as we were in *Hayes*, that a reasonable juror necessarily would understand from this instruction that defendant was guilty of robbery murder only if the intent to steal was formed before the fatal blow was struck. Instead, defendant asserts, such a juror might have been left with the impression that defendant could be guilty of robbery murder if he formed the intent to steal *after* he struck the fatal blow. Defendant theorizes that a reasonable juror might have found that "the robbery began with the application of force which resulted in the homicide and continued through the time that [defendant] formed the intent to steal and acted on that intent by taking Ms. Hickman's property." In such a situation, defendant reasons, the juror would find that the killing was committed "during the commission of the robbery," even though the juror also had found that "intent to steal did not arise until

---

"5. Such property was taken with the specific intent permanently to deprive such person of the property."

[14]The jury was instructed:

"The unlawful killing of a human being, whether intentional, unintentional or accidental, which occurs during the commission or attempted commission of the crime of robbery, burglary or sodomy is murder of the first degree when the perpetrator had the specific intent to commit such crime.

"The specific intent to commit robbery, burglary or sodomy and the commission or attempted commission of such crime must be proved beyond a reasonable doubt."

after the killing had occurred." We are not persuaded by defendant's speculation.

As both parties acknowledge, the jury also was instructed pursuant to CALJIC No. 3.31, regarding the concurrence of act and specific intent. That instruction required the jury to find "a union or joint operation of act or conduct and a certain specific intent in the mind of the perpetrator."[15] Reading CALJIC Nos. 8.21 and 9.40 together with No. 3.31, we believe that a reasonable juror would understand that defendant had to possess the specific intent to steal prior to or during his application of the force required for the commission of the offense of robbery.

Moreover, the jury also was instructed pursuant to CALJIC No. 8.81.17 that (1) the robbery-murder special-circumstance allegation could not be found true unless "the murder was committed while the defendant was engaged in the commission of a robbery . . . or the murder was committed during the immediate flight after the commission of a robbery," and that (2) "[t]o find the special circumstance[] referred to in these instructions as murder in the commission of robbery . . . is true, it must be proved . . . [that] the murder was committed in order to carry out or advance the commission of the crime[] of robbery . . . or to facilitate the escape therefrom or to avoid detection. [¶] In other words, the special circumstance referred to in these instructions is not established if the robbery . . . or attempted robbery . . . [was] merely incidental to the commission of murder."

We bear in mind that " ' " '[w]hether a jury has been correctly instructed is not to be determined from a consideration of parts of an instruction or from particular instructions, but from the entire charge of the court.' " ' " (*People v. Tapia* (1994) 25 Cal.App.4th 984, 1027 [30 Cal.Rptr.2d 851].) So viewing the trial court's charge, we conclude that the jury was adequately informed concerning the point in time the intent to steal must have been formed, and hence the trial court had no independent obligation to instruct specifically that the intent to steal must arise prior to or during the application of force.

c. *Requested pinpoint instruction concerning "afterthought theft"*

Defendant asserts that even assuming the instructions concerning the requirement of intent to steal were technically sufficient, as we have

---

[15]The jury was instructed:

"In the crimes charged in Counts I, II, and III of the information, namely, murder, robbery and burglary, there must exist a union or joint operation of act or conduct and a certain specific intent in the mind of the perpetrator. Unless such specific intent exists, the crime to which it relates is not committed.

"The specific intent required is included in the definitions of the crimes charged."

concluded above, "they were nevertheless far from clear." He asserts that "only the most intricate analysis could possibly have advised the jury that ' "if the intent arose only after the use of force against the victim, the taking will at most constitute a theft." ' " (Quoting *Marshall, supra,* 15 Cal.4th 1, 34.) Defendant argues that, in these circumstances, the trial court erred in refusing to grant his request for a clarifying "pinpoint" instruction.

As defendant acknowledges, he made no such request with respect to the robbery charge itself. Defendant did request such a pinpoint instruction relating to the robbery-murder special circumstance, however. Defendant asserts that the trial court should have given *that* requested instruction, and then, *on the court's own motion,* also should have given a version of that pinpoint instruction, modified to address the robbery charge.

Defendant requested that the jury be instructed concerning the robbery-murder special circumstance as follows: "With regard to the special circumstance allegation regarding a robbery you are instructed that you cannot return a verdict finding that special circumstance to be true unless it is proved beyond a reasonable doubt and to a moral certainty that the defendant conceived his intent to steal either before committing the act of force against the victim, or during the commission of that act. If the intent arose only after the use of force against the victim, the taking will at most constitute a theft."

We find no basis for reversal. As explained below, even if trial counsel properly had requested a pinpoint instruction as to the robbery charge itself, and assuming that defendant would have been entitled to such an instruction upon request, any error of the trial court in failing to provide the jury with the pinpoint instruction was nonprejudicial.

As defendant observes, we have stated that "[u]pon request, a trial court *must give* jury instructions 'that "pinpoint[] the theory of the defense," ' but it can refuse instructions that highlight ' "specific evidence as such." ' " (*People v. Earp* (1999) 20 Cal.4th 826, 886 [85 Cal.Rptr.2d 857, 978 P.2d 15] (*Earp*), italics added; see also *Saille, supra,* 54 Cal.3d 1103, 1119.) "Because the latter type of instruction 'invite[s] the jury to draw inferences favorable to one of the parties from specified items of evidence,' it is considered 'argumentative' and therefore should not be given." (*Earp, supra,* 20 Cal.4th at p. 886.) Even if proper, however, pinpoint instructions "are not required to be given sua sponte." (*Saille, supra,* 54 Cal.3d at p. 1119.)

At the trial, the prosecution objected to defendant's proposed pinpoint instruction on the grounds the proposed instruction was legally

incorrect and argumentative. On appeal, the People appear to abandon those claims, arguing instead that the proposed pinpoint instruction was confusing (because, as requested by defense counsel, it related only to the robbery special-circumstance allegation, and not the robbery charge itself), and even assuming it generally reflected a correct statement of the law, it was unnecessary because the point was covered adequately by the other instructions discussed *ante*. In other words, the People assert, defendant's proposed instruction merely would have elaborated on the general instructions given, and hence the trial court's refusal to give it was not error.

As the People observe, we so concluded—finding no error in similar circumstances—in *Hayes, supra,* 52 Cal.3d 577, 626, and *Hendricks, supra,* 44 Cal.3d 635, 643, in which we rejected such claims based upon failure to deliver similar requested pinpoint instructions. Defendant asserts that these no-error holdings are suspect, and that if, as we repeatedly have stated, legally correct and factually warranted pinpoint instructions designed to elaborate and clarify other instructions *should be delivered upon request* (e.g., *Earp, supra,* 20 Cal.4th 826, 886; *Saille, supra,* 54 Cal.3d 1103, 1120), we must find refusal to so instruct, upon request, to be error. As defendant observes, faced with a similar situation in the context of third party perpetrator instructions in *Earp, supra,* 20 Cal.4th at pages 886-887, we did not take the *Hayes/Hendricks* approach and find no error, but instead assumed error and found no prejudice under the "reasonable probability" test.

As defense counsel observed in his argument to the jury, the physical evidence suggested that the killing occurred about 3:00 p.m., but because, as the pathologist testified, Hickman's leg muscles exhibited comparatively less rigor mortis than the rest of her body, the physical evidence also suggested that she had been moved or repositioned "sometime after death within the first few hours." (See *ante,* p. 320.) Based upon this evidence, defense counsel theorized for the jury that defendant killed Hickman, and then, a few hours later (either after having remained in the apartment, or after having left and returned) repositioned the victim's legs. Counsel argued that if the "thefts took place on that second entry, then they are not special circumstances. And they are not burglaries and they are not robberies. They are theft, they are a petty theft or a grand theft." Later, defense counsel told the jury, concerning the robbery count: "If the taking occurred incidental to or as an afterthought after the killing, it's not a special circumstance. It won't support that first degree murder. [¶] The murder has to occur . . . during the commission of or during the immediate flight from [the robbery]."

Defendant stresses that, given the evidence, the jury reasonably could have found that defendant committed a killing, and then either stayed in the

apartment for an hour or two, or departed and returned after an hour or two, at which time he repositioned Hickman's body and wiped her with a sponge. Defendant also asserts that the jury reasonably could conclude, as defense counsel theorized, that at that later time—well after the killing—defendant formed the intent to steal, and then stole Hickman's wallet.[16]

We conclude there is no reasonable probability that, *had* trial counsel requested a pinpoint instruction concerning the robbery charge, and *assuming* that the trial court would have erred in refusing to grant a request for such an instruction (or that it erred in refusing the requested robbery-murder special-circumstance instruction), the jury would have failed to find that a robbery occurred. As a threshold matter, we note that the jury was properly instructed concerning the intent element of robbery: having been instructed pursuant to CALJIC Nos. 8.21, 9.40, and 3.31, a reasonable juror would understand that defendant was required to possess the specific intent to steal prior to or during his application of the force required for the commission of the offense of robbery. Moreover, as noted above, CALJIC No. 8.81.17 made it clear that in order for the jury to find true the robbery-murder special circumstance, it "must be proved . . . [that] the murder was committed in order to carry out or advance the commission of the crime[] of robbery . . . or to facilitate the escape therefrom or to avoid detection. [¶] In other words, the special circumstance referred to in these instructions is not established if the robbery . . . or attempted robbery . . . [was] *merely incidental to* the commission of murder." (Italics added.) Any lingering doubt that we could have concerning a reasonable juror's understanding of the intent element of robbery is dispelled by defense counsel's unrebutted closing argument, in which he emphasized and "pinpointed" for the jury the defense theory that if the taking was an afterthought to the killing, the robbery charge, the robbery-felony-murder theory, and the robbery-murder special circumstance were not established.

Under these circumstances, we conclude that the jury was adequately informed concerning "afterthought theft," and that, assuming the trial court erred in failing to provide the jury with a requested pinpoint instruction highlighting the defense theory, it is not reasonably probable that the trial court's failure to so instruct affected the robbery verdict, the first degree murder verdict, or the robbery-murder special-circumstance finding.

### 7. *Claims related to the sodomy charge*

#### a. *Sufficiency of evidence supporting forcible sodomy*

Defendant was convicted of forcible sodomy, which is defined as "sexual contact consisting of contact between the penis of one person and

---

[16]Based apparently on this state of the evidence, the jury was instructed on theft as a lesser included offense of robbery.

the anus of another person" (§ 286, subd. (a)) "when the act is accomplished against the victim's will by means of force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the victim or another person" (*id.*, subd. (c)(2)). The jury also found true a sodomy-murder special circumstance (*id.*, § 190.2, subd. (a)(17)(D)).

The evidence established that the victim had been left in a position with her feet propped against the wall, in a manner that exposed her genitalia and anus. Her blood-soaked shirt had been pulled up over her breasts, and her bra had been cut. Her panties were pulled down to midthigh. A pathologist testified that Hickman had been placed in the position in which she had been found "sometime after death within the first few hours." The pathologist also testified that the victim's anus was dilated to approximately one-half inch in diameter, and there was a bruise approximately two to three inches inside the rectum, where bleeding had occurred. According to the pathologist, this rectal bruising occurred *shortly before death*, and the injuries were consistent with penetration by a blunt object such as a penis or a finger. The pathologist testified that he did not observe in the crime scene photographs any object in the immediate vicinity of the victim's body that was consistent with the infliction of the injuries she sustained. Although tests were conducted for forensic evidence of defendant's seminal fluids or pubic hair, no such evidence was discovered.

Again, in addressing defendant's claim of insufficiency, we must "review the entire record, and drawing all reasonable inferences in favor of [the judgment], . . . determine whether a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (*Raley, supra,* 2 Cal.4th 870, 889.)

Defendant appears to concede that there was substantial evidence of anal penetration shortly before Hickman's death. He asserts, however, that the physical and medical evidence was insufficient to establish sodomy, because, as the pathologist testified, the evidence also was as consistent with penetration by other possible objects such as a finger (e.g., *People v. Keeney* (1994) 24 Cal.App.4th 886 [29 Cal.Rptr.2d 451]) or blunt object (e.g., *People v. Turner* (1985) 171 Cal.App.3d 116 [214 Cal.Rptr. 572] [sewing machine brush handle]) as with penetration by defendant's penis. Defendant claims that no reasonable juror could have found that the essential element of penetration by defendant's penis was proved beyond a reasonable doubt.

In prior decisions addressing analogous circumstances, courts have upheld implicit jury findings of penetration by a penis. In *People v. Chambers* (1982) 136 Cal.App.3d 444 [186 Cal.Rptr. 306], a murder/attempted rape

case, a pathologist testified that penetration had been made by an object "consistent" with a human penis. Rejecting the defendant's claim of insufficient evidence, the court commented that "what the pathologist can say from a laboratory examination is more limited than what a reasonable trier of fact may find beyond any reasonable doubt, after considering the evidence as a whole." (*Id.*, at p. 455.) We recognize, as defendant asserts, that a jury may not rely upon unreasonable inferences, and that "[a]n inference is not reasonable if it is based only on speculation." (*People v. Holt* (1997) 15 Cal.4th 619, 669 [63 Cal.Rptr.2d 782, 937 P.2d 213] (*Holt*).)

In order to conclude that the evidence was legally sufficient, we need not determine that the evidence was strong, and indeed it may be viewed as not strong. But the jury had before it clear evidence of a sexual attack, including expert evidence indicating anal penetration "consistent with" a penis, shortly before the victim's death. We conclude that this evidence was sufficient to permit a reasonable jury to infer, and find beyond a reasonable doubt, that the penetration was caused by defendant's penis.

 b. *Failure to instruct on battery as a lesser included offense of forcible sodomy*

 " 'The trial court has a sua sponte duty to instruct on lesser included offenses when the evidence raises a question as to whether all of the elements of the charged offense were present and there is evidence that would justify a conviction of such a lesser offense.' " (*People v. Hardy* (1992) 2 Cal.4th 86, 184 [5 Cal.Rptr.2d 796, 825 P.2d 781] (*Hardy*).) As we have explained, instructing on lesser included offenses shown by the evidence avoids forcing the jury into an "unwarranted all-or-nothing choice" (*People v. Wickersham* (1982) 32 Cal.3d 307, 323-324 [185 Cal.Rptr. 436, 650 P.2d 311], overruled on other grounds in *People v. Barton* (1995) 12 Cal.4th 186, 201 [47 Cal.Rptr.2d 569, 906 P.2d 531]) that could lead to an unwarranted conviction. (*Beck v. Alabama* (1980) 447 U.S. 625, 633-638 [100 S.Ct. 2382, 2387-2390, 65 L.Ed.2d 392]; *Keeble v. United States* (1973) 412 U.S. 205, 212-213 [93 S.Ct. 1993, 1998, 36 L.Ed.2d 844] ["[A] defendant is entitled to a lesser offense instruction . . . precisely because he should not be exposed to the substantial risk that the jury's practice will diverge from theory. Where one of the elements of the offense charged remains in doubt, but the defendant is plainly guilty of *some* offense, the jury is likely to resolve its doubts in favor of conviction."] (Italics in original.).)

"An offense is necessarily included in another if . . . the greater statutory offense cannot be committed without committing the lesser because all of

the elements of the lesser offense are included in the elements of the greater." (*People v. Clark* (1990) 50 Cal.3d 583, 636 [268 Cal.Rptr. 399, 789 P.2d 127].) In other words, when the greater crime "cannot be committed without also committing another offense, the latter is necessarily included within the former." (*People v. Lagunas* (1994) 8 Cal.4th 1030, 1034 [36 Cal.Rptr.2d 67, 884 P.2d 1015].)

■ "*Forcible sodomy*" is defined as "sexual conduct consisting of contact between the penis of one person and the anus of another person" (§ 286, subd. (a)) "when the act is accomplished against the victim's will by means of force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the victim or another person" (*id.*, subd. (c)(2)). "*Battery*" is "any willful and unlawful use of force or violence upon the person of another." (§ 242.)

Although we have not been cited and have not found any case directly on point, we note that decisions have assumed that battery is a necessarily included offense of sodomy. (*People v. Harrison* (1989) 48 Cal.3d 321, 327 [256 Cal.Rptr. 401, 768 P.2d 1078]; *People v. Willoughby* (1985) 164 Cal.App.3d 1054, 1068 [210 Cal.Rptr. 880].) Moreover, as defendant observed in his opening brief, in the analogous context of forcible rape, courts expressly have held that battery is a necessarily included offense (*People v. Guiterrez* (1991) 232 Cal.App.3d 1624, 1636 & fn. 2 [284 Cal.Rptr. 230], disapproved on other grounds in *People v. Cromer* (2001) 24 Cal.4th 889, 901 [103 Cal.Rptr.2d 23, 15 P.3d 243]; *People v. Lema* (1987) 188 Cal.App.3d 1541, 1545 [234 Cal.Rptr. 173]), and the People offer in their response brief no basis for distinguishing those cases in the present context.[17] We conclude that, under the test set forth above for lesser included offenses, one cannot commit forcible sodomy without also committing battery, and, accordingly, battery is a necessarily included offense of forcible sodomy.

We also conclude, however, that there was insufficient evidence to require the sua sponte giving of an instruction on battery. "As our prior decisions explain, the existence of '*any* evidence, no matter how weak' will not justify instructions on a lesser included offense, but such instructions are required whenever evidence that the defendant is guilty only of the lesser offense is 'substantial enough to merit consideration' by the jury. [Citations.] 'Substantial evidence' in this context is ' "evidence from which a jury composed of reasonable [persons] could . . . conclude[]" ' that *the lesser offense, but not*

[17]Additionally, as defendant notes, battery is listed as a lesser included offense of sodomy in the jury instruction handbook of the California Center for Judicial Education and Research. (CJER Mandatory Criminal Jury Instructions Handbook (CJER 2000) § 2.76, p. 64.)

*the greater,* was committed. [Citations.]" (*People v. Breverman* (1998) 19 Cal.4th 142, 162 [77 Cal.Rptr.2d 870, 960 P.2d 1094], second italics added (*Breverman*).)

The People assert that in view of the ample evidence indicating that the victim suffered a sexual attack, "it is highly unlikely that the jury would have inferred that [defendant] penetrated [the victim's] rectum solely with a finger, instead of a sexual organ" or some other foreign object. As defendant observes, the People's unspoken assumption is that a sexual attack must involve penile penetration—but this premise clearly is false. (§ 289 [proscribing forcible acts of penetration of genital or anal orifices by use of a foreign object, including a finger, for purposes of sexual arousal, gratification, or abuse].)

Nevertheless, we conclude there was no substantial evidence that defendant was guilty of battery but *not* forcible sodomy. (*Breverman, supra,* 19 Cal.4th 142, 162.) As noted above, the pathologist testified that the bruises found inside the victim's rectum were consistent with penetration by either a penis *or* a finger (or another blunt foreign object), and there was no physical evidence of penile penetration (such as sperm or pubic hairs). None of this, however, amounts to substantial evidence that defendant was guilty of battery but *not* forcible sodomy.[18]

We conclude that the trial court did not err in failing to instruct on its own motion concerning the lesser included offense of battery.

8. *Challenges to the murder conviction*

a. *Sodomy as a basis for felony murder*

██ Defendant was charged in count I with murder in violation of section 187. The trial court instructed the jury that defendant could be convicted of murder in the first degree, without the showing of premeditation or malice aforethought required by section 187, if the jury found that the killing occurred during the commission of a robbery, burglary, or sodomy.

---

[18]When defendant was informed that the police were about to take samples of his pubic hair and his fingernails, a police officer left defendant alone in a "temporary cell" for a few minutes while contacting defendant's attorney. Upon returning to defendant's cell, the officer observed defendant hunched over a combination urinal/basin located in the corner of the cell. The officer immediately noticed that defendant had washed his hands and bitten or torn down his fingernails. Citing to this evidence, defendant asserts that "defendant did not attempt to cleanse evidence from his penis." The record does not support defendant's speculation. For all we know, during the time the officer was out of the room, defendant may have stood at the combination urinal/basin and cleaned his penis as well as his fingers. In any event, this does not constitute evidence of significance, tending to demonstrate that defendant was guilty of battery but not forcible sodomy.

The People concede that the felony-murder charge as to sodomy was erroneous because at the time the crimes were committed, sodomy was not listed in the statute as a predicate felony for first degree felony murder. (*Tapia v. Superior Court* (1991) 53 Cal.3d 282, 286, 298-299 [279 Cal.Rptr. 592, 807 P.2d 434].) Contrary to defendant's assertion, however, this does not require reversal of the first degree murder conviction, because the jury's verdicts reflect that the first degree murder conviction nevertheless was grounded upon a valid legal theory of felony murder based upon robbery. (*Marshall, supra,* 15 Cal.4th 1, 38.)

Defendant relies upon *Guiton, supra,* 4 Cal.4th 1116, in which, as noted above, we distinguished cases in which the prosecution relied upon a factually inadequate theory from cases in which the prosecution's theory was legally inadequate. We held in *Guiton* that if the inadequacy of proof is purely factual, "reversal is not required whenever a valid ground for the verdict remains, absent an affirmative indication in the record that the verdict actually did rest on the inadequate ground" (*id.* at p. 1129), but that if the inadequacy is legal, the "rule requiring reversal applies, absent a basis in the record to find that the verdict was actually based on a valid ground." (*Ibid.,* fn. omitted.)

Facing a situation similar to that here at issue, we held in *Marshall, supra,* 15 Cal.4th 1: "Because it is possible here to determine from the record that the jury necessarily found defendant guilty on a proper theory (*People v. Guiton, supra,* 4 Cal.4th at p. 1130; see *People v. Sedeno* (1974) 10 Cal.3d 703, 721 [112 Cal.Rptr. 1, 518 P.2d 913]), there is no need to characterize the claimed inadequacy as either factual or legal." (*Marshall, supra,* 15 Cal.4th 1, 38.) *Marshall's* reasoning applies to the present case as well: The jury found true the special circumstances allegations that defendant killed the victim during the commission of a robbery. "Because a jury must unanimously agree that a special circumstance finding is true (§ 190.4), and the jury in this case was so instructed, the jury's finding that defendant killed [the victim] in the course of committing [a robbery] indicates that the jury unanimously found defendant guilty of first degree murder on the valid theory that the killing occurred during the . . . commission of a [robbery]." (*Marshall, supra,* 15 Cal.4th 1, 38; accord, *People v. Kelly* (1992) 1 Cal.4th 495, 531 [3 Cal.Rptr.2d 677, 822 P.2d 385].) Accordingly, we decline to reverse defendant's first degree murder conviction merely because the felony-murder theory as to sodomy was erroneous.

b. *Instruction on felony murder*

 Defendant asserts that the trial court's instructions permitting the jury to find him guilty of first degree murder on a felony-murder theory

violated his right to due process of law and related constitutional rights because he was charged in the information only with "malice murder" under section 187 and was not charged with first degree felony murder under section 189. Defendant claims that the jury's resulting general verdict convicting him of first degree murder (without specifying the theory of first degree murder) must be reversed. We disagree.

Defendant argues that (i) the trial court lacked jurisdiction to try him for the uncharged crime of first degree felony murder; (ii) the information failed to put him on notice that the prosecution planned to proceed under a first degree felony-murder theory; (iii) the felony-murder instructions violated his right to have all elements of the charged crime proved beyond a reasonable doubt; and (iv) charging both malice murder and felony murder in one count of the information violated his right to a unanimous verdict and unconstitutionally subjected him to double jeopardy.

All of defendant's various claims rest upon the premise that under *People v. Dillon* (1983) 34 Cal.3d 441 [194 Cal.Rptr. 390, 668 P.2d 697] (*Dillon*), felony murder and premeditated murder are separate crimes, and that *Dillon* implicitly overruled *People v. Witt* (1915) 170 Cal. 104 [148 P. 928], in which we held that a defendant may be convicted of felony murder even though the information charged only murder with malice.

As the People observe, numerous appellate court decisions have rejected defendant's jurisdictional argument. (*People v. Wilkins* (1994) 26 Cal.App.4th 1089, 1097 [31 Cal.Rptr.2d 764]; *People v. Johnson* (1991) 233 Cal.App.3d 425, 453-457 [284 Cal.Rptr. 579]; *People v. Scott* (1991) 229 Cal.App.3d 707, 712-718 [280 Cal.Rptr. 274]; *People v. Watkins* (1987) 195 Cal.App.3d 258, 264-268 [240 Cal.Rptr. 626].) We have rejected defendant's argument that felony murder and murder with malice are separate offenses (*Carpenter, supra*, 15 Cal.4th 312, 394-395 [it is unnecessary for jurors to agree unanimously on a theory of first degree murder]; *People v. Guerra* (1985) 40 Cal.3d 377, 386 [220 Cal.Rptr. 374, 708 P.2d 1252] [same]), and, subsequent to *Dillon, supra*, 34 Cal.3d 441, we have reaffirmed the rule of *People v. Witt, supra*, 170 Cal. 104, that an accusatory pleading charging a defendant with murder need not specify the theory of murder upon which the prosecution intends to rely. Thus we implicitly have rejected the argument that felony murder and murder with malice are separate crimes that must be pleaded separately. (E.g., *People v. Diaz* (1992) 3 Cal.4th 495, 557 [11 Cal.Rptr.2d 353, 834 P.2d 1171] (*Diaz*); *People v. Gallego* (1990) 52 Cal.3d 115, 188 [276 Cal.Rptr. 679, 802 P.2d 169] (*Gallego*).)

As we observed in *Diaz, supra*, 3 Cal.4th 495, "generally the accused will receive adequate notice of the prosecution's theory of the case from the

testimony presented at the preliminary hearing or at the indictment proceedings." (*Id.,* at p. 557.) In the present case, defendant received adequate notice: (i) the preliminary hearing testimony made clear the prosecution's intent to establish that defendant killed during the commission of a burglary and a robbery; (ii) the information charged defendant with robbery, burglary, and sodomy, and (iii) the evidence at trial alerted defendant to the felony-murder theory. Even now, defendant does not explain in what manner he might have been prejudiced by the absence of a separate felony-murder charge. We conclude that defendant received constitutionally adequate notice of the prosecution's felony-murder theory. (*Diaz, supra,* 3 Cal.4th 495, 557; *Gallego, supra,* 52 Cal.3d 115, 188-189.)

In summary, we reject, as contrary to our case law, the premise underlying defendant's assertion that felony murder and malice murder are two separate offenses. Accordingly, we also reject defendant's various claims that because the information charged him only with murder on a malice theory, and the trial court instructed the jury pursuant to both malice and a felony-murder theory, the general verdict convicting him of first degree murder must be reversed.

c. *Sufficiency of evidence supporting premeditated and deliberated murder*

 Defendant asserts that the evidence is insufficient to support a finding of first degree murder on a theory that he premeditated and deliberated killing Hickman. Once again, we must "review the entire record, and drawing all reasonable inferences in favor of [the judgment], . . . determine whether a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (*Raley, supra,* 2 Cal.4th 870, 889.)

 We recently explained: "Reversal on this ground is unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].' [Citation.] In *People* v. *Anderson* [(1968)] 70 Cal.2d [15,] 26-27 [73 Cal.Rptr. 550, 447 P.2d 942], we identified three categories of evidence relevant to resolving the issue of premeditation and deliberation: planning activity, motive, and manner of killing. However, as later explained in *People* v. *Pride* (1992) 3 Cal.4th 195, 247 [10 Cal.Rptr.2d 636, 833 P.2d 643]: '*Anderson* does not require that these factors be present in some special combination or that they be accorded a particular weight, nor is the list exhaustive. *Anderson* was simply intended to guide an appellate court's assessment whether the evidence supports an inference that the killing occurred as the result of preexisting reflection rather than unconsidered or rash impulse. [Citation.]' Thus, while premeditation and deliberation must result from ' "careful thought and weighing of

considerations" ' (70 Cal.2d at p. 27), we continue to apply the principle that '[t]he process of premeditation and deliberation does not require any extended period of time. "The true test is not the duration of time as much as it is the extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly . . . ." [Citations.]' " (*People v. Bolin* (1998) 18 Cal.4th 297, 331-332 [75 Cal.Rptr.2d 412, 956 P.2d 374] (*Bolin*).)

Here, there is ample evidence supporting an inference that the killing occurred as the result of preexisting reflection rather than unconsidered or rash impulse. Defendant brought his knife to the apartment, and a reasonable jury could infer that defendant planned and intended to commit robbery and/or sexual assault when he entered Hickman's dwelling, and to use his knife to facilitate the commission of those crimes, and then was motivated to kill his victim to eliminate her as a witness to those crimes. The manner of killing also supports an inference that the killing occurred as the result of preexisting reflection rather than unconsidered or rash impulse. The record suggests that defendant stabbed Hickman 11 times over a period of time. The wounds were inflicted from a variety of angles and positions, and there was blood trail evidence of a struggle throughout the apartment. The pathologist testified that none of the stab wounds was "rapidly fatal," that death would not have occurred from the stab wounds for at least an hour after they were inflicted, that the suspenders were wrapped around the victim's neck while she still was alive and after she had been stabbed in the neck—and that she had been strangled manually. From this evidence of the manner of killing, the jury reasonably could infer that because Hickman had not died from the stab wounds, defendant deliberately, and with premeditation, strangled her to death with his suspenders and with his hands. (E.g., *People v. Davis* (1995) 10 Cal.4th 463, 510-511 [41 Cal.Rptr.2d 826, 896 P.2d 119].) We find substantial evidence of first degree murder, premised on a theory of premeditation and deliberation.

9. *Asserted Griffin error during closing argument at the guilt phase*

Defendant asserts that on numerous occasions during the prosecution's closing argument, the prosecutor improperly commented upon his failure to testify, in violation of *Griffin v. California* (1965) 380 U.S. 609, 615 [85 S.Ct. 1229, 1233, 14 L.Ed.2d 106] (*Griffin*). Pursuant to *Griffin*, it is error for a prosecutor to state that certain evidence is uncontradicted or unrefuted when that evidence could not be contradicted or refuted by anyone other than the defendant testifying on his or her own behalf. (*People v. Murtishaw* (1981) 29 Cal.3d 733, 757-758 [175 Cal.Rptr. 738, 631 P.2d 446] (*Murtishaw*); see also *People v. Bradford* (1997) 15 Cal.4th 1229,

1339 [65 Cal.Rptr.2d 145, 939 P.2d 259] (*Bradford*) ["a prosecutor may commit *Griffin* error if he or she argues to the jury that certain testimony or evidence is uncontradicted, if such contradiction or denial could be provided *only* by the defendant, who therefore would be required to take the witness stand"].) We also suggested in *Murtishaw* that it is error for the prosecution to refer to the absence of evidence that only the defendant's testimony could provide. (*Murtishaw, supra,* 29 Cal.3d at p. 757 & fn. 19.) But although " '*Griffin* forbids either direct or indirect comment upon the failure of the defendant to take the witness stand,' " the prohibition " 'does not extend to comments on the state of the evidence or on the failure of the defense to introduce material evidence or call logical witnesses.' " (*People v. Hovey* (1988) 44 Cal.3d 543, 572 [244 Cal.Rptr. 121, 749 P.2d 776] (*Hovey*).)

Defendant failed to object at trial to *any* of the statements that he now asserts constitute error under *Griffin*. Defendant asserts that any such objection would have been futile because (i) "the sequence of improper comments was such that, by the time it became apparent that the prosecutor's theme would be [defendant's] failure to testify, the damage had been done, and it was too late for an objection and admonition to cure the harm," and (ii) "the volume and variety of the improper comments was such that purging the argument of *Griffin* error would have required almost constant objection, thereby magnifying, rather than curing, the harm." We do not believe that these reasons justified defendant's failure to object in this case. As we said in *Murtishaw, supra,* 29 Cal.3d 733, 758-759, "[w]e acknowledge that repeated objections and admonitions might well, as [defendant] asserts, merely emphasize to the jurors the defendant's failure to testify. We have no reason, however, to assume that the [prosecution] would have continued to make improper references to the 'uncontradicted' testimony once the court has sustained an objection to such a comment." We conclude that defendant has waived his right to complain of asserted *Griffin* error on appeal. (*People v. Mitcham* (1992) 1 Cal.4th 1027, 1050-1051 [5 Cal.Rptr.2d 230, 824 P.2d 1277] (*Mitcham*).)

In any event, we find none of the challenged comments improper under *Griffin, supra,* 380 U.S. 609. We shall address below the primary instances of asserted *Griffin* error advanced by defendant.

Defendant first asserts that the prosecution made various references to the absence of defense evidence concerning events that took place inside the victim's apartment, and he claims that because defendant was the only person who could have provided the information that the prosecution asserted was missing, the prosecutor's comments improperly highlighted defendant's failure to testify. As an example, defendant quotes the following

comment by the prosecutor: "Where is there a single piece of evidence that [defendant] somehow killed—something snapped because they were surprised at [seeing] each other [in the apartment]? Where is there evidence of that? *Where is there a witness to testify to that?* Where is there a piece of physical evidence to suggest that?" (Italics added.) Defendant asserts that this constituted the "functional equivalent" of a comment characterizing the prosecution's case as "uncontradicted" when only the testimony of the defendant could have contradicted it. On the record before us, we cannot agree. Under the defense theory of the case, defendant was in an unconscious state during the killing, and hence could not be expected to have provided answers to the prosecutor's questions, even had he taken the witness stand. In this setting, we view the challenged questions posed in the prosecutor's closing argument, and other questions and statements like them,[19] as nothing more than proper fair comment on the state of the evidence.

Defendant also challenges the prosecutor's references to the absence of defense evidence concerning defendant's consumption of alcohol and cocaine in the hours immediately prior to the killing. The prosecutor stated: "The defense has called no witness that could testify that this is what he drank or how much he drank," and "there has been no evidence that [defendant] ingested any cocaine that day." These comments properly highlighted for the jury the circumstance that there were no witnesses who testified concerning how much alcohol defendant had at his disposal to consume or how much cocaine defendant had used, and that the defense theory of the case was based upon speculation that defendant drank from a bottle of 151-proof rum, even though Bishop had testified that he drank from a bottle of 80-proof rum (and even though the expert testimony suggested that defendant would have been unable to walk or converse, had he in fact consumed the estimated volume of 151-proof rum). Here again, we read the prosecutor's statements as a comment on the general state of the evidence, rather than an assertion that the prosecution's evidence was not contradicted by defendant personally.

---

[19]Similarly, for example, defendant cites comments by the prosecutor referring to the absence of evidence concerning defendant's degree of intoxication at the time of the killing: "[Defense counsel] makes a big mistake here, he says that we have not presented any evidence that [defendant] was not intoxicated. No, no, no. No. We cannot prove he was intoxicated or not. We are not the ones that were intoxicated. We don't prove that. We don't bring before you evidence and can't be expected to bring before you evidence of [defendant's] blood alcohol at 3:40 in the morning." Likewise, defendant cites the prosecutor's references to evidence "from the witness stand": "I would ask you to accept my invitation and accept the judge's invitation to base your verdict on the law and on the facts, evidence that you can handle, *evidence of somebody from the witness stand,* not accept [defense counsel's] invitation and base your verdict on what could have happened but which we have no evidence of." (Italics added.)

Defendant also challenges the prosecutor's assertion that "uncontradicted" evidence revealed that defendant knew what he was doing at the time of the killing. The prosecutor argued, "The plain fact of the matter is, the physical evidence, *the evidence that is uncontradicted* and the evidence that there can be no dispute about unerringly points to somebody who was clearly aware of what [he] was doing, who clearly was goal directed, and who clearly intended to kill and did, and who, without any doubt, committed the robbery and burglary and sodomy." (Italics added.) Defendant asserts that only defendant could have provided the evidence that the prosecutor claimed was lacking, and that accordingly, this comment violated the *Griffin* rule. We read the challenged assertion, and others like it,[20] as a proper comment on the quality and persuasiveness of the defense experts' testimony and on the circumstantial evidence bearing upon defendant's asserted lack of mental capacity to form criminal intent at the time of the crimes.

Defendant claims that the prosecutor made inappropriate references to "personal testimony" and guesses by defense counsel concerning defendant's state of mind during the commission of the crimes, thereby improperly emphasizing defendant's own failure to testify concerning this subject. For example, at one point during closing argument the prosecutor spoke of defense counsel's addressing the jury and making "guesses as to his client's possible conceivable state of mind," and at another point cautioned the jury not to "accept [defense counsel's] invitation and his personal testimony as he stood before you as to facts that not one single witness testified to." Viewed in context, these statements were fair comments on the evidence and the relative weight that the jury should assign to it.[21]

Defendant complains of various rhetorical questions and devices employed by the prosecutor during closing argument. For example, at one point the prosecutor stated: "Why do you bring a knife if you don't intend to use it, if you're not willing to kill somebody with that knife that you bring with

---

[20]Similarly, defendant cites comments by the prosecutor referring to the absence of evidence concerning defendant's intent to rob, burgle, and sodomize. For example: "Again, if he wasn't robbing her, why did he have to kill her? There is no rational alternative explanation that has been offered by the defense evidence in this case as to anything other than the fact that [defendant] robbed [the victim]."

[21]Defendant notes that at one point, the prosecutor asserted as follows: "Just like his argument is convenient, the evidence here that they presented to you . . . is convenient, *just like when [defendant] told Detective Kennedy that you have my story, my story isn't going to change.* Until . . . that story became [inconvenient]. Didn't really help him very much. *So now we find that [defense counsel] tells you the story I guess changes.* I don't know. *We never really will know, I suppose.*" (Italics added.) As the People observe, in *Mitcham, supra*, 1 Cal.4th 1027, we held that a similar statement by the prosecutor (*"We'll never know what [the defendant] thought"*), was a "permissible reference to the state of the evidence and the fact that intent may be difficult to prove directly." (*Id.*, at p. 1051, italics in original.)

you to somebody else's home when you go to rob them or burgle their apartment?" We read this as a fair comment on the evidence, not as a veiled attempt to highlight defendant's failure to testify. Later, the prosecutor argued: "And then he figures there [are] cops around this house, *I better get rid of this coke*. I don't know what he did with it. We have no evidence of what he did with it. . . . [H]e didn't have it on him, but we have no evidence that he smoked it or snorted it or shot it or anything else. Again, speculation on the part of the defense." We read this too as a fair comment on the evidence—pointing out that it would be just as reasonable for the jury to conclude that defendant hid the cocaine when the police arrived, as to conclude that he used it earlier on the day of the crimes—and not as a veiled attempt to highlight defendant's failure to testify.

Also during his rebuttal argument, the prosecutor commented on the defense theory as being one of trying "everyone but the defendant. . . . According to [defense counsel], we are supposed to put on the defense. [¶] I guess that would be okay, we won't need [any of the defense attorneys in the case]. *Probably wouldn't need [defendant] sitting here*. We would put on the good stuff and the bad stuff and let you guys decide. But that's not the way it works." Contrary to defendant's assertion, this oblique reference to defendant "sitting here" was not tantamount to the statement that we condemned, but still did not find to be prejudicial, in *People v. Modesto* (1967) 66 Cal.2d 695, 711 [59 Cal.Rptr. 124, 427 P.2d 788] (" '*Who is the only person around who had blood on him, besides the two little girls? You know who he is. He is sitting here in this courtroom—and just sitting*' " (italics in original)). Read in context, the statement here at issue could not reasonably have been understood as a comment by the prosecutor on defendant's failure to testify.

### 10. *Cumulative effect of asserted guilt phase errors*

Defendant asserts that the cumulative effect of various errors alleged to have occurred at the guilt phase, including any assumed error by the trial court in failing to deliver a pinpoint instruction on "afterthought theft," requires reversal of the entire "guilt judgment." We discern no cumulative error requiring reversal of any aspect of the judgment as to guilt.

### C. *Special Circumstance Issues*

On the trial court's own motion (and without objection from either party), the court provided the jury during deliberations with written copies of all instructions. The written instruction concerning the special circumstance allegations, set forth in the language of CALJIC No. 8.81.17, was presented in the following format:

"TO FIND THAT THE SPECIAL CIRCUMSTANCES REFERRED TO IN THESE INSTRUCTIONS AS MURDER IN THE COMMISSION OF ROBBERY, BURGLARY, AND/OR SODOMY, IS TRUE, IT MUST BE PROVED:
"1a. THE MURDER WAS COMMITTED WHILE THE DEFENDANT WAS ENGAGED IN THE COMMISSION OF A ROBBERY, BURGLARY AND/OR SODOMY.
"1b. THE MURDER WAS COMMITTED DURING THE IMMEDIATE FLIGHT AFTER THE COMMISSION OF A ROBBERY, BURGLARY AND/OR SODOMY BY THE DEFENDANT.
"2. THE MURDER WAS COMMITTED IN ORDER TO CARRY OUT OR ADVANCE THE COMMISSION OF THE CRIMES OF ROBBERY, BURGLARY, AND SODOMY OR TO FACILITATE THE ESCAPE THEREFROM OR TO AVOID DETECTION. IN OTHER WORDS, THE SPECIAL CIRCUMSTANCE REFERRED TO IN THESE INSTRUCTIONS IS NOT ESTABLISHED IF THE ATTEMPTED ROBBERY, BURGLARY AND/OR SODOMY WERE MERELY INCIDENTAL TO THE COMMISSION OF THE MURDER." (Capitalization and formatting in original.)[22]

Defendant asserts that this instruction suffered from five independent but interrelated defects that allowed the jury to find the three special circumstances to be true without making factual findings required by law.

1. *Combining three separate special circumstances in one instruction*

██ Defendant asserts that by addressing all three special circumstances that were presented in a single instruction, the jury might have been misled into believing that it could find the robbery special-circumstance allegation to be true so long as it found that defendant committed the murder during the commission of a burglary or a sodomy. As he observes, we rejected this argument in *Holt, supra,* 15 Cal.4th 619, 680-681.

---

[22]In the oral instructions to the jury, the trial court delivered a slightly modified version of the written instruction, as follows:

"To find that the special circumstances referred to in these instructions as murder in the commission of robbery, burglary, and/or sodomy, is true, it must be proved:

"One, the murder was committed while the Defendant was engaged in the commission of a robbery, burglary and/or sodomy; or the murder was committed during the immediate flight after the commission of a robbery, burglary and/or sodomy by the Defendant.

"Two, the murder was committed in order to carry out or advance the commission of the crimes of robbery, burglary, and/or sodomy, or to facilitate the escape therefrom or to avoid detection.

"In other words, the special circumstances referred to in these instructions is not established if the attempted robbery, burglary and/or sodomy were merely incidental to the commission of the murder."

We shall assume for purposes of analysis that the jury followed the written instructions. (*People v. Osband* (1996) 13 Cal.4th 622, 687 [55 Cal.Rptr.2d 26, 919 P.2d 640]; *Crittenden, supra,* 9 Cal.4th 83, 138, and cases cited.)

In the present case, as in *Holt*, the jury first was instructed pursuant to CALJIC No. 8.80: "If you find the Defendant in this case guilty of murder of the first degree, you must then determine if one or more of the following special circumstances are true or not true: [¶] That the murder of Kim Hickman was committed by the Defendant while he was engaged in the commission of, [or] attempted commission of . . . a robbery, burglary, and or sodomy. . . . *You must decide separately each special circumstance alleged in this case.* . . . [¶] In order to find a special circumstance alleged in this case to be true or untrue, you must agree unanimously. You will state your special finding as to whether the special circumstance is or is not true on the form that will be supplied." (Italics added.) Thereafter, the jury was instructed in the language of CALJIC No. 8.81.17 that defendant now challenges. The verdict form differentiated each separate special-circumstance allegation.

Defendant, focusing upon a subsequent instruction informing the jury that it was not required to agree unanimously upon the *first degree murder count*, and focusing further upon the prosecutor's argument concerning the *first degree murder charge*, asserts that the present case is thus distinguishable from *Holt*, and argues that there is a greater risk that the jury here was misled to believe that it could find all of the special circumstances allegations to be true, even without specifically finding each one to be true. We disagree. The instructions, read together with the verdict form, made clear that there were three special circumstances, each of which had to be considered separately, and that in order to be found true each special circumstance required a determination that the murder was committed while defendant was engaged in the commission of the particular underlying crime, or committed during defendant's immediate flight after committing the particular underlying crime.

### 2. *Assertedly misleading nature of paragraph 2*

Defendant asserts that the instruction failed to convey that paragraph 2 (which stated the rule that the murder must have been committed to carry out or advance the underlying crime or crimes) comprised an independent element that was required to be proved in order to find true an alleged special circumstance, rather than being merely an alternative manner of finding a special circumstance allegation to be true. Despite defendant's attempts to demonstrate that the jury may have been confused in this regard (and may have assumed that paragraphs 1 and 2 set forth alternative rather than complementary requirements), we do not believe that a reasonable jury would have been so misled. The two paragraphs preceding paragraph 2 pertained to different times when the murder may have been committed and

were numbered 1A and 1B; all of this would have alerted the jury to the fact that those two paragraphs reflected *true* alternative findings. Paragraph 2, by contrast, gave no indication that it was an alternative finding, but, instead, conveyed the idea that it was the second of two necessary elements. We find no basis for concluding that the jury was misled in this regard.

### 3. *Allegation that the format of the instruction misled the jury*

Defendant notes that the format of the instruction (as set forth *ante*, at pp. 375-376) consisted of typed portions without indented paragraphs, and without additional spacing between the paragraphs. Defendant asserts that as a result, the jury may have been misled into believing that the final sentence of the instruction (beginning with the phrase "In other words") was in fact a separate paragraph, and that instead of elaborating upon only paragraph 2, that sentence would have been understood to restate or explain all preceding parts of the instruction (1A, 1B, *and* 2)—and thereby provide an alternative "description, complete in itself, of what the jury must find to conclude that the special circumstances had been proven."

According to defendant, had the jury followed that understanding of the instruction, it "could find all three special circumstances true without finding either that the murder had been committed during the commission or flight after any of the felonies or without finding that the murder was committed to carry out or advance any of the felonies. All the jury had to find is that one of the felonies (actually one of the 'attempted' felonies) was not 'merely incidental' to the murder. The jury could thus find all of the special circumstances true without making the factual findings required by law."

We disagree with defendant's premise, that reasonable jurors would have understood the final sentence of the instruction as a separate paragraph, setting out an alternative and independent description of what the jury must find in order to conclude that the special circumstances had been proved. In addition, there is nothing in the closing argument of either party to suggest that the jury should take such an approach. Indeed, defense counsel repeatedly emphasized that, to find a special circumstance true, the jury must find that the murder occurred during the commission of (or immediate flight from) the particular felony, *and* that the felonious act was not incidental to the commission of the murder. Contrary to defendant's contention, we conclude that it is not reasonably probable that the jury misunderstood the instruction to have permitted a true finding on all three special circumstances without a finding either that the murder was committed during the commission of (or flight after) any of the felonies or without a finding that the murder was committed to carry out or advance any of the felonies. (*Rodrigues, supra*, 8 Cal.4th 1060, 1144-1145.)

#### 4. *Failure to define "incidental" or give related requested instruction*

██ Defendant asserts that the trial court, on its own motion, should have defined the word "incidental" in the instruction. He argues that a term should be defined if it has a legal definition "that differs from its nonlegal meaning" (*People v. Estrada* (1995) 11 Cal.4th 568, 574 [46 Cal.Rptr.2d 586, 904 P.2d 1197], italics omitted), and that a trial court must provide clarification if the legal meaning of the term "differs from the meaning that might be ascribed to the same terms in common parlance." (*Id.*, at p. 575.)

In the present case, the challenged term "incidental" was designed to convey the rule of *Green, supra,* 27 Cal.3d 1, that a felony-murder special circumstance is inapplicable to cases in which the defendant intended to commit only murder and *incidentally* committed one of the specified felonies while doing so. On the other hand, defendant asserts, a reasonable jury *might* have understood the term "merely incidental" to mean something quite different. Quoting dictionary definitions, defendant argues that in common parlance, " 'incidental' can also mean '[o]ccurring as a fortuitous or minor concomitant.' " "It describes something that is 'subordinate' or 'nonessential,' something that occurs 'merely by chance or without intention or calculation'—a 'chance or minor consequence.' " Defendant observes that "[t]here is no way that jurors using this [alternative] definition could find the robbery, burglary, and sodomy to be 'merely incidental' to the murder, even if their understanding of the facts would have led them to conclude that the felonies were indeed 'merely incidental' if they had been advised how that phrase was used in *Green*."

We previously have rejected the claim that the term "merely incidental," as used in CALJIC No. 8.81.17, is ambiguous and needs to be defined for the jury on the court's own motion. (*Raley, supra,* 2 Cal.4th 870, 903.) If, in a particular case, it becomes apparent that the jury is in need of further definition, then of course such elaboration should be provided. But absent any indication that the jury in the present case was confused concerning the meaning of the phrase "merely incidental," we adhere to our conclusion in *Raley* that it was not error to fail to define the phrase further.

In a related argument, defendant asserts that the court erred in declining to give his requested modification to CALJIC No. 8.81.17, as follows: "With regard to each of the special circumstances alleged you are instructed that if the primary criminal goal was murder as opposed to those crimes alleged as special circumstances, you must return a verdict finding those special circumstances not to be true." The People assert that the proposed instruction was legally incorrect and, in any event, argumentative. Defendant appears to

concede those points: He does not argue otherwise in his reply brief, but instead asserts only that "even if the instruction was defective, the trial court should have fashioned its own instruction or corrected the one submitted by [defendant]." On the record before us we do not agree, because, as noted above, we find that the instruction actually given was adequate to inform the jury properly concerning the principles set forth in *Green, supra,* 27 Cal.3d 1, 61-62.

### 5. Reference to "attempted" underlying crimes

■■■ As noted above, the final sentence of the instruction advised the jury that "the special circumstance referred to in these instructions is not established if the *attempted* robbery, burglary, and/or sodomy were merely incidental to the commission of the murder." (Italics added.) As defendant notes, no attempted crimes were charged or found true, and accordingly there was no way for the jury to find that the murder was "merely incidental" to some such "attempted" crime. Defendant asserts this "guaranteed that the jury would not apply the limitation established in *People v. Green, supra,* 27 Cal.3d at page 61."

We believe that a reasonable jury, taking the instruction as a whole, would have understood that the listed crimes related back to the "commission of the crimes of robbery, burglary, and sodomy," set forth in all four preceding sentences of the instruction, and hence the jury would have treated the word "attempted" as unnecessary surplusage. In addition, as noted above, there was nothing in the closing arguments of either party to suggest that the jury should apply the *Green* limitation only to "attempted" underlying felonies— and indeed, defense counsel repeatedly emphasized that, to find a special circumstance true, the jury must find that the felonious act was not incidental to the commission of the murder. Accordingly, we determine that it is not reasonably likely that the jury misunderstood its duty to apply the *Green* limitation, or that it believed it was permitted to find true a special circumstance with regard to an underlying *completed* crime that was merely incidental to the murder.

In conclusion, we find that defendant's various challenges to the version of CALJIC No. 8.81.17 given by the trial court, whether viewed in isolation or cumulatively, do not establish that the jury was misled or prevented from making the findings required by law.

### D. *Death Penalty Issues*

#### 1. *Evidence admitted over defendant's objection*

##### a. *Defendant's possession of a sharpened instrument*

Section 190.3, factor (b), permits the penalty phase jury to consider "[t]he presence or absence of criminal activity by the defendant which involved the use or attempted use of force or violence or the express or implied threat to use force or violence." Prior to the commencement of the trial, the prosecution filed a notice pursuant to section 190.3 concerning its intent to introduce evidence in aggravation of penalty establishing that "defendant, while awaiting trial in this case, was found to possess a shank (sharpened instrument) in the jail on April 5, 1990."

At a hearing on the matter prior to commencement of the penalty phase, the prosecution asserted that the evidence reflected an offense proscribed by section 4502, subdivision (a), which at the relevant time made it a crime for a person to possess a weapon or "sharp instrument" while confined in prison, but did not apply to the county jail where defendant was being held pending and during trial. Defendant objected that evidence that he possessed a sharpened instrument, without more, failed to constitute evidence of criminal activity under section 190.3, factor (b), because it did not reflect violence or any threat of violence. The prosecution, relying upon *People v. Harris* (1981) 28 Cal.3d 935, 962-963 [171 Cal.Rptr. 679, 623 P.2d 240], argued that evidence of mere possession of such an object demonstrated an implied threat of violence under section 190.3, factor (b). The trial court, also relying upon *Harris*, agreed with the prosecution and ruled that evidence that defendant possessed the sharpened instrument in jail demonstrated a threat of violence and, accordingly, was admissible as aggravating evidence under factor (b).

Thereafter, at the penalty phase, the prosecution introduced the testimony of a deputy sheriff at the county jail, establishing that during a search of defendant's cell, the deputy found, hidden in a case where defendant kept his belongings, a four-inch, slightly bent but straightened, hard, sharp object with a loop at the end. The deputy described the object as a "shank" and testified that similar objects found in jail often are used to stab persons. Subsequently, during the presentation of the defense case, another witness, Jerry Enomoto (a former Director of the Department of Corrections) testified that "shank" is prison jargon for a homemade knife, and he described the item found in defendant's cell as a "long pin of some kind." Enomoto testified that he never had seen "this particular thing" used as a weapon, but

he also stressed that inmates have been "pretty creative over the years" in making weapons from numerous items, such as a toothbrush or a plastic food knife. Enomoto agreed that the item was a "sharp instrument . . . with a point" and that it "could be lethal under certain circumstances" if used to "hit the person in the right place with it." He further testified that it is a felony for a prisoner to possess such an object, because it is dangerous, quite easy to hide, and could be used to stab a person in the neck or eye.

Defendant now asserts that because, at the relevant time, his possession of the item was not in fact a crime under section 4502 (the statute then applied only to prison inmates, not county jail inmates),[23] the trial court erred in admitting this evidence for the jury's consideration at the penalty phase under section 190.3, factor (b), and in instructing the jury, at the prosecution's suggestion, pursuant to CALJIC No. 8.87, that "evidence has been introduced for the purpose of showing that the defendant has committed the following criminal act: possession of a sharpened instrument while confined in the county jail . . . ." (The instruction further provided that no juror could consider "such criminal act" as an aggravating factor unless satisfied beyond a reasonable doubt that defendant had committed "such criminal activity.")

The trial court's misinstruction was error, and as explained below, the question of prejudice is somewhat close.

"Evidence of prior criminal behavior is relevant under section 190.3, factor (b) if it shows 'conduct that demonstrates the commission of an actual crime, specifically, the violation of a penal statute . . . .' " (*People v. Pensinger* (1991) 52 Cal.3d 1210, 1259 [278 Cal.Rptr. 640, 805 P.2d 899]; *People v. Anderson* (2001) 25 Cal.4th 543, 588 [106 Cal.Rptr.2d 575, 22 P.3d 347] [§ 190.3, factor (b) requires that conduct be "criminal in fact" in order to constitute valid penalty evidence].) Even though defendant's possession of the sharpened object was not a crime under section 4502 as it provided at the relevant time, his possession was then a crime under section 4574, which provides in relevant part, "any person who, while lawfully confined in a jail . . . possesses therein any deadly weapon, . . . is guilty of a felony."

Here, the People assert, the testimony was uncontroverted that the long, straightened, and sharp-pointed pin found in defendant's possession was a deadly weapon: the sheriff's deputy testified that similar sharpened objects often are used for stabbing, and defendant's own witness, Enomoto, testified

---

[23]The statute subsequently was amended, after the time relevant here, to cover inmates in county jails. (Stats. 1994, ch. 354, § 1, p. 2154.)

that the object could be "lethal" and could be used to stab a person in the neck or eye. Moreover, the People observe, *defendant* made no request for jury instructions on the identity or the elements of the underlying crime (as noted above, the trial court at the prosecution's request instructed the jury concerning defendant's "possession of a sharpened instrument while confined in the county jail"), and we repeatedly have held that a trial court has no duty to instruct the penalty phase jury concerning such other crimes on the court's own motion. (*People v. Tuilaepa* (1992) 4 Cal.4th 569, 591-592 [15 Cal.Rptr.2d 382, 842 P.2d 1142] (*Tuilaepa*); *People v. Payton* (1992) 3 Cal.4th 1050, 1068 [13 Cal.Rptr.2d 526, 839 P.2d 1035]; *Hardy, supra,* 2 Cal.4th 86, 205-207; *People v. Phillips* (1985) 41 Cal.3d 29, 68 & 72-73, fn. 25 [222 Cal.Rptr. 127, 711 P.2d 423].)

We reject the People's reasoning. The trial court, having decided to identify the other criminal activity and to instruct on its elements, had a duty to do so accurately and not mislead the jury. (*People v. Malone* (1988) 47 Cal.3d 1, 49 [252 Cal.Rptr. 525, 762 P.2d 1249]; *People v. Carrera* (1989) 49 Cal.3d 291, 342 [261 Cal.Rptr. 348, 777 P.2d 121].) Here, the jury was told that the crime the prosecution had described as establishing conduct involving "the express or implied use of force or violence or the threat of force or violence" was defendant's possession in jail of a sharpened instrument—an act that was, at the time, and without more (that is, a showing that the object was a deadly weapon), not a crime.

Nevertheless, in light of the testimony described above, we are satisfied, beyond reasonable doubt, that defendant's conduct in possessing the item constituted criminal activity under section 4574 (possession of a deadly weapon while in jail), and that it involved the implied threat of violence under section 190.3, factor (b). Contrary to defendant's suggestions, an object need not be inherently deadly in order to qualify as a deadly weapon under section 4574 (*People v. Savedra* (1993) 15 Cal.App.4th 738, 744-745 [19 Cal.Rptr.2d 115]; *People v. Rodriquez* (1975) 50 Cal.App.3d 389, 396 [123 Cal.Rptr. 185]), or to qualify under section 190.3, factor (b), as evidence of criminal activity by the defendant that involved the implied threat to use force or violence (*Tuilaepa, supra,* 4 Cal.4th 569, 589, and cases cited). Indeed, it is not even required that the defendant intend to make violent use of the item as a weapon. (*People v. Roberts* (1992) 2 Cal.4th 271, 332 [6 Cal.Rptr.2d 276, 826 P.2d 274]; *Rodriquez, supra,* 50 Cal.App.3d at p. 396; *Savedra, supra,* 15 Cal.App.4th at pp. 744-745.) Accordingly, we conclude that the four-inch-long sharp and pointed pin, described as "lethal" under certain circumstances, qualified as a deadly weapon (*Savedra, supra,* 15 Cal.App.4th 738, 744-745) and that defendant's possession of it constituted properly admitted evidence of "criminal activity by the defendant

which involved the . . . implied threat to use force or violence" under section 190.3, factor (b). (*Tuilaepa, supra,* 4 Cal.4th at p. 589 [possession of razors and blades posed implied threat to use force or violence]; see also *People v. Howard* (1988) 44 Cal.3d 375, 428 [243 Cal.Rptr. 842, 749 P.2d 279] [possession of handcuff keys while in jail may have posed implied threat to use force or violence].)

Although the trial court erred by instructing the jury in the language of section 4502 rather than in the language of section 4574, the error is minor—specifically, the instruction should have used the words "deadly weapon" rather than "sharpened instrument." We conclude for two reasons, which cumulate, that this error was harmless.

To find prejudice, we would need to hypothesize two things, which tend to be self-canceling: (i) that the jury would consider the shank, although a sharpened instrument, not to be a deadly weapon, and (ii) that despite such a finding, the jury nonetheless considered the evidence to be so important that it affected the penalty determination.

It is quite unlikely that the jury would find the object to be a sharpened instrument but not a deadly weapon. But if the jury made that improbable finding, thus minimizing the seriousness of the evidence, it is also quite unlikely that it would then consider the evidence to be so important as to control, or even have a significant impact upon, the penalty determination. The combination of these circumstances (unlikelihood that a properly instructed jury would have disregarded the evidence because it would not believe the shank was deadly plus the unlikelihood that a jury so finding nonetheless would give the evidence significant weight) convinces us that the error was harmless.[24]

b. *Testimony regarding defendant's statements while in jail*

As noted above, defense witness Jerry Enomoto, the former Director of the California Department of Corrections, testified that, based upon his review of defendant's prison records, defendant, if incarcerated in a maximum security prison for a term of life without possibility of parole, would make a "satisfactory" and "adequate" adjustment to prison life. On cross-examination, Enomoto testified that he based his conclusion on the circumstance that there was nothing in defendant's record indicating that defendant

---

[24]Defendant asks us to reconsider and overrule our conclusion in *People v. Balderas* (1985) 41 Cal.3d 144, 204-205 [222 Cal.Rptr. 184, 711 P.2d 480], and numerous other cases, and hold instead that the admission of unadjudicated criminal activity at the penalty phase of a capital trial denies a defendant the right to a fair and impartial jury, a reliable penalty determination, equal protection of the laws, and a fair trial conducted in accordance with due process of law. We decline to overrule *Balderas* and the decisions that follow it. (E.g., *People v. Avena* (1996) 13 Cal.4th 394, 426-428 [53 Cal.Rptr.2d 301, 916 P.2d 1000].)

ever had assaulted staff or fellow inmates while in custody. The witness acknowledged that an inmate serving a term of life without possibility of parole, unlike other inmates, does not receive credit for good behavior, "[no] matter how good they are." Enomoto also conceded that he had read two disciplinary reports concerning conduct by defendant while housed in the county jail.

Outside the presence of the jury, defendant objected to testimony concerning these two incidents. The trial court overruled the objection, and on further cross-examination, the prosecution asked defendant's expert witness whether he had considered the following: First, that defendant had been found in his cell with a torn sheet around his waist, and when told by a guard that a disciplinary report would be written concerning the incident, defendant replied something like, "I don't care, go ahead." Second, when defendant had been told a few days later that another disciplinary report would be prepared after it was discovered that he had placed cardboard over the locking mechanism of his cell door, defendant told the guard something like "go ahead, I don't care, there is nothing you can do to me because I'm going away to prison for life anyway."

Enomoto testified that he had indeed considered those reports (along with defendant's possession of the sharpened pin, discussed *ante*), but that defendant's statements did not change his opinion concerning defendant's future adjustment to prison, because "[i]nmates say a lot of things. What they do is . . . many times [considerably] different. Sometimes it's worse than what they say, sometimes it's not as bad as what they say."

Defendant asserts that the trial court erred in allowing the testimony concerning defendant's statements, elicited by the prosecution on cross-examination. He claims that testimony was irrelevant, constituted improper aggravating evidence, and exceeded the proper scope of rebuttal. We disagree.

The questions and testimony concerning defendant's statements were relevant to challenge Enomoto's testimony concerning the likelihood of defendant's satisfactory adjustment to future prison life. The testimony was not admitted as aggravating evidence, but as rebuttal to the defense expert's opinion evidence. (E.g., *People v. Mattson* (1990) 50 Cal.3d 826, 878 [268 Cal.Rptr. 802, 789 P.2d 983] ["Evidence of future dangerousness may be introduced in rebuttal when the defendant himself has raised the issue of performance in prison and has offered evidence that in a prison environment he would be law-abiding"].) Defendant insists that he did not attempt to imply that he would be a " 'model' prisoner," but we believe that the

challenged testimony was an appropriate and measured rebuttal to the defense expert's testimony that defendant would make an "adequate" or "satisfactory" adjustment to prison life.

Defendant also asserts that the trial court erred in failing to instruct on its own motion that the jury should consider defendant's statements only in assessing the weight to be given his expert witness's opinion. He cites no authority supporting the proposition that such an instruction is required sua sponte on the facts presented here, and we conclude that an instruction was not required on the court's own motion. In any event, we would find any error to be nonprejudicial. The prosecution did not rely upon the challenged testimony to show defendant's future dangerousness, but only to question the opinion of Enomoto, the defense expert. Moreover, in light of the other properly admitted evidence in aggravation, there is no reasonable possibility that the trial court's failure to provide the requested limiting instruction affected the penalty verdict.

### 2. Asserted misconduct of the prosecutor

#### a. Questions posed during cross-examination

■ Defendant presented two witnesses, his former girlfriend, Susan Pothier, and her mother, Rita Dolbeare, both of whom testified at the penalty phase concerning defendant's nonviolent character. On cross-examination of the first witness, Susan Pothier, the prosecution inquired whether she previously had told "somebody" from the Nashua, New Hampshire, Police Department, that defendant was "mean and nasty" when drunk. Pothier replied, "No." Next, the prosecutor asked the witness whether she remembered "talking to an investigator from our office who contacted you by telephone and read a statement that you had given to a Nashua police officer?" At this point, defense counsel objected and requested an offer of proof from the prosecutor. The trial court, without seeking an offer of proof, overruled the objection, stating, "It's proper cross-examination." Thereafter the prosecutor resumed posing similar questions, asking Pothier whether she recalled speaking with a Nashua officer about her relationship with defendant. Pothier replied, "Yes." The witness denied, however, recalling any telephone discussion with anyone from the prosecutor's office, concerning her conversation with the Nashua officer. The prosecutor then asked, "[a]nd you also deny telling the person, Detective Sergeant Dial, that [defendant] was someone who was mean and nasty when he drank." Pothier responded that she never had used that term and "did not say that to him," and that defendant was not "anything like that when he drank."

The prosecutor conducted similar (albeit less extensive) cross-examination of the second witness, Rita Dolbeare. He asked, "You have never described

[defendant] as being mean and nasty when he drinks, [have] you?" The witness responded, "No."

After the presentation of evidence at the penalty phase and prior to the commencement of closing arguments, defense counsel again raised the issue of the prosecutor's insinuations. Counsel reminded the court of the questions posed during Pothier's cross-examination (counsel did not focus upon the cross-examination of Dolbeare) and observed that no evidence had been introduced to support the prosecutor's insinuations that the witness in fact previously had told law enforcement officers that defendant was mean and nasty when drunk. Defense counsel argued that the cross-examination of Pothier was designed improperly to convince the jury that statements described in the prosecutor's questions had in fact been made by the witness, and he requested that the court strike those questions posed to Pothier, and her answers. Defense counsel did not, however, assert that the prosecution had asked the questions in bad faith. (*People v. Mickle* (1991) 54 Cal.3d 140, 191, fn. 38 [284 Cal.Rptr. 511, 814 P.2d 290] (*Mickle*).)

The trial court asked the prosecutor for his position on the "motion to strike that testimony of Ms. Pothier." The prosecutor asserted that he wished the matter "had been brought up sooner," noting that the court would not be instructing "on prior inconsistent statement." The prosecutor acknowledged that he had "fail[ed] to complete the impeachment" and that he had not proved the insinuated prior inconsistent statements, but asserted that he had not been able to find any authority concerning whether, in such circumstances, "it's appropriate to do a motion to strike."

The trial court granted the motion to strike, stating that it would "inform the jury of that fact prior to the commencement of argument." Minutes later, the court did so, admonishing the jury: "[B]efore we commence argument, I wish to call one thing to your attention. You may recall that when Ms. Pothier . . . testified there were questions asked of her as to whether certain statements were made to a sergeant from a police department in New Hampshire. I am now striking from the record any questions and answers regarding that interview by Sgt. Boyle. You are to disregard those questions and answers, and treat them as if you have never heard them." Closing arguments followed.

Later, when addressing the jury after the conclusion of closing arguments, the trial court instructed pursuant to CALJIC No. 1.02: "Do not assume to be true any insinuation suggested by a question asked a witness. A question is not evidence and may be considered only as it enables you to understand the answer. Do not consider for any purpose any offer of evidence that was

rejected or any evidence that was stricken by the court. Treat it as though you had never heard it."

Defendant asserts that for various reasons the admonition and instruction were "insufficient to undo the harm." First, defendant asserts, the prosecutor's questioning constituted serious misconduct that could not be cured by admonition or instruction. Defendant observes that during the in limine hearing, the prosecutor "neither claimed that he had evidence to back up the insinuations of his questions nor asserted that he had asked the questions in good faith." Defendant also asserts that there is "no indication that the prosecutor was prepared to introduce evidence to substantiate his insinuations" even though the prosecutor had numerous opportunities to present such evidence, and even though "one of the witnesses mentioned in the prosecutor's questions was an investigator from his own office" who presumably was available to testify.

Of course, " '[i]t is improper for a prosecutor to ask questions of a witness that suggest facts harmful to a defendant, absent a good faith belief that such facts exist.' " (*People v. Osband, supra,* 13 Cal.4th 622, 695.)

We do not infer misconduct on these facts. The factual specificity of the prosecutor's questions implies that they were based on information obtained during the prosecution's review of records available to the defense, and were not, as defendant suggests, baseless or unfounded. (*Mickle, supra,* 54 Cal.3d 140, 191.) From all that appears, it seems that, rather than reflecting misconduct, the record reveals that the prosecutor simply decided, perhaps for tactical reasons, not to pursue the matter by introducing impeaching evidence on this point. We are not, on this record, left with any substantial suspicion that the prosecutor lacked such evidence, or that he asked the questions in bad faith.[25]

Next, defendant asserts, the trial court's admonition was defective in numerous respects. First, he asserts, it was late, being delivered two days after the cross-examination in question. But this was not a substantial delay, and in any event, the admonition was given as soon as it was requested. Second, defendant asserts, the admonition was incomplete, covering only the examination of Pothier, and not that of her mother, Dolbeare. But the admonition was tailored to defense counsel's motion, which in turn highlighted only the cross-examination of Pothier (during which the vast majority of the challenged questions occurred) and not that of Dolbeare, and defense counsel did not object that the admonition was insufficient in scope.

[25]We also reject defendant's related contention that, on these facts, the trial court was required to insist on an offer of proof from the prosecutor and determine whether there was a factual basis for the questions before allowing the prosecutor to proceed. Although such a hearing would have been advisable and helpful, the trial court did not err in failing to conduct such a hearing.

Third, defendant argues as follows: the admonition cautioned the jurors to disregard any "questions and answers regarding that interview by Sgt. Boyle"—and yet there were no questions or answers concerning any "Sergeant Boyle"; the admonition referred to "a sergeant from a police department in New Hampshire," whereas the testimony concerned a police officer or investigator from the "Nashua Police Department," and the admonition did not cover questions and answers concerning Pothier's alleged statements to an investigator from the district attorney's office. Again, there was no objection by defense counsel. He likely believed, as we do, that because Pothier testified concerning only one interview with a New Hampshire police officer, and because the prosecutor had referred to a telephone interview by a "Detective Sergeant Dial" from his own office, a reasonable jury would have understood that it was to disregard *all* questions and answers regarding *all* such evidence.

Finally, defendant complains that the admonition did not expressly retract the trial court's earlier statement before the jury, made in response to defense counsel's objection, that the prosecutor's questions constituted proper cross-examination. As suggested above, we are not convinced that the prosecutor's questions constituted improper cross-examination, or misconduct. But in any event we believe that a reasonable jury would have understood the admonition and instruction as precluding consideration of the challenged questions and answers.

In conclusion, although the admonition was hardly a model of clarity, and it would have been preferable for the trial court to have consulted with trial counsel concerning the wording of the intended admonition before delivering it, viewing the trial court's actions as a whole, we discern no reversible error.

b. *Arguments concerning the Bible*

The prosecutor, during closing argument, referred to and quoted from the Bible. As we have explained, "[t]he primary vice in referring to the Bible and other religious authority is that such argument may 'diminish the jury's sense of responsibility for its verdict and . . . imply that another, higher law should be applied in capital cases, displacing the law in the court's instructions.' " (*People v. Wash* (1993) 6 Cal.4th 215, 261 [24 Cal.Rptr.2d 421, 861 P.2d 1107], quoting *People v. Wrest* (1992) 3 Cal.4th 1088, 1107 [13 Cal.Rptr.2d 511, 839 P.2d 1020] (*Wrest*).)

Defendant argues that the prosecutor in this case exhorted the jury to "follow God's law of mandatory execution rather than engaging in a careful

analysis of the aggravating and mitigating factors." At the outset, we note that by failing to object at trial, defendant waived any claim of error or misconduct that could have been cured by timely admonition. (*Wrest, supra,* 3 Cal.4th 1088, 1105, and cases cited.)

If we agreed that defendant correctly has characterized the gist of the prosecutor's comments, we would find, as we did in *Wrest, supra,* 3 Cal.4th 1088, that such argument was improper. (*Id.,* at p. 1107.) But viewed in context, we disagree with defendant's characterization and find that the prosecutor's comments constitute neither error nor misconduct. We quote below in detail the prosecutor's relevant comments.

The prosecutor first stressed that "[t]o return a judgment of death, each of you must be persuaded that the aggravating circumstances are so substantial in comparison with the mitigating circumstances that it warrants death instead of life without parole." The prosecutor emphasized that the jury was not to "automatically" vote for death, and that "[w]e don't want you to go back there and say eye for an eye. That's not the way it works . . . ." "Once you get to that point where you decide that the factors in aggravation outweigh the factors in mitigation substantially, you're on your own . . . . There is no rule, no formula. You are the sole judges of what you want to have done. You can use your heart, you can use your soul, you can use your sense of values, your sense of mores. You can use your religious beliefs, whatever it is that you fall back on in order to make that ultimate decision."

The prosecutor then described and argued the significance of what he believed to be the applicable factors in the case, and proceeded to assert as follows:

"You have come to the point, I think, that it becomes apparent that the factors in aggravation, particularly the circumstance of the crime and what he did, substantially outweigh those in mitigation. Not just a little bit, but substantially. [¶] Question is what do you do now. I want to talk to you about a few things. Not for very long, but just a few things kind of just to get you thinking about . . . how much sympathy you want to give for [defendant] in determining whether or not he deserves to live. . . ."

Soon thereafter, the prosecutor continued: "As I mentioned before, I don't have any answers as to what you do when you get to that point where you have to make that decision, and I think, as I said, that you would find that the death penalty is called for beyond a reasonable doubt in this case. Beyond a reasonable doubt, even though that's not the burden. There is no burden of proof. But I have no answers as to what you do when you get to that point.

[¶] So what do you do? You use—as I said, you use your heart, your so[ul], your mores. I can't read your mind. I don't know what is important to you. I know maybe what's logical that some people might think about is religion. They might fall back on that. What does it say? What does it mean? [¶] And religion or the Bible is not a basis for you to impose the death penalty. The Bible or religion does not tell you [that you] should, and I don't mention it for that purpose. I mention it only to tell you that the Bible is not an impediment to imposing the death penalty. It doesn't get in the way. It's not a reason to do it, but it's also not a reason not to do it. [¶] I bring it up because people try to look for something. They try to find something to fall back on, and I'm sure that there are places in the Bible and in religion—and I mention the Bible simply because Judeo-Christian-type beliefs are really the only ones that I'm even marginally familiar with. I'm sure there are similar kinds of things in other sorts of religion. [¶] But you can look, and there are places in here where it is permissible. Not mandatory again, but permissible."

The prosecutor concluded: "I don't know how many of you are familiar with it, and I won't take a lot of time with it. But in Genesis, chapter 9, verse 6; 'Whoever sheds the blood of man shall his blood be shed.' In the book of Exodus, chapter 21, verse 12; 'Whoever strikes a man so that he dies, shall be put to death.' And there are others. [¶] In the book of Matthew, chapter 26, verse 52, something you've all heard more or less; 'Put your sword back into place, for all who take the sword, will perish by the sword,' and there are others. There are others. [¶] . . . I'm not telling you [that] you should or that this tells you [that] you should. What it tells you is a Bible is not an impediment. The Judeo-Christian ethic is not an impediment. The Judeo-Christian ethic is not an impediment to voting to take somebody else's life. [¶] Certainly the defense would probably tell you but the Bible also tells you thou shall not kill. Actually what it says is thou shall not commit murder. Because in the same place that it is in there, would be inconsistent with the rest of the Bible which does talk about the fact that one can kill in response to murder. It's not an impediment. I'm not telling you that you should do one thing or the other based on that. I'm simply telling you I don't believe it is an impediment to doing it."

In *Wrest, supra*, 3 Cal.4th 1088, we found that although the prosecutor's comments concerning a number of topics—including biblical support for capital punishment—were "strategically phrased in terms of what he was *not* arguing, they embody the use of a rhetorical device—paraleipsis—suggest-ing exactly the opposite. Repetition of the statement, 'I am not arguing *X*,' strongly implied the prosecutor was in fact asserting the validity and rel-evance of *X*, but, for lack of time, was concentrating on other, presumably

more important topics." (*Id.,* at p. 1107, italics in original.) Defendant, noting that the biblical quotations selected by the prosecutor emphasized not only the *permissibility* of a death penalty, but also its *mandatory* nature, asserts that essentially the same kind of improper paraleipsis occurred here.

We disagree. The prosecutor's references were part of a straightforward argument that jurors should not be persuaded either way by biblical and religious teachings, and that the ultimate penalty decision was an individual determination. The prosecutor did not imply or suggest that another, higher law should be applied instead of the court's instructions, and he stressed that even if the jury found that the aggravating circumstances were so substantial in comparison with the mitigating circumstances, the jury still need not automatically find in favor of the death penalty.

### c. *Other asserted instances of prosecutorial misconduct*

Defendant advances four additional asserted instances of prosecutorial misconduct. Once again we note at the outset that by failing to object at trial, defendant waived any claim of error or misconduct that could have been cured by timely admonition. (*Wrest, supra,* 3 Cal.4th 1088, 1105, and cases cited.)

#### i. *Factor (h) evidence*

First, defendant asserts that the prosecutor improperly argued that voluntary intoxication was not a mitigating factor. During his discussion of section 190.3, factor (h) ("Whether or not at the time of the offense the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was impaired as a result of mental disease or defect or effects of intoxication"), the prosecutor stated: "Well they tried that. They tried to convince you of that, apparently they didn't in the first part of this trial. That does not apply. That factor in mitigation."

Contrary to defendant's suggestions, we do not read this passage as telling the jury that it was precluded from considering defendant's evidence of intoxication in mitigation, and we do not believe that a reasonable juror would have so understood the comment. The prosecutor repeatedly told the jury that it was up to each individual juror to decide whether factors in aggravation or mitigation existed, and if so, how much weight to give to them. We believe that a reasonable juror would have understood the prosecutor's challenged comment to reflect nothing more than his own *assessment* of the evidence. (See *People v. Marshall, supra,* 13 Cal.4th 799, 857-858.)

#### ii. *Asserted Griffin error during penalty phase argument*

Defendant claims that the prosecutor committed error under *Griffin, supra,* 380 U.S. 609, 615 [85 S.Ct. 1229, 1233], by commenting indirectly

upon defendant's failure to testify. In the course of argument concerning section 190.3, factor (b) ("The presence or absence of criminal activity by the defendant which involved the use or attempted use of force or violence or the express or implied threat to use force or violence"), the prosecutor stated: "[W]e have proven . . . that [defendant], while he was in the jail awaiting trial on this case, possessed an instrument which has no purpose other than force or violence. There has been no testimony in this case that there was any legitimate purpose to use that sharp instrument in the jail . . . —other than to use it as some sort of force or violent stabbing instrument. There has been no dispute, no evidence that [defendant] didn't possess it. There has been no evidence to the contrary that it was possessed for some other purpose, other than force or violence."

As we observed earlier, "a prosecutor may commit *Griffin* error if he or she argues to the jury that certain testimony or evidence is uncontradicted, if such contradiction or denial could be provided *only* by the defendant, who therefore would be required to take the witness stand." (*Bradford, supra,* 15 Cal.4th 1229, 1339, italics in original.) But although " '*Griffin* forbids either direct or indirect comment upon the failure of the defendant to take the witness stand,' " the prohibition " 'does not extend to comments on the state of the evidence or on the failure of the defense to introduce material evidence or call logical witnesses.' " (*Hovey, supra,* 44 Cal.3d 543, 572, quoting *People v. Jackson* (1980) 28 Cal.3d 264, 304 [168 Cal.Rptr. 603, 618 P.2d 149].)

The "absent" contradiction or denial referred to by the prosecutor would not have required defendant's testimony; indeed, immediately after making the challenged comment, the prosecutor continued by remarking that defendant's own expert (Enomoto, the former Director of the Department of Corrections) testified that the object in question was a "stabbing instrument." *That* expert witness, or another defense witness other than defendant, *might* have testified to a nonviolent purpose or use for the object found in defendant's cell, and the prosecutor was well within his rights to observe that there was no such testimony. We agree with the People that viewed in context, the challenged remarks simply were proper comment upon the state of the evidence.

Defendant also challenges the prosecutor's comments that, contrary to the suggestion of defense counsel, there was no evidence that defendant would be "haunted" by his crimes for the rest of his life. The prosecutor stated, "I have heard no evidence of that. I don't know if you got anything out of the evidence that was presented about [defendant] being haunted or anything. The only thing we heard about [defendant]—well, there just simply isn't, we don't know, there is no evidence of being haunted."

Again, this constituted proper comment on the evidence, and a proper comment in response to defense counsel's argument. As we have observed, a prosecutor is entitled to point out to the jury a defendant's lack of remorse, and doing so does not amount to error under *Griffin, supra,* 380 U.S. 609. (*Carpenter, supra,* 15 Cal.4th 312, 414.)

### iii. *Asserted misstatements of law and appeals to passion*

■ As noted earlier, after discussing the statutory aggravating and mitigating factors, the prosecutor told the jury that in his view the factors in aggravation substantially outweighed those in mitigation, and that the "[q]uestion is what do you do now. I want to talk to you about . . . just a few things . . . just to get you thinking about . . . how much sympathy you want to give for [defendant] in determining *whether or not he deserves to live. . . .*" (Italics added.) Later, the prosecutor argued: "[In] this case there is not enough sympathy, there is not enough forgiveness to overshadow what [defendant] did. There's simply not enough there. There's not enough explanation. There's not enough for you to *forgive* him to find that he deserves to live." (Italics added.) Subsequently, rebutting defense counsel's argument, the prosecutor said: "[Defense counsel] has tried to trivialize the things that matter and try to convince you that [defendant] does not deserve to die. And I would suggest to you the question is the other way around. *Does he deserve to live in light of what you have heard.*" (Italics added.)

Defendant argues that these comments improperly shifted to the defense the evidentiary burden of proving that he deserved to live. (See *Hayes, supra,* 52 Cal.3d 577, 643 ["Because the determination of penalty is essentially moral and normative . . . , and therefore different in kind from the determination of guilt, there is no burden of proof or burden of persuasion"].) Viewing the prosecutor's comments in the context of the instructions, we disagree. As noted earlier, the prosecutor also emphasized to the jury that "[t]o return a judgment of death, each of you must be persuaded that the aggravating circumstances are so substantial in comparison with the mitigating circumstances that they warrant death instead of life without parole." Moreover, during rebuttal, the prosecutor stated: "[Defense counsel] says . . . you don't have to kill [defendant]. And I would agree. . . . You don't have to vote for the death penalty. You can vote for life without possibility of parole. [¶] . . . The law does not allow you . . . to be in a position where the law says you shall [vote for death]." Thereafter, the court instructed the jury that it was "free to assign whatever moral or sympathetic value you deem appropriate to each and all of the various factors you are permitted to consider," and the court also instructed, consistently with the prosecutor's earlier comments, that "[t]o return a judgment of death, each of you must be persuaded that the aggravating circumstances are so substantial in comparison with the mitigating circumstances that they warrant death instead of life without parole."

We reject defendant's claim that by suggesting defendant did not "deserve to live," the prosecutor implied there was a presumption that anyone guilty of a special circumstance murder should be sentenced to death. "The prosecutor merely argued that the balance of aggravating and mitigating evidence in this case favored death over the alternative of life imprisonment without possibility of parole." (*People v. Arias* (1996) 13 Cal.4th 92, 177 [51 Cal.Rptr.2d 770, 913 P.2d 980].) We conclude that, viewing the challenged comments in context, the prosecutor merely informed the jury that in his view, in light of the evidence in aggravation, defendant had insufficient redeeming qualities to warrant a sentence of life rather than death.

Defendant also argues that the prosecutor's use of the word "forgive" constituted "a brazen attempt to improperly inflame the jurors' passions and prejudices by making them think that returning a sentence of life without possibility of parole was the equivalent of at least partially condoning [defendant's] actions." We agree with the People that, when viewed in the context of the remainder of the prosecution's argument, the prosecutor simply and properly was asserting that although the jury may consider sympathy and mercy, defendant was unworthy of such sympathy or mercy. We also agree that there is no reasonable likelihood that the jury was misled as defendant claims.

In a related vein, defendant asserts that the prosecutor's entreaty that the jury should grant defendant as much "sympathy and mercy" as he gave the victim while she was being "terrorized" constituted an improper appeal to the jury's passion and prejudice. We previously have rejected this argument (e.g., *People v. Ochoa* (1998) 19 Cal.4th 353, 464-465 [79 Cal.Rptr.2d 408, 966 P.2d 442]) and do so here as well.

### iv. *Argument concerning "victim impact"*

Defendant asserts that the prosecutor improperly argued facts not in evidence in explaining why he had presented no evidence concerning the victim or the impact of the crime on her family.[26] We have rejected similar claims in the past (e.g., *People v. Sanders* (1995) 11 Cal.4th 475, 548-550 [46 Cal.Rptr.2d 751, 905 P.2d 420] (*Sanders*)) and do so here as well. As in *Sanders*, we find that the prosecutor did not dwell upon irrelevant facts or lead the jury to be overcome by emotion; nor, for that matter, did the prosecutor refer to any facts concerning the victim or her family outside the record or unknown to defendant. (*Id.*, at p. 550.)

---

[26]The prosecutor noted that defendant had presented evidence concerning his family and background, but that "we didn't hear anything about the victim" or "her family." The prosecutor proceeded to explain that the death penalty statute did not permit such evidence, and "[t]hat's the way it is . . . that's the rules that we have to abide by." Subsequently, the high court made clear in *Payne v. Tennessee* (1991) 501 U.S. 808 [111 S.Ct. 2597, 115 L.Ed.2d 720], that such victim impact evidence is admissible.

### 3. *Limitations on defense expert testimony*

 Defendant presented extensive expert testimony of psychologist and "social historian" Gretchen White concerning factors in mitigation of penalty. Defendant asserts that the trial court erroneously sustained two objections by the prosecutor to Dr. White's testimony.

Dr. White testified that she had been asked by the defense to prepare a psychological history and background report concerning defendant. She described how defendant's chaotic and unstable family life affected his ability to cope, his sense of individuality, and his sense of self-esteem. She explained that, in her opinion, defendant's problems in these areas were influenced primarily by the psychological makeup of his parents and their inability to care properly for their eight children. The witness reported that both parents had alcohol problems and all of the children had drug problems, but that as a general matter there was no ongoing violence in the family.

Defense counsel next asked Dr. White whether there were any sexual infidelities or related improprieties in the family. The prosecutor objected and requested an offer of proof. Outside the presence of the jury, Dr. White asserted that testimony regarding such matters "is very routine" in evaluating a family and its effects on a person. Dr. White explained that during interviews defendant's parents accused each other of sexual infidelity, and defendant's siblings claimed that they were aware of, and affected by, the infidelity in the sense that it "provide[d] a sort of confusing element to the family that was already pretty confused." Dr. White also revealed that during her interviews with defendant and three of his siblings, she was told that defendant's mother, when intoxicated, accused her children of being gay, attempted to seduce one of defendant's brothers, and told defendant that he was "probably sexually better than his father." In response to the prosecutor's further objection that testimony concerning such specific allegations of sexual impropriety would constitute inadmissible hearsay, the trial court ruled as follows: "[Dr. White] will be allowed to testify that following the separation of the parents, as further evidence of the lack of communication between the parents and failure of the parents even to inform the children that the marriage was breaking apart, the father began to date other women without informing the children of the status of his marriage to the mother, and that the mother, on occasion in fits of intoxication, made sexually inappropriate remarks about or to the children. [¶] I believe that further detail than that is not appropriate under the circumstances."

Defense counsel immediately responded, "I have no problem with that. No wish to embarrass anyone in this matter."

Defendant now asserts the trial court erred in ruling as it did. He argues that "the excluded [detailed evidence] would have helped explain, though

obviously not excuse, [defendant's] acts" and that the trial court committed federal constitutional error under *Skipper v. South Carolina* (1986) 476 U.S. 1 [106 S.Ct. 1669, 90 L.Ed.2d 1] and related cases in excluding such mitigating evidence over objection.

We disagree. First, defense counsel expressly acceded to the trial court's limitation on the evidence that Dr. White would be able to relate to the jury as the basis for her opinion. Accordingly, defendant has waived any claim of error. (*People v. Mickey* (1991) 54 Cal.3d 612, 689 [286 Cal.Rptr. 801, 818 P.2d 84]; *People v. Gordon* (1990) 50 Cal.3d 1223, 1264-1265 [270 Cal.Rptr. 451, 792 P.2d 251] (*Gordon*), overruled on another point in *People v. Edwards* (1991) 54 Cal.3d 787, 835 [1 Cal.Rptr.2d 696, 819 P.2d 436].)

In any event, there was no prejudicial error. The jury was allowed to hear and consider the essence of the mitigating evidence. Dr. White testified, as she had proposed, that defendant's father began dating other women after defendant's mother moved out of the family home, that defendant's parents did not tell the children that their marriage was breaking up, and that these events were significant *not* because they showed sexual infidelity, but because they demonstrated the absence of communication, and resulting confusion, within defendant's family. The witness explained that the family is a "building block" for development of coping and related skills and that defendant's family interfered with and impaired his ability to develop such socialization skills (and that defendant's drug and alcohol use caused further impairment in this regard). Dr. White also testified that when defendant's "mother was very intoxicated, she would say things of sexual impropriety to various children, both the boys and the girls" and that these comments were "[v]ery inappropriate for a mother." It appears that Dr. White was not restricted in rendering her opinion concerning the mitigating weight of defendant's background, and we find it difficult to believe that the excluded evidence concerning the sparse proffered details of defendant's mother's inappropriate sexual comments to her children would have "helped to explain" defendant's sexual misconduct in this case.

The second sustained objection to Dr. White's testimony related to her statement that she did not believe that "everybody has the same degree of free will." Defense counsel next asked, "because of all the things we've discussed in the past couple of days, would you say that [defendant] didn't have any choice but to kill Kim Hickman?" The prosecutor objected to the question as being improper, and the court sustained the objection. Defense counsel asserted he would "ask it another way," and inquired, "[w]ould you say that [defendant] had no other option but to kill this woman?" The trial court again sustained the prosecutor's objection, and ruled that Dr. White would be allowed to "testify to [defendant's] . . . ability to make knowing

and correct choices at the time based on the lack of [socializing] building blocks and other testimony that [Dr. White] has given here today, but whether he had a choice in the matter is not within the province of this witness to say." Dr. White proceeded to testify that defendant had difficulty reining in his impulses, and declining to act on his impulses.

Defendant asserts that defense counsel was "rhetorically asking" an "inflammatory question" with the expectation that Dr. White would answer "No," but then would proceed to explain (i) that "in her expert opinion [defendant's] social history and addiction to drugs were mitigating in that they nevertheless impair[ed] his ability to choose appropriately on the day of the charged crimes," and that (ii) "it is a 'myth' that different people have 'equally autonomous free choice' and [thus defendant's] background impaired his ability to choose appropriately during the charged acts." Although Dr. White was not allowed to answer the "rhetorical" question as posed, the witness did testify consistently with the gist of defendant's proposed statement, and in any event nothing in the trial court's ruling would have prevented Dr. White from testifying exactly as defendant proposes now. Once again, we perceive no prejudicial error in the trial court's ruling.

Defendant also asserts that the trial court's ruling left the jury with the mistaken impression that defendant sought to argue he had no choice but to kill the innocent victim in this case and bore no blame for her death, and further contends that the jury was thereby "no doubt enraged," leading to the possibility that the verdict was based upon "caprice and emotion." (*Gardner v. Florida* (1977) 430 U.S. 349, 358 [97 S.Ct. 1197, 1204, 51 L.Ed.2d 393].) We find that conclusion to be unduly speculative, and in any event nothing prevented defense counsel from clarifying the point and emphasizing to the jury that his original questions were merely rhetorical, if indeed they were.[27]

4. *Limitation on defense argument*

Defendant asserts the trial court improperly prevented him from rebutting the prosecutor's closing argument by pointing to other crimes that allegedly were more egregious than his, and yet did not result in the death penalty. The prosecutor argued that in his "estimation, there are three kinds of killers," as follows:

---

[27]Finally, in a related vein, defendant asserts that the prosecutor committed misconduct by accusing Dr. White, through his questioning, of withholding from the prosecution requested information concerning her professional background (for example, all courts in which she had qualified as an expert, a list of the last 10 criminal cases in which she had testified for the defense, etc.). As revealed during cross-examination, the witness had not refused to produce such information, but instead advised the prosecution that the request was time-consuming and that she would comply with it if the prosecutor were willing to pay her normal hourly fee for compiling that information. Despite defendant's assertion to the contrary, nothing in this exchange suggested to the jury that Dr. White had shown herself willing to "break the law to help [the] defense." We perceive no misconduct, and in any event no prejudicial error.

"[Y]ou get those kinds of people that make the house payment, they try to make the car payment, they work, they have a family, they sit in traffic, and then all of a sudden something just unwinds . . . . *Maybe like the guy down in San Diego a few years ago that went into the McDonald's.*[28] That kind of a killer it's easy to understand. It's easier maybe to even have some sympathy for that person because what he did was awful, but you look at the kind of person he was. He tried to work. He tried. [¶] Then you get terrorists. . . . They . . . are cold-blooded killers, but they have some higher, although in most of our minds perverted, purpose in killing, and it is almost easier to feel better about that person, who for some religious fanatical reason, at least has some logic behind it. . . . [¶] And then you have the third kind, the predator. The base antisocial killer, the type of killer that [defendant] is. The type of person who robs rather than works. Who commits burglaries in order to get money for his alcohol and his drugs . . . . He indulges himself by victimizing other people. The kind of person who kills, as [defendant] did, because it's better than being caught for a burglary. . . ." (Italics added.)

Defense counsel, in his rebuttal argument, asked the jury to focus upon the question, "is the death penalty the only appropriate one in this case," and argued, based upon other cases, that it was not: "Consider, those of you who may have listened to the news this morning . . . before you came here, the Florida case of the five youngsters. Now, that is a bad person. That's somebody who is deliberately going out finding people to kill. . . ." By contrast, counsel argued, defendant had been "involved in violence" only this one time. Defense counsel then continued: "If you think about it, earlier this year there was a case of a young man over in Salinas, Mr. Baca." At that point, the prosecutor objected, and outside the presence of the jury, the court heard arguments concerning the propriety of such intercase proportionality evidence.

Defense counsel argued that he proposed to offer such evidence (and that he also planned to mention the "trailside killer" case[29] and the "Sirhan" case[30]) in order to illustrate his thesis that defendant was not the "worst of the worst," and therefore he did not deserve the death penalty when others who had committed worse crimes were not also given the death penalty. The prosecutor responded that there were various reasons why these and other similar cases did not result in an enforced death penalty (e.g., the Baca case

[28]The prosecutor apparently was referring to the case of the person who entered a McDonald's restaurant in San Ysidro and killed 21 persons. (See *Lopez v. McDonald's Corp.* (1987) 193 Cal.App.3d 495 [238 Cal.Rptr. 436].)

[29]See *Carpenter, supra,* 15 Cal.4th 312, and *People v. Carpenter* (1999) 21 Cal.4th 1016 [90 Cal.Rptr.2d 607, 988 P.2d 531].

[30]See *People v. Sirhan* (1972) 7 Cal.3d 710 [102 Cal.Rptr. 385, 497 P.2d 1121].

resulted in a plea agreement; and in the Sirhan case, a jury did impose the death penalty, but the law later was declared unconstitutional). The prosecution stated further that if such argument were allowed, he should be allowed to inform the jury of the facts of each of the cited cases and explain to the jury why the death penalty was not imposed in each particular case.

The trial court sustained the prosecutor's objection, ruling as follows: "[I]t would be fair comment for you to say, as you have already said, that if [defendant] were sentenced to life in prison without possibility of parole, he may very well number amongst his cell mates people who have committed more atrocious crimes [than] he. [¶] . . . I will permit you a thorough and complete elaborating on your point that the penalty should be reserved for, as you said, the worst of the worst, but you can make that argument thoroughly and completely without using examples of cases that you perceive to be more atrocious wherein the death penalty was not meted out. . . ." Defense counsel responded, "That's fine."[31]

We have upheld similar exercises of trial court discretion to control the scope of oral argument by refusing to allow defense counsel to compare the subject crime to other well-known murders. (E.g., *People v. Roybal* (1998) 19 Cal.4th 481, 528-529 [79 Cal.Rptr.2d 487, 966 P.2d 521]; *People v. Marshall, supra,* 13 Cal.4th 799, 853-855; and *Sanders, supra,* 11 Cal.4th 475, 554-555.) Here, as in *People v. Roybal, People v. Marshall,* and *Sanders,* defendant was permitted to make his central point and to argue in general terms that there were "worse cases" than his, in which the death penalty had not been meted out.

Defendant suggests that these decisions are distinguishable because in the present case, he was attempting to rebut the prosecutor's own intercase proportionality discussion. This argument was not advanced in the trial court when counsel was attempting to explain to the court why his proposed intercase proportionality discussion should be allowed, and in any event, as the People observe, the prosecutor's fleeting reference to the McDonald's killings hardly constituted the detailed proportionality review proposed by defense counsel. We find no abuse of the trial court's discretion and no error.

5. *Trial court's response to jury's note*

After approximately three and one-quarter hours of deliberation, the jury sent a note to the court, stating: "We need clarification on necessity of unanimity," and "What if we are undecided, what will the result be?" The

---

[31]The People do not assert that trial counsel thereby waived defendant's present claim on appeal, and it would be inappropriate to view this statement as anything more than an acknowledgement by counsel that he understood and would abide by the court's ruling.

trial court met with counsel for the parties outside the presence of the jury, and, regarding the second question, stated: "The law is that [in the event of a deadlock] the Court is required to impanel a new jury and try the penalty phase over again. [I'm n]ot real sure how appropriate it is for the jury to know that." Defense counsel immediately agreed that the jury should not be informed of the consequences of deadlock, stating, "I think that giving them that kind of information is tantamount to giving them the basic dynamite instruction." The trial court responded that it did not view the precise objection cited by defense counsel "as being a problem," and noted that "so-called dynamite instructions, are criticized because they put pressure on minority jurors." But, the trial court stated, "[w]hat I don't want this jury to do is basically abdicate their responsibilities by saying, well, if we don't do it, someone else will come in and perhaps the next jury can reach a decision." The prosecutor asserted that the jury's question appeared to be premature.

The jury was called back into the courtroom, and the court asked the foreperson to clarify the first question. The juror responded: "The question is *if per chance* the jury is not unanimous for the death penalty, *if* there are some jurors who are not convinced, would we continue to argue or would we accept that as the jury's result and the Court would impose the alternative life imprisonment?" (Italics added.) The court replied, "I take it that leads to the second question, what if we were undecided, what will the result be?" The juror responded, "That's right."

The trial court proceeded to explain that it would answer only the first of the jury's two questions, and stated, "[t]o the extent that your question is must the jury be unanimous, the answer very definitely [is] yes. This jury cannot return a verdict as to either penalty unless it is the unanimous verdict of this jury."

Concerning the jury's second question, the court stated: "What will happen if this jury is unable to decide on a verdict probably isn't an appropriate subject of discussion at this time. For many reasons, I would prefer not to get into discussions of what will happen if this jury is unable to reach a verdict, rather than simply direct you to continue your deliberations and to continue your discussions and your sharing of your thoughts among yourselves in an effort to reach a verdict. How long that process will take, how long your deliberations will take, of course, is entirely in your province. [¶] . . . I would like to say this about the subject of being undecided. You have . . . had this case for approximately three and a half hours at this point, and . . . you did take one 15-minute break, so approximately three and one quarter hours have been spent on deliberations in this case. [¶] . . . I will direct you to continue your deliberations and reach a verdict, if you can. To

answer your first question, that verdict, if there is to be a verdict by this jury, must be unanimous. Whether we will at some point later discuss the question of what will happen if this jury is unable to reach a verdict, I will simply put off at this point. I will not answer that question. I will consult further with counsel on that issue, but in—I think it's a little premature at this time to be discussing that particular subject."

Jury deliberations continued for approximately 40 minutes and then recessed for the night, resuming the next morning. After approximately an hour and 10 minutes, the jury returned to the courtroom and announced its verdict of death.

 Defendant asserts that the trial court erred in failing to instruct the jury concerning the consequences of a deadlock, and to clarify that a deadlock would result in a penalty retrial instead of automatic imposition of a sentence of life without the possibility of parole. We agree with the People that this claim is waived by defense counsel's agreement with the trial court that informing the jury of the consequences of a deadlock would have been improper. (*Rodrigues, supra,* 8 Cal.4th 1060, 1193.)

In any event, we also would reject the claim on its merits. In *Rodrigues, supra,* 8 Cal.4th 1060, a trial court gave a similar response to a jury's essentially identical request for information concerning the consequences of a deadlock. We held, as we have in numerous other cases presenting the same question, that "[t]he trial court 'is not required to "educate the jury on the legal consequences of a possible deadlock." ' " (*Id.,* at p. 1193; see also *People v. Hines* (1997) 15 Cal.4th 997, 1075 [64 Cal.Rptr.2d 594, 938 P.2d 388], and cases cited.) Especially in a case like this—in which it was not clear that there *actually was* any deadlock—an instruction informing the jury of the consequence of a deadlock "would have diminished the jurors' sense of duty to deliberate, and to be open to the ideas of fellow jurors. *The effect of a hung jury is irrelevant to the jury's deliberation of any issue before it.*" (*People v. Rich* (1988) 45 Cal.3d 1036, 1115 [248 Cal.Rptr. 510, 755 P.2d 960], italics added.)

Defendant attempts to distinguish prior decisions rejecting his claim, on the ground that the jury in the present case assertedly made it clear it was operating under the erroneous assumption that in the event of a deadlock, there would not be a penalty phase retrial, but that instead the trial court would impose a sentence of life without possibility of parole. It is not clear that defendant's premise is correct, and that the jury even initially labored under such a misunderstanding of the law. Moreover, contrary to defendant's premise, we have no reason to believe that the jury continued to labor under any such assumed misunderstanding after having been told by the court that such a question was premature and would be addressed, if at all, only later,

in the event the jury was unable to reach a verdict. We conclude that under the circumstances presented, the trial court did not err by informing the jury as it did, that the jury's second question, concerning a possible deadlock, would not be answered at that time.

### 6. *Refusal to instruct concerning mercy*

In a supplement to his opening brief, defendant asserts that the trial court erred in refusing to give the jury defendant's requested instructions concerning mercy, and that in the absence of such instructions, there is a substantial likelihood that the jury believed it was precluded from considering relevant mitigating evidence.[32]

As noted above, the trial court instructed the jury pursuant to CALJIC No. 8.85 that it was to consider, if applicable, "any other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime and any sympathetic or other aspect of the defendant's character or record that the defendant offers as a basis for a sentence of less than death, whether or not related to the offense for which he is on trial." The court also instructed that the jury was "free to assign whatever moral or sympathetic value you deem appropriate to each and all of the various factors you are permitted to consider."

We repeatedly have held that a trial court need not give a specific "mercy instruction," even if requested, when the above quoted instructions are given (e.g., *Rodrigues, supra,* 8 Cal.4th 1060, 1187-1188, and cases cited), and we reaffirm that conclusion here. We find no reason to believe that the jury may have been misled about its obligation to take into account mercy or any of defendant's mitigating evidence in making its penalty determination.

### 7. *Constitutional claims*

#### a. *The statutory "death eligibility" process*

Defendant asserts California's homicide and death penalty statutes do not sufficiently narrow the class of homicide offenders eligible for the death penalty. We have rejected this claim in numerous decisions and decline to

---

[32]The requested instructions were as follows:

"You are not required to find any mitigating circumstances in order to make a recommendation of mercy that is binding on the trial court."

"You need not find any mitigating circumstances in order to return a sentence of life imprisonment. A life sentence may be returned regardless of the evidence."

"However, it is not essential to a decision to impose a sentence of life imprisonment without the possibility of parole that you find mitigating circumstances. You may spare the defendant's life for any reason you deem appropriate and satisfactory."

"In determining whether to sentence the defendant to life imprisonment without the possibility of parole, or to death, you may decide to exercise mercy on behalf of the defendant."

conclude differently here. (See, e.g., *Bolin, supra,* 18 Cal.4th 297, 345; *People v. Barnett* (1998) 17 Cal.4th 1044, 1179 [74 Cal.Rptr.2d 121, 954 P.2d 384] (*Barnett*), and cases cited; *People v. Scott* (1997) 15 Cal.4th 1188, 1228 [65 Cal.Rptr.2d 240, 939 P.2d 354].) Defendant also asserts that the prosecutorial discretion permitted under our statutes renders California's death eligibility process unconstitutional. Again, we have rejected this claim in numerous decisions and decline to reconsider them now. (See, e.g., *Bolin, supra,* 18 Cal.4th at p. 345; *Barnett, supra,* 17 Cal.4th at p. 1179, and cases cited; *Scott, supra,* 15 Cal.4th at p. 1228; *People v. Kirkpatrick* (1994) 7 Cal.4th 988, 1024 [30 Cal.Rptr.2d 818, 874 P.2d 248].)

b. *Miscellaneous instructional claims concerning "core adjudicative principles"*

Defendant faults the trial court for failing to alter the standard instructions given in capital cases by instead requiring the jury to: (i) find proof beyond a reasonable doubt of aggravating factors, (ii) find beyond a reasonable doubt that the aggravating factors outweigh the mitigating factors, (iii) find beyond a reasonable doubt the appropriateness of death, (iv) reach unanimity as to the aggravating factors, and (v) presume that life imprisonment without possibility of parole is the appropriate sentence. We have rejected similar claims, and do so here as well. (E.g., *People v. Jones* (1997) 15 Cal.4th 119, 196 [61 Cal.Rptr.2d 386, 931 P.2d 960].)

c. *Challenges to the "death selection process"*

Defendant asserts as follows: (i) allowing a jury to find aggravation based upon the circumstances of the crime (§ 190.3, factor (a)) improperly permitted consideration of a factor that is vague and overbroad because it permits dual use of evidence, from the guilt phase, in aggravation; (ii) allowing the jury to consider unadjudicated criminal activity (§ 190.3, factor (b)) resulted in an unreliable sentence, permitted consideration of a factor that is vague, and violated equal protection principles; (iii) inclusion of the adjectives "extreme" (in § 190.3, factors (d) & (g)) and "substantial" (in § 190.3, factor (g)), and the inclusion of temporal language (in § 190.3, factors (d) & (h)) impermissibly limited consideration of mitigating factors; and (iv) the trial court erred in failing to delete assertedly inapplicable sentencing factors, instruct as to which sentencing factors are aggravating and which are mitigating, exclude from the jury's consideration nonstatutory aggravating factors, and instruct on the definition of mitigation.

Again, we have rejected similar claims, and do so here as well. (E.g., *Crittenden, supra,* 9 Cal.4th 83, 156 [challenge to § 190.3, factor (a)]; *People v. Hawthorne* (1992) 4 Cal.4th 43, 76-77 [14 Cal.Rptr.2d 133, 841 P.2d 118] [challenge to § 190.3, factor (b), and claim concerning failure to exclude

nonstatutory aggravating factors]; *Samayoa, supra,* 15 Cal.4th 795, 862 [challenge to adjectives employed in § 190.3, factors (d) & (g), and claim concerning definition of mitigation];[33] *People v. Kipp* (1998) 18 Cal.4th 349, 380-381 [75 Cal.Rptr.2d 716, 956 P.2d 1169] [claims concerning deletion and designation of sentencing factors].)

Defendant also asserts that CALJIC No. 8.88, given here, is constitutionally inadequate to "channel the jury's discretion and provide a non-arbitrary, non-capricious sentencing decision" by informing the jury, consistently with section 190.3, that if, in weighing the factors in aggravation and mitigation, the jury finds that the former do not outweigh the latter, the jury must return a verdict of life imprisonment. We rejected a similar challenge in *People v. Duncan* (1991) 53 Cal.3d 955, 978 [281 Cal.Rptr. 273, 810 P.2d 131], and do so here as well.

Defendant claims that the prosecution provided inadequate notice of penalty phase evidence because the notice did not specify evidence related to the circumstances of the crime. We rejected a similar challenge in *Carpenter, supra,* 15 Cal.4th 312, 421, and do so here as well.

Defendant advances a number of other claims that we repeatedly have rejected, and that we again reject: The trial court did not err in failing to (i) require a written "statement of findings and reasons" for the jury's death verdict, (ii) instruct on lingering doubt, or (iii) instruct on the meaning of "life without possibility of parole." (*People v. Frierson* (1979) 25 Cal.3d 142, 178-180 [158 Cal.Rptr. 281, 599 P.2d 587] [written statement]; *People v. Sanchez* (1995) 12 Cal.4th 1, 77-78 [47 Cal.Rptr.2d 843, 906 P.2d 1129] [lingering doubt]; *Gordon, supra,* 50 Cal.3d 1223, 1277 [meaning of "life without possibility of parole"].)

Defendant also argues that the "multiple use and counting" of facts and circumstances as aggravating factors under section 190.3, factor (a) (circumstances of the crime), artificially inflated the statutory factors favoring death. We have rejected such claims in the past (*Barnett, supra,* 17 Cal.4th 1044, 1180), and do so here as well.

Finally, defendant asserts that recent amendments to section 667 (the "Three Strikes" law) preclude imposition of the death penalty on defendant.

---

[33]The temporal language in section 190.3, factors (d) and (h) (consideration of any extreme mental or emotional disturbance or impairment from mental disease or defect or the effects of intoxication *at the time of the offense*), did not preclude the jury from considering any such evidence merely because it did not relate specifically to defendant's culpability for the crimes committed. As the People observe, the jury also was instructed, pursuant to section 190.3, factor (k), that it could consider, if applicable, "any sympathetic or other aspect of the defendant's character or record that the defendant offers as a basis for a sentence less than death, *whether or not related to the offense for which he is on trial.*"

We have rejected such claims in the past (*People v. Alvarez* (1996) 14 Cal.4th 155, 246-247 [58 Cal.Rptr.2d 385, 926 P.2d 365]), and do so here as well.

### d. *Constitutionality of California's appellate review process*

Defendant asserts that California's appellate review process in capital cases is unconstitutional because (i) it does not require intercase proportionality review; (ii) representation by the same counsel on appeal and on habeas corpus proceedings creates a conflict of interest in regard to potential claims, on habeas corpus, of ineffective assistance of appellate counsel, and (iii) the appellate review system is impermissibly influenced by political considerations.

We repeatedly have rejected the first aspect of this claim. (E.g., *People v. Frye* (1998) 18 Cal.4th 894, 1029 [77 Cal.Rptr.2d 25, 959 P.2d 183] (*Frye*).) We considered and rejected the second and third aspects of this claim in *People v. Kipp* (2001) 26 Cal.4th 1100, 1139-1141 [113 Cal.Rptr.2d 27, 33 P.3d 450].

### e. *Cruel and unusual punishment*

Defendant asserts that the 11 years he has spent on death row awaiting his appeal constitutes cruel and unusual punishment and that execution by lethal injection is unconstitutional. We have rejected similar claims, and do so here as well. (*Frye, supra,* 18 Cal.4th 894, 1030-1032 [length of time pending appeal]; *Samayoa, supra,* 15 Cal.4th 795, 864 [method of execution].)

Defendant also asserts that his sentence is so disproportionate to his personal culpability as to "shock the conscience" or "offend fundamental notions of human dignity." (See, e.g., *People v. Padilla* (1995) 11 Cal.4th 891, 961-962 [47 Cal.Rptr.2d 426, 906 P.2d 388]; *Dillon, supra,* 34 Cal.3d 441.) Even though defendant may not be among the most heinous of murderers and his crimes may not be as abominable as some of the others we have reviewed, based upon the facts presented we cannot conclude that the sentence he received " ' "is disproportionate to defendant's 'personal responsibility and moral guilt.' " ' " (*Padilla, supra,* 11 Cal.4th at p. 962.)

### 8. *Asserted cumulative error*

Defendant asserts that cumulative error mandates reversal of the penalty judgment. We have identified only one possible significant error occurring at the penalty phase: the claim set out *ante*, part II.D.1.a. (p. 380), concerning misinstruction on aggravating evidence (the sharpened pin found in defendant's jail cell). As noted above, we conclude that defendant waived his claim of error in this regard and that in any event the error, on its own, does not

warrant reversal of the penalty verdict. Nor do we believe that any other asserted error at trial, considered in combination with this asserted penalty phase claim, warrants reversal of the penalty verdict. On this record, it is not reasonably possible that the sentencing jury would have reached a different penalty verdict had these errors (real or assumed) not occurred.

### III. Disposition

The judgment is affirmed in its entirety.

Kennard, J., Baxter, J., Werdegar, J., Chin, J., Brown, J., and Moreno, J., concurred.

Appellant's petition for a rehearing was denied April 10, 2002, and the opinion was modified to read as printed above. George, C. J., did not participate therein.